UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Lillian Roberts, Council 37, *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al*,<br><br>*Defendants*. | 1:12-CV-0046<br>(MAD)(DRH) |
| The New York State Law Enforcement Officers Union Council 82, *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1525<br>(MAD)(DRH) |
| Danny Donohue, CSEA, *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1530<br>(MAD)(DRH) |
| New York State Correctional Officers & Police Benevolent Association, Inc., *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1523<br>(MAD)(DRH) |

| | |
|---|---|
| The Police Benevolent Association of the New York State Troopers, Inc., *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1526 (MAD)(DRH) |
| The New York State Police Investigators Association, *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1527 (MAD)(DRH) |
| Police Benevolent Association of New York State, Inc., *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1528 (MAD)(DRH) |
| Kenneth Brynien, PEF, *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>The State of New York, *et al.*,<br><br>*Defendants*. | 1:11-CV-1533 (MAD)(DRH) |

| | |
|---|---|
| Hyman Kuritz, UUP, *et al.*,<br><br>                                                    *Plaintiffs,*<br><br>                    -against-<br><br>The State of New York, *et al,*<br><br>                                                    *Defendants.* | 1:11-CV-1529<br>(MAD)(DRH) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York  12224-0341

By:  Charles J. Quackenbush
      BRN 601683
      Assistant Attorney General, Of Counsel
      (518) 402-2270
      charles.quackenbush@ag.ny.gov

      Kevin P. Hickey
      BRN 509796
      Assistant Attorney General, Of Counsel
      (518) 474-4367
      kevin.hickey@ag.ny.gov

## Table of Contents

Preliminary Statement.................................................................................................... 5
Statement of the Case.................................................................................................... 6
Standard of Review under Rule 12(b) ........................................................................... 9

POINT I:
Plaintiffs cannot obtain subject matter jurisdiction
against the State of New York, its agencies or officials. ............................................. 10

POINT II:
Plaintiffs cannot obtain subject matter jurisdiction
upon which to present compensatory claims. .............................................................. 12

POINT III:
Plaintiffs cannot obtain subject matter jurisdiction
upon which to present claims based upon New York State law. .................................. 13
A.  New York State Constitutional claim ..................................................................... 14
B.  Claims presented under N.Y. CPLR Article 78 ..................................................... 15

POINT IV:
Subject matter jurisdiction over these actions
is barred under the *Younger* abstention doctrine........................................................ 16

POINT V:
New York State officials are immune from suit
under the doctrine of legislative immunity. ................................................................ 18

POINT VI:
Plaintiffs fail to State a plausible claim of a contractual entitlement to certain State contributions
towards health insurance premiums............................................................................ 20
A.  Plaintiffs have not alleged an express contract under which New York State is obliged to
contribute a fixed amount toward retiree health insurance......................................... 21
B.  Plaintiffs have not alleged a statutorily implied contract under which New York State is
obliged to contribute a fixed amount toward retiree health insurance........................ 22
C.  Contractual analysis within the context of N.Y. State Const. Art. V, §7............... 25
D.  Even if plaintiffs could demonstrate a contractual interest in a NYSHIP cost contribution
rate, no defendant has caused a "substantial impairment" of such a contract.............. 27
E.  Legitimate public purpose ..................................................................................... 29
F.  Reasonable & necessary means .............................................................................. 31

POINT VII:
Plaintiffs fail to state a cognizable due process claim. .............................................. 32

Conclusion ................................................................................................................. 34

Printed [Reproduced] on Recycled Paper

## Preliminary Statement

Before the Court are several complaints which, for purposes of this motion, shall be addressed in consolidated fashion.[1]  The complaints allege that defendants have impaired the contractual rights of plaintiffs by modifying the rate of contribution for optional health insurance. However, for the reasons discussed below, the plaintiffs cannot obtain subject matter jurisdiction over their complaints, a prerequisite to proceeding in the U.S. District Court.  In addition, individual State officials are shielded from suit under the doctrine of legislative immunity.  Even looking beyond jurisdiction and immunity, the plaintiffs fail to state any plausible claims of a constitutional violation or of a contractual entitlement to certain state contributions for health insurance premiums.

The plaintiffs in the above actions consist largely of individuals who assert that they are retired State employees who have subscribed to the New York State Health Insurance Program (NYSHIP).[2]  They are joined by several unions and current union officials.[3]  They have brought combined plenary actions and Article 78 proceedings complaining of changes to their

---

1  All of the plaintiffs assert that their cases should proceed as class actions.  Resolution of class certification issues under Fed. R. Civ. P. Rule 23 is premature.  However, since the actions share a common core of operative facts and law, and in the interest of judicial economy, the defendants respectfully submit this combined motion.

2  Information regarding the NYSHIP is available at a public website maintained by the New York State Department of Civil Service, *see* http://www.cs.ny.gov/nyship/nyship.cfm.  For a general discussion of the NYSHIP *see Handler v. DiNapoli, et al*, 88 AD3d 1187 (3rd Dept. 2011).  While the *UUP* complaint names the NYSHIP as a defendant, it is a State program, not an administrative entity.

3  Since this action is jurisdictionally barred, without conceding or waiving the issue the defense will refrain from full briefing on the issue of whether unions and their officials have standing to participate in these actions.  Nonetheless it should be noted that, in the Second Circuit, a labor organization does not have standing to assert rights of its members in a case brought under 42 U.S.C. §1983.  *See Nnebe v. Daus*, 644 F.3d 147, 156 (2nd Cir. 2011).  *See also Allied Chem.. & Alkali Workers Local Union No.1 v. Pittsburgh Plate Glass Co*., 404 U.S. 157, 172 (1971) (retirees are not represented by former unions); *Schweizer Aircraft Corp. v. Local 1752, et al*, 29 F.3d 83, 87 (2nd Cir. 1994); *Toussaint v. J.1. Weiser & Co., et al*, 2005 WL 356834 (SDNY 2/13/05) (union officials acting in official capacity, even if regarded as union itself, did not have standing to pursue ERISA claims on behalf of retirees).

Printed [Reproduced] on Recycled Paper

contribution rates for optional health insurance offered by their former employers following the State Legislature's adoption of §2 of Part A of Chapter 491 of the Laws of 2011.  In various forms each action asserts that defendants have impaired contractual rights under the State and federal constitutions, and have acted arbitrarily, capriciously, or otherwise without authority.

The defendants include the State of New York; Governor Andrew Cuomo; the New York State Department of Civil Service; Patricia A. Hite, Acting President of the Civil Service Commission and Acting Commissioner of the Department of Civil Service; the New York State Civil Service Commission; Caroline W. Ahl and J. Dennis Hanrahan, Commissioners of the Civil Service Commission; the New York State Division of the Budget; Robert L. Megna, Director of the Division of the Budget; the New York State Governor's Office of Employee Relations (GOER); Gary Johnson, Director of the GOER; Thomas P. DiNapoli, Comptroller of the State of New York; and the New York State and Local Retirement System (hereinafter, the State defendants).  The defendants respectfully submit this pre-answer Motion to Dismiss under Fed. R. Civ. P. Rule 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)6) for plaintiffs' failure to state claims upon which relief may be granted.

## Statement of the Case

Plaintiff retirees assert that they are contractually entitled to optional health insurance offered them by the State of New York, their former employer, at rates offered them at the time they retired.  They seek judgment invalidating legislation and administrative actions which have reduced their former employer's contribution rate.  They also seek monetary damages.[4]

---

4  *E.g. Council 37*, ¶¶115-117, 127, 145-147, 163, 171, 172, 177 &  " Wherefore" at (h), (i).  *Council 82*, ¶¶141, 148, 154, 158, 162, 187, 191, 197 & "Wherefore" at (j), (k).  *CSEA*, ¶¶99-101, 111, 119-121, 137, 146, 151 & " Wherefore " (h), (i).  *NYSCOPBA*, ¶¶137, 144, 150, 154, 183, 187, 193 & "Wherefore" (j), (k).  *NYSPIA*,  ¶¶120, 124, 128, 136, 159, 165, 172 155-158 & "Wherefore" (h), (j).  *NYSP PBA*, pp. 27-32, 36-39.  *PBA*, ¶¶124, 128, 132, 140, 163, 169, 176 &  "Wherefore" (h), (j).  *PEF*, ¶¶ 177, 181, 199, 208, 216, 217, 227, 228, 233 & "Wherefore" (f), (g).  *UUP*, "Wherefore" (7), (8), (9).

Printed [Reproduced] on Recycled Paper

The State of New York has long protected the interests of its employees in pension and retirement systems, deeming these contractual in nature and addressing interference therewith as impairment of contract.  *See, e.g.,* New York State Constitution Article V, §7 ("After July first, nineteen hundred forty, membership in any pension or retirement system of the State or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired").  It is equally well settled, however, that New York's statutory scheme providing options of health insurance benefits to its retirees vests no contractual rights in public employees.  Rather, it represents benefits proffered as a matter of legislative discretion.  *See*, *e.g.*, *Lippman v. Board of Education*, 66 NY2d 313 (1985) (public employer was free to reduce contribution towards health insurance premiums of retirees by 50% as Civil Service Law [CSL] §167 generates no contractual entitlement to maintain certain contributions).

In these actions the plaintiffs assert that successive collective bargaining agreements from 1982 to present, which provided for the continued availability of then-extant NYSHIP coverage, somehow created an implied contract guaranteeing State-subsidized health insurance at an unchanging cost to employees who retired during the terms of those agreements.  Plaintiffs assert that provisions of CSL §167(1)(a), which provided for various rates of State contribution towards employees' health insurance contracts, "were incorporated into" and "continued as part of the collective bargaining agreements."[5]  Plaintiffs assert that these statutory provisions, which New York courts have recognized as discretionary legislative declarations of policy (*see Lippman*), in some way have become fixed contractual rights of retirees, divesting the Legislature of its power to adjust State employer's contribution rates.[6]

Article 11 of the Civil Service Law authorizes the establishment of a health benefit plan

---

5  *E.g. UUP*, ¶¶ 92-108.  *PEF*, ¶¶ 77-91.  *CSEA*, ¶¶ 37-60.

6  *E.g.  NYSCOPBA*, ¶¶ 63-80.  *Council 37*, ¶¶ 59-77.  *CSEA*, ¶¶ 37-60.

Printed [Reproduced] on Recycled Paper

for employees of the State of New York and various school districts and municipalities throughout the State.  Civil Service Law §163(3) allowed retired employees to subscribe.  It also authorized the President of the Civil Service Commission to establish rules for participation in the plan by both employees and retirees.  As is discussed further below, under CSL §161(1) the President of Civil Service has held the authority and duty to "establish a health benefit plan for State officers and employees and their dependents. . . ."  She has the authority to exclude types of coverage by regulation and is expressly authorized to impose deductibles and coinsurance mandates for some or all benefits.  These broad and flexible powers are to be used toward the goal of maintaining the NYSHIPs long-term stability.  CSL §161(2).

Until 1983, the State paid 100% of government-subsidized health insurance premiums for retirees.  In 1983, the Legislature amended CSL §167(1)(a) to reduce the State's contribution for employees who retired after that date to specified rates.  The amended statutory contribution rate was maintained until 2011, when the Legislature amended CSL §167(8) in §2 of Part A of Chapter 491 of the Laws of 2011.

From 1983 until 2011, CSL §167(8) permitted collective bargaining agreements to authorize increases in State contributions towards health insurance coverage for current employees only.  In 2011, the Legislature amended §8 by, among other things, authorizing negotiated changes to the State's contribution towards employee health insurance coverage.  The amended statute expressly permitted the President of the Civil Service Commission, with the approval of the Director of the Budget, to extend such a modification to those not covered by a negotiated agreement - - including retirees.

It is undisputed that in the spring of 2011 the State of New York and several collective bargaining units negotiated new contracts containing agreements for specific reductions in the

8

State's contribution rates towards the employees' health insurance.[7]  Thereafter, the Department

of Civil Service and the Division of the Budget authorized modifications to NYSHIP rate

changes for retirees, which became effective in October of 2011.[8]  On October 12, 2011, the

Department of Civil Service caused a notice of emergency rulemaking to be published in the

New York State Register.[9]  The rule described the extension of NYSHIP premium increases

under the CSEA contract to retirees.  *See* 4 NYCRR 73.12.

As demonstrated below, the plaintiffs cannot obtain subject matter jurisdiction to litigate

these claims.  Jurisdiction is precluded by the Eleventh Amendment, sovereign immunity,

abstention principles and legislative immunity.  Moreover, plaintiffs fail to state a plausible

claim that they had a contractual right to compel a specific State contribution, much less a claim

that that right was unconstitutionally impaired.  Failing to establish any vested right under a

contract, plaintiffs' due process claims similarly fail to state a cause of action.

### Standard of Review under Rule 12(b)

Defendants move to dismiss the plaintiffs' complaints in their entirety pursuant to FRCP

12(b)(1) and 12(b)(6).  In reviewing a motion to dismiss under Rule 12(b)(1), the court "must

accept as true all material factual allegations in the complaint, but [is] not to draw inferences

from the complaint favorable to plaintiffs."  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107,

110 (2nd Cir. 2004) (*citation omitted*).  "A plaintiff asserting subject matter jurisdiction has the

burden of proving by a preponderance of the evidence that it exists."  *Morrison v. National*

*Australia Bank Ltd.*, 547 F.3d 167, 170 (2nd Cir. 2008) (*citation omitted*).  Since dismissal of an

---

7  *E.g. CSEA*, ¶77.  *PEF*, ¶128.  *UUP*, ¶118.

8  *E.g. Council* 37, ¶¶ 88-91.  *NYSPIA*, ¶100.  *UUP*, ¶¶111-115, 120.

9  The rule is published at an informational web page maintained by the New York Department of State.
*See* http://www.dos.State.ny.us/info/register/2011/oct12/pdfs/rules.pdf.

Printed [Reproduced] on Recycled Paper

action for lack of subject matter jurisdiction renders all other accompanying defenses and motions moot, courts will generally consider a 12(b)(1) motion before ruling on other bases for dismissal. *See United States ex rel Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155-56 (2nd Cir. 1993), *cert. den. sub nom*; *Kreindler & Kreindler v. United Techs. Corp.*, 508 U.S. 973 (1993); *Magee v. Nassau County Medical Center*, 27 F.Supp. 2d 154, 158 (EDNY 1998) (disposition of a Rule 12(b)(6) motion involves merits and is an exercise of jurisdiction). With jurisdiction at issue a court may look to evidence outside the pleadings without treating the motion as one brought under Rule 56. *LeBlanc, et al v. Cleveland, et al*, 198 F.3d 353, 356 (2nd Cir. 1999); *Filetech S.A. v. France Telecom, S.A.*, 157 F.3d 922, 932 (2nd Cir. 1998).

On a motion to dismiss under Rule 12(b)(6), on matters other than jurisdiction a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2nd Cir. 2009) (*citation omitted*). "[A] complaint must contain sufficient factual matter, accepted as true, to State a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*citation omitted*). The court is "not bound to accept as true legal conclusions couched as factual allegations." *Id.* at 1950–51. "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 430 (2nd Cir. 2011).

## POINT I

### Plaintiffs cannot obtain subject matter jurisdiction against the State of New York, its agencies or officials.

Plaintiffs have named as defendants the State of New York, the New York State Department of Civil Service, the New York State Civil Service Commission, the New York State

Printed [Reproduced] on Recycled Paper

GOER and the New York State and Local Retirement System.  The Governor and various State officials are named as well.  All federal question claims against these defendants are presented via 42 U.S.C. §1983.[10]   However, the defendants are entitled to dismissal of all such claims. The State of New York, its agencies and officials are not "persons" amenable to suit under §1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *see also Caroselli v. Curci*, 371 Fed. Appx. 199, 202 (2010); *Huminski v. Corsones*, 396 F.3d 53, 70 (2nd Cir. 2005); *Lieder v. New York State Comptroller's Office of Unclaimed Funds*, 837 F.Supp. 512, 513 (EDNY 1993) (State Comptroller not a "person," foreclosing subject matter jurisdiction).

Moreover, these defendants are protected from suit by the doctrine of sovereign immunity.  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  A State is immune from suits in federal court that are brought by its citizens, unless that State consents. *See Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974); *McGinty v. New York,* 251 F.3d 84, 91 (2nd Cir. 2001).

Governmental agencies acting under State control enjoy the protection of Eleventh Amendment immunity as well.  *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993).  The Department of Civil Service, the Civil Service Commission, the Division of the Budget, the GOER, the Office of the Comptroller and the New York State and Local Retirement Systems are all agencies of the State of New York against which subject matter jurisdiction is precluded.  *Cf. Hall v. Ruggeri,* 841 F.Supp. 484, 486 (NDNY 1994) (granting motion to dismiss claims against other State entities under Rule 12(b)(1) based on 11th Amdt. immunity).  The immunity extends to State officials as well.  *P.R. Aqueduct,* 506 U.S. 139, 145-

---

10  *E.g. Council 82*, ¶¶2, 155-158; *NYSCOPBA*, ¶¶2, 151-154; *NYSP PBA*, ¶2, 129-133.

Printed [Reproduced] on Recycled Paper

46 (1993); *Will,* 491 U.S. at 71; *Pennhurst State School & Hospital v. Halderman, et al,* 465 U.S. 89, 105-106 (1984); *Alliance of American Insurers v. Cuomo,* 854 F.2d 591, 604 (2nd Cir. 1988).[11]   For all of these reasons plaintiffs' actions must be dismissed under Rule 12(b)(1).

## POINT II

### Plaintiffs cannot obtain subject matter jurisdiction upon which to present compensatory claims.

Insofar as plaintiffs seek compensatory relief[12] it is well established that "neither a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] §1983." *Will v. Michigan,* 491 U.S. at 71 (1989).   Therefore, no defendant can be sued in their official capacities for such retrospective relief under §1983. *Id.*

Sovereign immunity is a deeply rooted doctrine which is not necessarily dependent upon, nor defined by, the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193 (2006).   Unless a State has explicitly and unequivocally consented, it is immune from private suit in federal court. *See Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974); *McGinty v. New York,* 251 F3d 84, 91 (2nd Cir. 2001).

Section 1 of the Fourteenth Amendment contains no abrogation of New York's sovereign immunity from damages claims arising from alleged violations of the United States Constitution. *See, e.g.*, *Santiago v. New York State Dept. of Correctional Services*, 945 F.2d 25, 30 (2nd Cir. 1991) (dismissing claims for compensatory and exemplary damages against State alleging equal

---

11  Under §1983 the plaintiffs are obliged to show that an individual State actor has infringed on a particular federally protected right. *E.g. Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *EVAC, LLC v. Pataki, et al*, 89 F.Supp.2d 250 (NDNY 2000).  Plaintiffs have described no action by any defendant which might fulfill the "individual conduct" requirement of §1983 or which might justify application of the narrow exception set out in *Ex parte Young,* 209 U.S. 123 (1908).

12  *E.g. PBA*, at ¶124, 128, 132, 140, 163, 169, 176 & "Wherefore" (h) and (j); *NYSPIA*,  ¶120, 124, 128, 136, 159, 165, 172 155-158 & "Wherefore" at (h) and (j); *UUP*, "Wherefore" (7), (8) and (9).

Printed [Reproduced] on Recycled Paper

protection violation in State employment); *Quern v. Jordan*, 440 U.S. 332 (1979) (jurisdictional

bar must be enforced even when claim ostensibly arises under U.S. Constitution).[13]

It is generally true that suit may be brought against State officials under §1983 in their

individual capacities for both prospective and retrospective relief.  S*ee*, *e.g.*, *Hafer v. Melo*, 502

U.S. 21, 23 (1991); *Posr v. Court Officer Shield #207*, 180 F.3d 409, 414 (2nd Cir. 1999).

However, a suit seeking a money judgment which must be paid from the State treasury is barred

by the Eleventh Amendment even when nominally asserted against an individual official.

*Edelman*, 415 U.S. at 663; *McGregor v. Goord, et al*, 18 F.Supp.2d 204, 210 (1998).  The

plaintiffs seek reimbursement of premiums paid into the NYSHIP in excess of the percentage

rates described in CSL §167(1)(a).  In each of the federal actions, every individual defendant has

been identified in their capacity as a State official.  In no sense do the plaintiffs assert that any

individual defendant has engaged in personal conduct causing a federally cognizable injury.  In

all respects, the plaintiffs claims implicate only the State and its agencies.

### POINT III

**Plaintiffs cannot obtain subject matter jurisdiction
upon which to present claims based upon New York State law.**

In these actions, the plaintiffs seek to have this Court issue injunctions and direct the

payment of compensatory damages on the basis of their interpretations of Chapter 491 of the

Laws of 2011, the Civil Service Law and New York State regulations.  The Supreme Court has

consistently recognized that the Eleventh Amendment bars exactly this sort of federal intrusion.

As the Court emphasized in *Pennhurst*,

> in such a case the entire basis for the doctrine of *Young* and *Edelman* disappears.
> A federal court's grant of relief against State officials on the basis of State law,

---

13  *Cf. Association of Supreme Court Reporters v. New York State*, 940 F2d 766 (2nd Cir. 1991) in which
the Court could prospectively direct State to not lag pay - the effect on the treasury was deemed only
ancillary to the forward-looking equitable relief.

Printed [Reproduced] on Recycled Paper

whether prospective or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on State sovereignty than when a federal court instructs State officials on how to conform their conduct to State law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst*, 465 U.S. at 106.

## A.  New York State Constitutional claim

The plaintiffs contend that the extension of a NYSHIP cost contribution increase to retirees constitutes an impairment of contractual rights protected under N.Y. State Constitution Article I, §6.[14]  They declare that CSL §167(1)(a), by virtue of its duration and history of bargaining agreements which have incorporated it by reference, entitles retirees to a static NYSHIP cost contribution percentage.  They go on to argue that official defendants have misconstrued and misapplied CSL 167(8) in violation of N.Y. Const. Art. I, §6.[15]

It is well settled that New York has not waived its immunity from suit in federal court for claims based upon violations of State law.  *See Richardson v. N.Y. State Dept. of Corr. Servs.*, 180 F.3d 426, 432, 447–49 (2nd Cir. 1999).  Still, the plaintiffs presuppose that, if defendants' actions under CSL Article 11 can be shown to have violated the State Constitution, this will form a basis for federal relief against the State.  However, even if the agencies (or their officials) could be shown to have misapplied the Civil Service Law or in some way infringed upon N.Y. Const. Art. I, §6, such events cannot cause New York to forfeit its constitutional immunity.  In the words of the Supreme Court, such a theory "is out of touch with reality."  *Pennhurst* at 106-107.

---

14  N.Y. Const. Art. I §6 provides that "[no] person shall be deprived of life, liberty or property without due process of 1aw."  From that language courts have found that "the State may not deprive a party to a contract of an essential contractual attribute without due process of law."  *Patterson v. Carey*, 41 NY2d 714, 720-21 (1977).

15  *E.g. CSEA*, ¶1, 2, 138-151 and "Wherefore" (c); *PEF*,  ¶ 2, 220-233; *Council 37*, at ¶ 2, 3, 164-177 and "Wherefore" (c).

Printed [Reproduced] on Recycled Paper

The Court has made clear that federal relief cannot be ordered against State officials for failing to properly construe State laws or carry out their duties under such laws. *Id*. at 109; *see also Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690 (1949). Moreover, a federal suit cannot be predicated upon alleged violations of State statutes which assign discretionary duties - as such, it is impossible for plaintiffs to demonstrate that New York officials have taken *ultra vires* actions.[16] *Id*. at 110-111. "Where . . . the exercise of authority by State officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Rizzo v. Goode,* 423 U.S. 362, 378 (1976) (*quoting Stefanelli v. Minard,* 342 U.S. 117 (1951)). This Court should affirm New York sovereignty and decline to compel defendants to comply with plaintiffs' unilateral interpretation of State laws.

**B. Claims presented under N.Y. CPLR Article 78**

The plaintiffs invoke CPLR 7804 and contend that the extension of a NYSHIP cost contribution increase to retirees is arbitrary, capricious and contrary to law.[17] Whether the plaintiffs seek to challenge officials' interpretations of CSL §167(8), their promulgation of regulations or the propriety of the Civil Service President's appointment,[18] such claims cannot be

---

16 *E.g. Council 82,* ¶¶163-170, 173-175, 179-180, 184-185, "Wherefore" (e). *NYSP PBA*, pp. 32-35. *UUP*, ¶¶130, 149, "Wherefore" ¶6.

17 Art.78 claims appear in the plaintiffs' complaints as follows: *Council 37*, ¶¶5, 39-40, 149, 163. *Council 82*, ¶¶5, 177-87, "Wherefore" (h). *CSEA*, ¶¶30-31, 123, 137 [no explicit cite to Art.78]. *NYSCOPBA*, ¶¶5, 173-83, "Wherefore" (h). *NYSP PBA*, ¶¶5, 145-52. *NYSPIA*, ¶¶149-65. *PBA*, ¶¶158-69. *PEF*, ¶¶195, "Wherefore" (d) [no explicit cite to Art.78]. *UUP*, ¶¶1, 130, 154-63, "Wherefore" (7).

18 *E.g. Council 82*, ¶¶111-120. In December of 2010 the previous Civil Service Commissioner and President, Nancy G. Groenwegen, resigned from the agency to assume a post as General Counsel to the Comptroller. On 12/22/10, pursuant to Public Officers' Law §9, Ms. Groenwegen - who was still the Civil Service President - designated Patricia A. Hite as a Deputy, authorized and sworn to perform all duties of the head of the Department in the event of Ms. Groenwegen's absence or other inability. Thus, while Ms. Hite has not been formally appointed as Civil Service President, she continues to carry out the duties and functions properly designated to her.

Printed [Reproduced] on Recycled Paper

pursued in this Court.  The State of New York has not empowered the federal courts to hear

Article 78 claims.  Accordingly, the courts in this Circuit decline subject matter jurisdiction.

*McNamara v. Kaye, et al*, 360 Fed. Appx. 177 (2nd Cir. 2009); *Reed v. Medford Fire Dept., Inc.*,

806 F.Supp.2d 594 (EDNY 2011); *Blatch ex rel. Clay v. Hernandez,* 360 F.Supp.2d 595, 637

(SDNY 2005); *Beckwith v. Erie County Water Auth.,* 413 F.Supp.2d 214, 226 (WDNY 2006);

*Cartagena v. City of New York,* 257 F.Supp.2d 708, 709-710 (SDNY 2003) (emphasizing CPLR

7804(b) provisions for exclusive jurisdiction in N.Y. Supreme Court or Appellate Division).

### POINT IV

**Subject matter jurisdiction over these actions
is barred under the *Younger* abstention doctrine.**

Federal courts abstain from taking jurisdiction over federal constitutional claims which

involve or call into question ongoing State proceedings.  *Younger v. Harris*, 401 U.S. 37, 43-44

(1971).  This principle of federalism has become known as the *Younger* abstention doctrine.  *See,

e.g  Spargo v. New York State Com'n on Judicial Conduct,* 351 F.3d 65, 75 (2nd Cir. 2003);

*Diamond "D" Construction Corp. v. McGowan, et al*, 282 F.3d 191, 193 (2nd Cir. 2001); *Heelan

v. Goord, et al*, 2006 WL 2335550 (NDNY 8/10/06).  Though the *Younger* doctrine originated in

the context of State criminal proceedings its effect has been extended, even into administrative

proceedings.  *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627

(1986); *CECOS Int'l Inc. v. Jorling*, 895 F.2d 66, 70 (2nd Cir. 1990); *Oxford House, Inc., et al v.

City of Albany*, 819 F.Supp. 1168, 1172 n.1 (NDNY 1993); *Canny, et al v. Ray*, 1991 U.S. Dist.

LEXIS 17994, *7 n.2 (NDNY 12/11/91).

When the *Younger* doctrine applies, abstention is mandatory and its application deprives

the federal court of subject matter jurisdiction.  *Diamond "D"* at *16; *Colorado Water Conserv.

Dist. v. United States*, 424 U.S. 800, 816 n.22 (1976); *see also Collins v. Morsillo, et al*, 1994

16

U.S. Dist. LEXIS 14133, *4-5 (NDNY 9/19/94).  The doctrine must be enforced even when a plaintiff ostensibly presents claims of federal constitution violations.  *Moore v. Sims*, 442 U.S. 415 (1979).  Abstention under *Younger* is required when three conditions are met: (1) there is an ongoing State proceeding; (2) an important State interest is implicated in that proceeding; and (3) the State proceeding will afford adequate judicial review of the federal constitutional claims. *Diamond "D"* at *18; *Grieve v. Tamerin*, 269 F.3d 149, 152 (2nd Cir. 2001).

These inquiries are clearly fulfilled here.  In *RPEA v. State of New York, et al,* Index #7586-2011 (Albany County Special Term) the Retired Public Employees' Association[19] and fourteen State retirees have brought an Article 78 proceeding/plenary action against the Governor, the Civil Service President, the Civil Service Commission, the NYSHIP, the Director of the Budget, the Director of Employee Relations, the GOER and the State Comptroller.

The petitioners/plaintiffs in the *RPEA* case frame three causes of action which implicate important State issues.  In the first and third causes of action, plaintiffs contend that a 2011 administrative increase in retirees' health insurance contributions is inconsistent with the provisions of Civil Service [CSL] §167 (1)(a), and constitutes an improper exercise of legislative authority in violation of Article III, §1 of the New York State Constitution.  In the second cause of action, plaintiffs contend that this modification to retirees' contributions runs afoul of constitutional contracts clauses.  They seek various forms of equitable and compensatory relief -- (a) a declaration invalidating the 2011 administrative implementation of an increase in retirees' contributions for NYSHIP medical benefits; (b) a declaration invalidating the emergency regulation filed on September 27, 2011 (effective October 1, 2011) by the Department of Civil

---

19  The *RPEA* petition/complaint and supporting Memorandum are public records on file with the Albany County Clerk.  For the Court's convenience a copy is submitted as Quackenbush App. A.  The RPEA asserts that it is an organization which "represents the interests of individuals receiving a retirement allowance, or who are eligible for a vested retirement allowance, from a public retirement system of New York State, or from an Optional Retirement Plan and their dependents. . . ."  Petition/Complaint, ¶3.

Printed [Reproduced] on Recycled Paper

Service which prescribed a 2% increase in retirees' required contributions to the cost of NYSHIP health insurance coverage; (c) an injunction prohibiting respondents from implementing increases in retirees' NYSHIP contributions under the emergency regulation; and (d) an injunction compelling respondents to refund amounts paid by retirees for NYSHIP health insurance coverage in excess of the percentage set forth in Civil Service Law §167(1)(a).  The causes of action in *RPEA* may be styled slightly differently than in the federal cases, but the claims/issues presented are virtually identical to those featured in the federal actions.  Indeed, *RPEA* may determine a broader range of issues since it appears to also involve a facial challenge to CSL §167(8).[20]

On February 24, 2012, the New York State respondents served and filed a CPLR 3211 motion to dismiss.  As such, within a few months, the New York State Supreme Court will rule upon the propriety of officials' implementations of a New York State statute and regulations on an issue of public fiscal significance.  In this situation, the principles of *Younger* come directly to bear and preclude federal jurisdiction over these actions.

## POINT V

### New York State officials are immune from suit under the doctrine of legislative immunity.

The doctrine of legislative immunity supplies a personal, rather than a jurisdictional, immunity from suit.  *Almonte v. City of Long Beach,* 478 F.3d 100, 106 (2nd Cir. 2007).  It shields legislators and governmental officials from claims for compensatory as well as equitable relief.  Under the doctrine a lawsuit against a State official is barred if (1) when committing an alleged violation, the official was acting in a "legislative capacity," and that (2) granting the

---

20  *RPEA* supporting Memo, pp. pp.31-44.  The instant federal actions only present "as applied" challenges to §167(8).  *See Council 37*, ¶3; *Council 82*, ¶3, 159-162; *CSEA* , ¶2, 122-137; *NYSCOPBA*, ¶3, 155-158; *NYSP PBA*, ¶3, 134-135; *NYSPIA*, ¶2, 122-124; *PBA*, ¶ 2, 110, 125-128; *PEF*, ¶3, 179-181; The *UUP* complaint does not clearly address either the facial or "as applied" validity of §167(8).

18

requested relief would enjoin defendants in their performance of legislative functions.  *Bogan v. Scott-Harris,* 523 U.S. 44, 54-56 (1998).

It is well established that State legislators are entitled to absolute immunity from civil liability for their legislative activities, and that this immunity extends to executive officials when they act in a legislative capacity.  *Bogan v. Scott-Harris*, 523 U.S. 44, 46-55 (1998) (mayor was entitled to legislative immunity for budgetary acts taken which were "integral steps in the legislative process"); *see also Campaign for Fiscal Equity v. State of New York,* 179 Misc.2d 907, 910–911 (N.Y. Sup. 1999), *affd.* 265 AD2d 277 (1st Dept. 1999) (executive governmental officials fulfilling legislative duties).

Under Bogan, there are two critical factors upon which to determine whether a State official's acts have been within the "sphere of legitimate legislative activity."  *Id.* at 54.  First, a court will examine whether a defendants' actions have been legislative "in form," *i.e.,* whether they were "integral steps in the legislative process." *Id.* at 55.  Second, it may also be relevant whether a defendants' actions were legislative "in *substance*," *i.e.,* whether the actions "bore all the hallmarks of traditional legislation," including whether they "reflected ... discretionary, policymaking decision[s] implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents." *Id.* at 55-56.

In the instant matters, to the extent that any personal conduct has been ascribed to individually named State officials, such actions have been taken in the course of effectuating a law of statewide application.  The Civil Service President and the Director of the Budget are written into this action only by virtue of their promulgation of regulations, which are now codified in 4 NYCRR Part 73, as the Legislature directed under CSL §167(8).  In form and in substance this was a legislative act - such regulations carry the force of law and represent a policy choice of the State.  *See Allstate Ins. Co. v. Rivera,* 12 NY3d 602, 608 (2009); *Raffellini v.*

19

*State Farm Mutual Auto. Ins. Co.,* 9 NY3d 196, 201 (2007); *State Farm Mutual Auto. Ins. Co. v. Mallela, et al*, 4 NY3d 313, 321 (2005); *General Elec. Capital Corp. v. New York State Div. of Tax Appeals,* 2 NY3d 249, 254 (2004).  By issuing the regulations, these defendants fulfilled a discretionary, policymaking function directly implicating State budgetary priorities and services. As such, officials involved in this activity must be held immune from suit.

## POINT VI

### Plaintiffs fail to State a plausible claim of a contractual entitlement to certain State contributions towards health insurance premiums.

Even looking beyond jurisdictional issues, the plaintiffs do not present a federal claim for impairment of contract upon which relief may be granted.[21]  In pertinent part, U.S. Const Art. 1, §10 provides that "[n]o State shall . . .  pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. 1, §10, cl. 1.  A federal contract clause claim turns upon whether a State law has, in fact, "operated as a substantial impairment of a contractual relationship."  *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 410 (1983).  "This inquiry has three components:  whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992).  Moreover, even where a State action results in a substantial contractual impairment, the action will be upheld if it has been a reasonably necessary measure toward legitimate public purposes.

A district court will generally look to federal law to determine whether a contract exists and to define the nature and extent of its obligations.  *Irving Trust Co. v. Day*, 314 U.S. 556, 561 (1942).  However, when it is claimed that a contract has arisen under a State statutory enactment, district courts must look to the State's decisional law.  *Indiana ex rel. Anderson v Brand*, 303

---

21  *E.g. PEF,*  ¶77-122, 177-187; *NYSPIA*, ¶48-106; *CSEA*, ¶37-60; *PBA*, ¶50-96; *NYSCOPBA*, ¶63-81; *UUP,* ¶55-108; *Council 37,*  ¶47-77; *Council 82*, ¶50-85; *NYSP PBA*, ¶45-73.

Printed [Reproduced] on Recycled Paper

U.S. 95, 100 (1938).

Contracts may be found to arise between a State and others via their mutual agreement to terms by negotiation or by acceptance of a statutory offering of specific terms.  *E.g. Cook v. City of Binghamton*, 48 NY2d 323, 329 (1979).  In these actions, the plaintiffs seem to point to both collective bargaining agreements and statutory pronouncements addressing employee health insurance in attempting to establish a contractual entitlement.  There is, however, no express or implied contract by which New York State has bound itself to provide optional health insurance with a perpetually fixed contribution rate.  Indeed, under the State's statutory scheme the reality is to the contrary.

**A.  Plaintiffs have not alleged an express contract under which New York State is obliged to contribute a fixed amount toward retiree health insurance.**

The plaintiffs do not claim that defendants have rescinded or reduced the availability of such insurance.  They are as free to subscribe to NYSHIP coverage as they were prior to the 2011 amendment to CSL §167(8).  However, the plaintiffs present quotes selected from various collective bargaining agreements from which, they argue, New York has contractually bound itself to provide State retirees with subsidized health insurance at an unchanging cost.[22]  Under those contracts the State has agreed to ". . .continue to provide all the forms and extent of coverage as defined by health insurance contracts in force [on a date certain]."[23]

There is no dispute that New York has offered, and continues to offer, "all the forms and extent of coverage" as it has in years past.  The quotes proffered by the plaintiffs do not, however, specify that the State will contribute toward health insurance at a perpetual rate.  The plaintiffs do not direct the Court to any negotiated contractual language which does so.  For

---

22  *E.g. CSEA*, ¶¶37-60.  *NYSCOPBA*, ¶¶63-81.  *NYSPIA*, ¶¶62-92.

23  *E.g. Council 37*, ¶¶49-56.  *PBA*, ¶¶53-83.  *UUP*, ¶¶58-89.

Printed [Reproduced] on Recycled Paper

purposes of Rule 12(b) it is not necessary to ask the Court to sift through thirty years' of

contracts negotiated by nine unions to see whether any contain such terms.  The Court can

discern that, if any such provision existed in any public contract, plaintiffs would plead it.

Nothing in §167, and nothing in the history of the administration of the NYSHIP program, can

serve to bind the State to promises that it never made.  *See Aeneas McDonald Police Benevolent*

*Assn. v. City of Geneva*, 92 NY2d 326, 333 (1998).

**B.  Plaintiffs have not alleged a statutorily implied contract under which New York State is obliged to contribute a fixed amount toward retiree health insurance.**

Plaintiffs alternatively contend that the statutory scheme under which the NYSHIP has

been formed gives rise to an implied enforceable entitlement to an ongoing fixed contribution

rate.[24]  However, no court in New York has implied such an interest from CSL Article 11.  In

cases in which the issue has arisen, courts have rejected plaintiffs' theory.

Article 11 of the Civil Service Law authorizes the establishment of a health benefit plan

for employees of the State of New York and various school districts and municipalities

throughout the State.  Under CSL §163(3) the Legislature has allowed retirees to participate in

the NYSHIP and has directed the President of the Civil Service Commission to establish plan

rules which govern both employees and retirees.  Since 1956, under CSL §161(1), the President

of Civil Service has held the authority and duty to "establish a health benefit plan for State

officers and employees and their dependents. . . ."  The President has express authority to

exclude types of coverage by regulation.  CSL §161(2).  Under CSL §161(2), the President holds

the authority and responsibility to purchase health benefit contracts and to impose controls upon

---

24  *E.g. CSEA*, ¶¶102-111.  *NYSPIA*, ¶¶107-120.  *UUP*, ¶¶94-100, 150-153.

Printed [Reproduced] on Recycled Paper

integral plan features including deductible and coinsurance provisions. CSL §161(2).[25]

Civil Service Law §167 has been amended in various ways over the course of 45 years. Under the 1983 version of the statute, §167(8) authorized increases in State contributions for retiree health insurance premiums with respect to current employees only:

> Notwithstanding any inconsistent provision of law, where and to the extent that an agreement between the State and an employee organization entered into pursuant to article fourteen of this chapter so provides, the State cost of premium or subscription charges for eligible employees covered by such agreement may be increased pursuant to the terms of such agreement and for a duration provided by such agreement and pursuant to rules and regulations as may be established by the president. Such increase in State cost shall only apply during the period of eligibility provided by such agreement and shall not be applied during retirement.

In 2011, the Legislature amended §§8 by enacting L.2011, Ch.491 Part A, §2 (*adopted 8/17/11 - deemed effective 4/2/11*):

> Notwithstanding any inconsistent provision of law, where and to the extent that an agreement between the State and an employee organization entered into pursuant to article fourteen of this chapter so provides, the State cost of premium or subscription charges for eligible employees covered by such agreement may be modified pursuant to the terms of such agreement.  The president, with the approval of the director of the budget, may extend the modified State cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision.

CSL §167(8).  The amended statute authorizes negotiated increases *or* decreases to the State's contribution towards employee health insurance coverage.  It expressly permits the President of the Civil Service Commission, with the approval of the Director of the Budget, to extend such cost modifications to employees and retirees who are not covered by a negotiated agreement.

---

[25]  In 1979 the Legislature enacted CSL §161-a which created the Council on Employee Health Insurance.  The Council consists of the President of Civil Service, the Director of the Division of the Budget, and the Director of Employee Relations.  CSL §161-a(3).  It bears the duty to supervise the administration of changes to health benefit plans negotiated in collective bargaining and to provide continuing policy direction to insurance plans administered by the State.  While the Council has not been named as a party to these actions, its existence illustrates the nature of the NYSHIPs existence.  It is a State-subsidized program, created by the Legislature, subject to administrative control.

Printed [Reproduced] on Recycled Paper

The amendment changed nothing with respect to the continuing authority of the President under CSL §161(2) and CSL §162 to negotiate contracts for insurance, determine coverage exclusions, adjust deductibles/coinsurance amounts or establish requirements for participation in the plans.[26]

In analyzing a potential implied contractual interest arising under the NYSHIP, the Court must begin with the strong presumption that statutes do not create contractual rights. *Nat'l R. Passenger Corp. v. Atchison, Topeka & Santa Fe. R. Co.*, 470 U.S. 451, 465-66 (1985). "[T]he principal function of a legislature is not to make contracts, but to make laws that establish the policy of the State." *Id.*. In order to find that a statute creates a contractual obligation, there must be "an adequate expression of an actual intent" of the State to bind itself. *Id.* at 466-67. A statute may only be treated as a contract ". . .when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977).

The New York State Court of Appeals has emphasized that certain types of legislative acts - including those fixing salaries and compensation - are not presumed to create a contract. *Cook,* 48 NY2d at 330. Such provisions are presumed to merely declare "'. . . a policy to be pursued until the [legislative body] shall ordain otherwise.'" *Id.*, *quoting Dodge v. Board of Educ.,* 302 U.S. 74, 79 (1937). *See also Handy v. County of Schoharie*, 244 AD2d 842, 843 (3rd Dept. 1997) (*discussing Cook*). CSL Article 11 contrasts against the Teachers' Tenure Act examined in *Indiana ex rel Anderson v. Brand*, 303 U.S. 95 (1938):

---

26  The inherent nature of health insurance precludes a notion that the State could have implicitly agreed to a contribution percentage fixed into perpetuity. In a different but analogous context the Second Circuit has appreciated the fluctuating and unpredictable nature of heath care plan costs - - "Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs." *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2nd Cir. 1988) (examining exclusion of welfare benefit plans from ERISA vesting requirement).

24

The title of the act is couched in terms of contract.  It speaks of the making and canceling of indefinite contracts. In the body the word 'contract' appears ten times in section 1, defining the relationship; eleven times in section 2, relating to the termination of the employment by the employer, and four times in section 4, stating the conditions of termination by the teacher.  The tenor of the act indicates that the word 'contract' was not used inadvertently or in other than its usual legal meaning. . . .  No more apt language could be employed to define a contractual relationship. . . .  Examination of the entire act convinces us that the teacher was by it assured of the possession of a binding and enforceable contract against school districts.

*Indiana* at 105.  *See also Alliance of American Insurers v. Chu*, 77 NY2d 573 (1991) which featured statutes governing the Property and Liability Insurance Security Fund, which explicitly and unequivocally granted insurance carriers the right to income earned on contributions which the carriers had paid into the Fund.  *Id*., pp.577-78.

## C.  Contractual analysis within the context of N.Y. State Const. Art. V, §7.

Indeed, the New York State Constitution contains a direct example of a law-based contractual entitlement.  Under the New York Constitution, membership in the State Retirement System is expressly contractual in nature.  N.Y. Const. Art. V, §7.  However, while the right to a pension payment is enforceable in contract, the New York Court of Appeals has made clear that there is no concomitant right to optional health insurance under CSL §167.

In *Lippman*, 66 NY2d 313, the Court of Appeals examined a school board's reduction of its retiree health insurance subsidy.  From 1971 to 1983 the district had undertaken to pay 100% of premiums for retirees, 50% for dependents.  In 1983 the board adopted a resolution reducing the district's contribution to 50% for retired employees and 35% for dependents.  *Id*. at 315.[27] The Court of Appeals held that CSL Article 11 created no statutory contract pertaining to health insurance benefits - or costs - for purposes of N.Y. State Const. Art. IV §7.  The Court contrasted the mandates of the State's pension system against other employment benefits which merely have

---

27  NB *Lippman* featured a far deeper drop in the employer's contribution rate than the 2% featured in these matters.

Printed [Reproduced] on Recycled Paper

an incidental relationship to membership in the State Retirement System:

> [O]ther employment conditions, though they may be protected by statute, resolution or individual or collective bargaining agreement, are not within its coverage.  That no more was intended is evident from the memorandum of the Constitutional Convention Committee which proposed the provision, which Stated (2 Revised Record of 1938 New York State Constitutional Convention, at 1405): "It is a substantial factor in entering the permanent Civil Service of the government, State or local, 'career service' as some call it, that the employee can look forward to a pension or retirement allowance when his service is over.  That reward or benefit is part of the compensation which he accepts in lieu of the greater rewards of private employment.  The *membership* in a pension or retirement system *is, therefore,* substantially *a contractual relationship when the member joins the system.  The benefits which are the essence of that contract should not be diminished or impaired.* That protection is given by this proposed amendment."  (Emphasis supplied.)

*Lippman* at 317 (*quotations/citations/emphasis in original*).  The Court went on to emphasize,

> [M]ore than an incidental relationship to the retirement system must be found before an employee benefit will be held to be within the area of action prohibited by the Constitution (*Cook v. City of Binghamton,* 48 NY2d 323 [*supra*]; *see, Majauskas v. Majauskas,* 61 NY2d 481; *Brown v. New York State Teachers Retirement Sys.,* 19 NY2d 779, *affg.* 25 AD2d 344).

*Id.* (*citations in original*).  The Court of Appeals recognized that under New York's statutory scheme, health insurance subsidized by a governmental employer is not a benefit of membership in the New York State Retirement Systems.  It is not a product of a contractual obligation.  It is provided by public employers as a matter of grace, in furtherance of legislative policy.  *Id.*

Offering subsidized health insurance to retirees serves readily discernible governmental purposes.  It supplies an incentive to attract individuals into State service, to join the Retirement System and to serve out full careers.  However, while pension payments are contractually and constitutionally protected, health insurance benefits are a discretionary legislative benefit and enjoy no such contractual or constitutional protection:

> the only relation between health benefits and retirement benefits is the purely incidental one that the latter provides the means by which the former is paid in those instances where the employer has elected to pay less than the full premium. The result of a reduction in the proportion of the health insurance premium paid

26

by the school district is that a retiree will receive a smaller retirement check, but this is no more a change in retirement benefits than would be an increase in the price of eggs at the supermarket or in a retiree's apartment rent. The retiree has less to spend, but there has been no change in his *retirement benefit.* Payment of part or all of his or her health insurance premium is a benefit that comes to a retired employee not as a benefit of membership in the retirement system but because he or she was an employee of the State of New York or participating employer, as to whom the Legislature has provided, in Civil Service Law §167, that part of the premium shall be paid by the employer and that the employer may, if it so chooses, increase the portion of the premium that it pays.

*Lippman* at 318-319.  Eleven years after *Lippman* the Court of Appeals reemphasized that health insurance benefits "exist separately from the . . .pension or retirement system."  *Ballentine v. Koch, et al*, 89 NY2d 51, 59 (1996).  *See also Cook*, 48 NY2d at 330; *Handy*, 244 AD2d 842; *Kapell v. Incorporated Village of Greenport*, 63 AD3d 940 (2nd Dept. 2009) (former town mayor had no enforceable entitlement to retirement-related subsidized health insurance for purposes of Art.78 or 42 U.S.C. §1983).  Twenty three years after *Lippman* the U.S. District Court for the Southern District of New York examined and enforced it:

> The N.Y. Constitution "does not impair the right of the public employer to alter retirement benefits other than pension contracts," *McDermott v. McDermott,* 119 AD2d 370, 382 (N.Y. App. Div. 1986), and the New York Court of Appeals has explicitly held that retirement health insurance benefits are not within the N.Y. Constitution's protections.  *See* [*Lippma*n at 315].

*D'Antonio v. MTA, et al*, 2008 WL 582354 (SDNY 3/4/08) (*quotes & citations in original*); *see also Lawrence v. Town of Irondequoit, et al*, 246 F.Supp.2d 150 (WDNY 2002).

**D.  Even if plaintiffs could demonstrate a contractual interest in a NYSHIP cost contribution rate, no defendant has caused a "substantial impairment" of such a contract.**

The plaintiffs cannot show that any defendant has substantially impaired their presupposed contractual right to a continuation of certain NYSHIP contributions.  *See Local 342 v. Town Board of the Town of Huntington*, 1993 WL 735042, *4 (EDNY 9/15/93) (no substantial impairment where sovereign did not pass a law and, through enforcement, prevent contracting parties from fulfilling respective obligations).  The NYSHIP program is still in place.  It is still

Printed [Reproduced] on Recycled Paper

available to retirees wishing to subscribe.  The State continues to administer the program and

subsidize its cost.  Thus, even if New York is deemed to have contractually bound itself to

continue providing the program, it is fulfilling its contractual obligation.

The NYSHIP was formed, and is maintained, under New York State laws.  The State as

sovereign always retains the right to amend the Civil Service Law and to adjust the

compensation of its employees.  As the Fourth Circuit has noted:

> Public employees - federal or State - by definition serve the public and their
> expectations are necessarily defined, at least in part, by the public interest.  It
> should not be wholly unexpected, therefore, that public servants might well be
> called upon to sacrifice first when the public interests demand sacrifice.

*Baltimore Teachers Union v. Mayor of Baltimore, et al*, 6 F.3d 1012, 1021 (4th Cir. 1993).

Within the context of a governmentally established and maintained program such as the

NYSHIP, an adjustment to a subsidy rate is but one of many foreseeable ways by which

participants might experience variability in their subscription cost.  If a relevant "contract" has

existed at all, such a change must be deemed to fall within the parties' reasonable expectations

thereunder.  *E.g. City of El Paso v. Simmons*, 379 U.S. 497, 515 (1965) (laws which restrict a

party to gains reasonably to be expected from a contract are not subject to attack under contract

clause even if they technically alter an obligation of contract).

The plain language of CSL §167(8) reflects the lawmakers' understanding that the

subsidized cost of retiree NYSHIP coverage is a governmental expense subject to adjustment

according to the State's fiscal needs.  Other recently submitted bills reflect this understanding as

well.  *See, e.g.* Assembly Bill A7871-2011 which was introduced to the Assembly on May 19,

2011, shortly before the August 2011 amendment to CSL §167(8):

> Section 1. On and after the effective  date  of  this  act,  a  public employer shall
> be prohibited from diminishing the health insurance benefits  provided  to  public
> employee retirees and their dependents or the contributions such employer makes
> for   such   health   insurance   coverage  below  the  level  of  such  benefits  or

28

> contributions made on behalf of such retirees  and  their  dependents by such employer *unless* a corresponding diminution of benefits or contributions is effected from  the  level  of benefits  or  contributions provided to a corresponding group of active employees for such retirees.

A7871-2011, §1 (*emphasis added*).  This bill - presumably drafted at the behest of retiree constituents - reflects the Legislature's awareness of the changeable nature of NYSHIP coverage and costs.  Among other things it would have authorized public employers to increase retirees' NYSHIP cost contributions so long as active employees were experiencing the same increase. *See also* Assembly Bill AO2007-2011 (same bill, introduced 1/12/11); Senate Bill S5714-2011 (specific to police/firefighters, introduced 6/13/11).

     Indeed, at least one major public union recently acknowledged the State's power to modify retirees' NYSHIP costs/benefits.  In January of 2010, in connection with 2010 Tier 5 legislation, the NYSUT proclaimed its success in negotiating a moratorium on unilateral adjustments to retirees' health care:  "A 15-year effort has paid off for NYSUT's school district retirees - the achievement of a permanent moratorium on unilateral changes to their health care plans. . . .The permanent moratorium means the health insurance of retirees in a K-12 local cannot be reduced *unless a comparable reduction in benefits is negotiated for inservice members* in that local."  *See* http://www.nysut.org/newyorkteacher_14294.htm (*emphasis added*).[28]  Whether or not an increased responsibility to pay for ones' own health insurance can be regarded as a "reduction in benefits" it must be seen that in 2010, NYSUT retirees celebrated legislation which brought about the same net effect as CSL §167(8).

**E.  Legitimate public purpose**

     Even if a contractual interest in a particular NYSHIP contribution rate can be assumed, and even if 2011 governmental actions might be deemed to have substantially affected a parties'

---

28  *See* Quackenbush App. B-E (copies of bills and NYSUT news publication).

Printed [Reproduced] on Recycled Paper

ability to fulfill a contractual obligation, the cost modification under review must be regarded as an appropriate measure toward legitimate public purposes.  Such purposes are readily evident.

The State of New York is in the midst of extraordinary fiscal challenges of which this Court may deem itself fully aware.  *See*, *e.g. F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 315 (1993) (legislative choice may be recognized without formal record of evidence or empirical data); *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 368 (2nd Cir. 2006), *cert. den*. 550 U.S. 918 (2007) (recognizing City of Buffalo fiscal crisis); *Bloomberg L.P. v. Board of Governors of FRS*, 649 F.Supp.2d 262, 266 (SDNY 2009) (recognizing subprime mortgage crisis emerging in summer 2007); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 2009 WL 3787197 *2 (SDNY 11/10/09); *Lautenberg Found. v. Madoff,* 2009 WL 2928913 *1 (DNJ 9/9/09); *Sangirardi v. State*, 205 AD2d 603, 605 (2nd Dept. 1994) (judicial notice of fiscal crisis). In 2011, New York State was facing a $10 billion budget deficit.  In March of 2011 Howard Glaser, the Director of State Operations, emphasized to the Legislature that a significant portion of the deficit has been attributable to escalating, unsustainable labor costs.[29]  In June of 2011, in support of the bills which resulted in the amendment to CSL §167(8), the Governor wrote in a Message of Necessity, "[w]ithout consideration and passage of this bill, the State may have no other recourse but to lay off thousands of employees in order to realize necessary cost savings."[30] The 2011-2012 Executive Budget reflects that the New York State government has been overhauled in a number of ways beyond the modification of NYSHIP cost allocation.  *Inter alia*, eleven State agencies have been merged into four.  Prisons have been consolidated.

---

29  *See* Quackenbush App. F; *see also* App. G (legislative testimony of Budget Director Robert Megna).

30  *See* Quackenbush App. J (Governor's Message of Necessity upon A.8513 and S.5846).

Printed [Reproduced] on Recycled Paper

Fundamental reforms to the juvenile justice system are underway.[31]

The amendment to CSL 167 was a significant component of the State's budgetary reform efforts.  The Division calculated that reductions in health care costs would yield $1.27 billion in savings.[32]  The State's NYSHIP cost subsidy has necessarily been part of this equation.

## F.  Reasonable & necessary means

The final inquiry in a federal contract clause analysis is whether means chosen in pursuit of a public policy goal have been reasonable and necessary.  *Tobe*, 464 F.3d at 369; *Subway-Surface Supervisors Assn. v. New York City Transit Auth.*, 44 NY2d 101, 109 (1978).  In determining reasonableness, a court must give some deference to a legislative determination. *Tobe*, 464 F.3d at 369; *Subway-Surface Supervisors Assn.*, 44 NY2d at 112.  *See also F.C.C. v. Beach Comm., Inc.*, 508 U.S. 307, 315 (1993) (legislative choice not subject to courtroom fact-finding - may be based on rational speculation without formal evidence).  Where a State impairs its own obligation, a higher standard of reasonableness and necessity may apply.  Though a court may not afford the "complete deference" applicable to laws that have been shown to impact upon private contracts, it should refrain from reexamining the factors underlying the legislation at issue, and from venturing a better statutory solution to a given problem.  *Tobe*, at 370.  "Such a high level of judicial scrutiny of the legislature's actions would harken a dangerous return to the days. . .in which courts would act as superlegislatures, overturning laws as unconstitutional when they 'believe[d] the legislature [] acted unwisely.'"  *Id*. at 371 (*internal quotations omitted; alterations in original*).

As discussed above, there has been no contractual impairment in the first instance.  Even

---

31  *See* Quackenbush App. H (2011-2012 N.Y. State Budget Briefing Book).

32  *See* Quackenbush App. I (Governor Cuomo's 6/11/11 Press Release entitled "Governor Andrew Cuomo Announces  Five Year Labor Agreement with Civil Service Employees Association").

31

imagining that plaintiffs have presented such, for purposes of Rule 12(b) there is no basis to find that New York State has failed to balance the importance of contracts against competing policy concerns.  Neither is there a basis to find that plaintiffs have experienced a "drastic contractual impairment" when another choice of action, imagined to be more moderate, would seem to have served governmental purposes equally well.  Nor is there any basis to find that the 2011 modification of NYSHIP contributions has been unreasonable in light of surrounding circumstances.  *Tobe* at 371.

On this issue it may be worthwhile to consider what the State has *not* done.  The Legislature has not eliminated the NYSHIP program.  It has not rewritten CSL §167(1)(a) to prescribe a more severe modification to cost contributions.  The public record demonstrates that the adjustment to the NYSHIP cost allocation is but one of a number of measures taken in order to forestall far more drastic alternatives.  In light of New York's indisputable fiscal situation and in the larger context of the State's efforts to manage its way out of crisis, the 2% adjustment to retirees' NYSHIP cost must be regarded as a reasonably tailored imposition.

## POINT VII

### Plaintiffs fail to state a cognizable due process claim.

While plaintiffs make various nominal references to "due process"[33] they do not articulate a particular theory of liability.  As such, any ostensible due process cause of action must be dismissed under Rule 12(b)(6).  *See generally Ashcroft*, 556 U.S. 662 (threadbare, conclusory references to elements of a cause of action).

In order to establish any form of a due process claim the plaintiffs must demonstrate that they have a protectable property interest in the insurance cost percentages described in CSL

---

33  *E.g. Council 82*, ¶2, 142-162;  *Council 37*, ¶2, 142-162; *UUP*, ¶1, 130, 139-146.  Plaintiffs' complaints are also interspersed with undeveloped references to the Fourteenth Amendment *e.g. NYSCOPBA*, ¶2, 138-154;  *PBA*, ¶2, 133-140; *CSEA*, ¶1, 112-121.

Printed [Reproduced] on Recycled Paper

§167(1)(a).  *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985).  Property

interests are not created by the Constitution, but rather are created and defined by existing rules

or understandings that stem from an independent source such as State law.  *Board of Regents of*

*State Colleges v. Roth*, 408 U.S. 564, 577  (1972).  To have a property interest in a benefit, the

person claiming same must have more than an abstract desire for it and more than a unilateral

expectation of it - he must have a legitimate claim of entitlement to it.  *Id.*

As discussed above, plaintiffs have no express or implied contractual interest in a specific

State contribution toward optional health insurance coverage.  The Court of Appeals in *Lippman*

*et seq*. has closed the door on the notion of an entitlement arising under State law.  As Chief

Judge Mordue noted in *Levine v. Paterson*, 2011 WL 4593739 (NDNY 9/30/11),

> In order to be protected by the Constitution against the deprivation of a
> government benefit without due process of law, a claimant must have a
> "legitimate claim of entitlement to it."  *Leventhal v. Knapek*, 266 F.3d 64, 77 (2nd
> Cir. 2001) (*quoting Board of Regents of State Colleges v. Roth*, 408 U.S. 564,
> 577, [1972]). "The expectation of entitlement is typically derived from 'existing
> rules or understandings that stem from an independent source such as State law-
> rules or understandings that secure certain benefits.'"  *Id.* (*quoting Roth*, 408 U.S.
> at 577) (*citing Bernheim v. Litt*, 79 F.3d 318, 322 (2nd Cir. 1996) ["To State a
> cause of action under the [D]ue [P]rocess [C]lause, a plaintiff must show that she
> has a property interest, created by State law, in the employment or the benefit that
> was removed."]).
>
> Because the decision regarding compensation increases for M/C employees is
> within the discretion of the director of the budget, plaintiffs cannot establish a
> property interest in them. "[W]here the complained-of conduct concerns matters
> that are within an official's discretion, entitlement to that benefit arises only when
> the discretion is so restricted as to virtually assure conferral of the benefit."
> *Bernheim*, 79 F.3d at 323; *see also Leventhal*, 266 F.3d at 77 (finding that the
> plaintiff could not "satisfy the threshold requirement that the salary increase was
> his 'property' because the salary increase could by law, be withheld from any
> employee who, in the opinion of the director of the budget, had substandard job
> performance or when the increase was otherwise unwarranted.").  As Stated
> above, Part B §15.1 provides that any compensation increases may be withheld
> when, in the opinion of the director of the budget, such withholding is necessary
> to reduce State expenditures to acceptable levels.  Since plaintiffs fail to allege a
> property interest in the compensation increases, they cannot State a plausible due
> process claim.

33

Printed [Reproduced] on Recycled Paper

*Id*. at *6-7 (*citations/quotes in original*).  The plaintiffs in these actions cannot show a due

process property interest arguably equal to that examined in *Levine*.  That case featured a dispute

over pay for work being performed by active employees.  In these actions there is no issue of

proper compensation for services being rendered - the NYSHIP itself, and its subsidized cost,

exist as a matter of legislative grace.  And as in *Levine*, the Legislature has assigned

discretionary decision-making power over this fiscal issue to administrative officials.  As such,

as a matter of law, no due process claim based upon NYSHIP cost contributions should proceed.

### Conclusion

For the reasons set forth above the State defendants respectfully request that the

Complaint be dismissed in its entirety.

Dated: Albany, New York
       March 1, 2012

                                        **ERIC T. SCHNEIDERMAN**
                                        Attorney General of the State of New York
                                        Attorney for New York State Defendants
                                        The Capitol
                                        Albany, New York  12224

                                        By: _____
                                        Charles J. Quackenbush
                                        Assistant Attorney General, of Counsel
                                        (518) 402-2270
                                        charles.quackenbush@ag.ny.gov

Printed [Reproduced] on Recycled Paper

**To:**

Jeffrey P. Mans, Esq.
Sheehan, Greene Law Firm
Counsel for plaintiffs in *NYSCOPBA*
54 State Street, Suite 1001
Albany, NY 12207

Christine A. Caputo Granich, Esq.
New York State Law Enforcement Officers
Union, District 82
Counsel for plaintiffs in *Council 82*
63 Colvin Avenue
Albany, NY 12206

Stephen G. DeNigris, Esq.
Office of Stephen G. DeNigris
Counsel for plaintiffs in *NYSP PBA*
2100 M Street, N.W., Suite 170-283
Washington, DC 20037-1233

Mark T. Walsh, Esq.
Richard C. Reilly, Esq.
Gleason, Dunn Law Firm
Counsel for plaintiffs in *NYSPIA* & *PBA*
40 Beaver Street
Albany, NY 12207

Robert T. Reilly, Jr., Esq.
New York State United Teachers
Counsel for plaintiffs in *UUP*
800 Troy-Schenectady Road
Latham, NY 12110-2455

Paul S. Bamberger, Esq.
Civil Service Employees Association, Inc.
Counsel for plaintiffs in *CSEA*
143 Washington Avenue
P.O. Box 7125, Capitol Station
Albany, NY 12224

Lisa M. King, Esq.
John F. Kershko, Esq.
Public Employees Federation, AFL-CIO
Office of General Counsel
Counsel for plaintiffs in *PEF*
1168-70 Troy-Schenectady Road
Albany, NY 12110

Erica C. Gray-Nelson, Esq.
District Council 37
Counsel for plaintiffs in *Council 37*
125 Barclay Street
New York, NY 10007

35

**Amida Capital**



669 F.Supp.2d 430
*Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 2009 WL 3787197 *2 (SDNY 11/10/09)

United States District Court,
S.D. New York.
AMIDA CAPITAL MANAGEMENT II, LLC, Plaintiff,
v.
CERBERUS CAPITAL MANAGEMENT, L.P., Ram Holdings, Inc., Ram Acquisition Corp., Ram Holdings Company, LLC, Cerberus Partners L.P., Cerberus Associates, L.L.C., Steven F. Mayer [FN*], and Stephen A. Feinberg [*],
Defendants.

FN* Steven F. Mayer was incorrectly named as "Steven T. Mayer," and Stephen A. Feinberg was incorrectly named as "Stephen M. Feinberg." I have amended the caption accordingly, and the Clerk of the Court is directed to amend the docket sheet.

No. 08 Civ. 5516(MGC).
Nov. 10, 2009.

**Background:** Investment firm sued private equity firm and related defendants for fraud in connection with investment firm's purchase of issuer's stock during equity firm's aborted buy-out of issuer. Defendants filed motion to dismiss.

**Holdings:** The District Court, Cedarbaum, J., held that:
(1) issuer's misstatements could not be imputed to private equity firm;
(2) securities fraud claim was not stated against private equity firm based on its filing of Schedule 13D; and
(3) inference from the temporal proximity of private equity firm's roadshow to date of private equity firm's announcement nine days later that it did not intend to close the deal was not "strong circumstantial evidence" that private equity firm had knowingly misrepresented the state of affairs on date of roadshow.

Motion granted.

West Headnotes

**[1] Securities Regulation 349B 💠60.40**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.39 Persons Liable
                    349Bk60.40 k. In general; control persons. Most Cited Cases

A person is only a primary violator in a misstatement case under § 10(b) if a misstatement is attributed to it at the time of the statement's dissemination. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[2] Securities Regulation 349B 💠60.40**

349B Securities Regulation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

    349BI Federal Regulation
       349BI(C) Trading and Markets
          349BI(C)7 Fraud and Manipulation
            349Bk60.39 Persons Liable
              349Bk60.40 k. In general; control persons. Most Cited Cases

**Securities Regulation 349B ⌐━60.41**

349B Securities Regulation
    349BI Federal Regulation
       349BI(C) Trading and Markets
          349BI(C)7 Fraud and Manipulation
            349Bk60.39 Persons Liable
              349Bk60.41 k. Aiders and abettors. Most Cited Cases

    Because private equity firm, which sought to acquire issuer, never made any "articulated statement" adopting issuer's statements or warranting their accuracy, issuer's misstatements could not be imputed to private equity firm, and therefore private equity firm was not a primary violator of section 10(b); furthermore, no liability existed for aiding and abetting. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[3] Securities Regulation 349B ⌐━60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
       349BI(C) Trading and Markets
          349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
              349Bk60.51 In General
                349Bk60.51(2) k. Scienter. Most Cited Cases

    Securities fraud claim was not stated against private equity firm based on its filing of Schedule 13D disclosing the purpose of its intended acquisition of the issuer's securities and plans regarding the issuer since allegations did not raise strong inference that firm knowingly or recklessly misrepresented its plan to merge with issuer as of that date. Securities Exchange Act of 1934, § 13(d), 15 U.S.C.A. § 78m(d); 17 C.F.R. § 240.13d–101.

**[4] Securities Regulation 349B ⌐━60.27(1)**

349B Securities Regulation
    349BI Federal Regulation
       349BI(C) Trading and Markets
          349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
              349Bk60.27 Misrepresentation
                349Bk60.27(1) k. In general. Most Cited Cases

    Securities fraud liability may be imposed for failure to amend a Schedule 13D disclosing the purpose of acquisition of the issuer's securities and any plans regarding the issuer when required. Securities Exchange Act of 1934, §§ 10(b), 13(d), 15 U.S.C.A. §§ 78j(b), 78m(d); 17 C.F.R. § 240.13d–101.

**[5] Securities Regulation 349B ⌐━60.27(1)**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**


349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.27 Misrepresentation
                  349Bk60.27(1) k. In general. Most Cited Cases

    Securities fraud claim was not stated against private equity firm based on its failure to update its Schedule 13D disclosing the purpose of its intended acquisition of the issuer's securities and plans regarding the issuer since firm's position on the merger after filing its Schedule 13D but before indicating its intent not to close the deal was not such a "sharp break" from its previous position that its 13D was rendered materially misleading. Securities Exchange Act of 1934, §§ 10(b), 13(d), 15 U.S.C.A. §§ 78j(b), 78m(d); 17 C.F.R. § 240.13d–101.

**[6] Securities Regulation 349B ☞60.45(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
               349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
               349Bk60.45(1) k. In general. Most Cited Cases

    Section 10(b) of Securities Exchange Act does not create a cause of action for negligence. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[7] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 In General
                  349Bk60.51(2) k. Scienter. Most Cited Cases

    Inference from the temporal proximity of private equity firm's roadshow, which was intended to solicit interest in a private placement of post-merger notes of issuer, to date of private equity firm's announcement nine days later that it did not intend to close the deal was not "strong circumstantial evidence" that private equity firm had knowingly misrepresented the state of affairs on date of roadshow so as to give rise to securities fraud claim based on alleged misrepresentations made during roadshow. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[8] Fraud 184 ☞3**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k2 Elements of Actual Fraud
         184k3 k. In general. Most Cited Cases

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

**Fraud 184 ⟜16**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k16 k. In general. Most Cited Cases

    Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.

**[9] Fraud 184 ⟜3**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k2 Elements of Actual Fraud
            184k3 k. In general. Most Cited Cases

    Under New York law, elements of a claim for fraudulent inducement are: (1) the defendant must have made a misrepresentation of a material fact, (2) that was known to be false and intended to be relied on when made, and (3) that the plaintiff justifiably relied on that misrepresentation to its injury.

**[10] Fraud 184 ⟜4**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k2 Elements of Actual Fraud
            184k4 k. Intent. Most Cited Cases

    Under New York law, claims of fraud and fraudulent inducement must be based on facts giving rise to a "strong inference" of fraudulent intent.

**[11] Estoppel 156 ⟜85**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k82 Representations
                156k85 k. Future events; promissory estoppel. Most Cited Cases

    Elements of a claim for promissory estoppel under New York law are: (1) a clear and unambiguous promise; (2) upon which the plaintiff reasonably and foreseeably relied; (3) to the plaintiff's detriment.

**\*432** Coughlin Stoia Geller Rudman & Robbins LLP, by Samuel H Rudman, Esq., David A. Rosenfeld, Esq., Stuart A. Davidson, Esq., Stephen R. Astley, Esq., Melville, NY, for Plaintiff.

Milbank, Tweed, Hadley & McCloy, LLP, by Michael L Hirschfeld, Esq., Robert C. Hora, Esq., Jennie Woltz, Esq., New York, NY, for Defendants.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

*OPINION*

CEDARBAUM, District Judge.

Amida Capital Management II, LLC ("Amida") sues under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and under New York law, for fraud in connection with Amida's purchase of stock of United Rentals, Inc. during Cerberus's aborted buy-out of United Rentals in 2007.

I dismissed the original Complaint at oral argument on October 30, 2008, and granted Amida leave to replead. Defendants now move to dismiss the Amended Complaint. For the following reasons, the motion to dismiss is granted.

## BACKGROUND

### I. The Parties

The following facts are drawn from the Amended Complaint, the exhibits attached to that complaint, and documents incorporated into the complaint by reference.

Amida is a New York-based investment firm. Cerberus Capital Management L.P. is a large private equity firm headquartered in New York. Cerberus Partners, L.P. is the general partner of Cerberus Capital Management L.P. Cerberus Associates, L.L.C. is a Delaware limited liability company that is the general partner of Cerberus Partners L.P.

Cerberus [FN1] created Ram Holdings, Inc., a Delaware corporation, as an acquisition vehicle for United Rentals, Inc. The sole shareholder of RAM Holdings, Inc. is RAM Holdings Company, LLC, whose sole member is Cerberus Associates, LLC. RAM Acquisition Corp. is a wholly-owned subsidiary of RAM Holdings, Inc.

> FN1. For the purposes of this motion, I will adopt the parties' practice and refer to Cerberus Capital Management, L.P., Cerberus Partners, L.P., Cerberus Associates, L.L.C., Ram Holdings, Inc., Ram Holdings Company, LLC, and Ram Acquisition Corp. collectively as "Cerberus" unless it is necessary to identify a specific entity.

**\*433** United Rentals, Inc., ("URI") is a large equipment rental company with a principal place of business in Greenwich, Connecticut.

Amida sues Cerberus Capital Management, Cerberus Partners, RAM Holdings, Inc., RAM Acquisition Corp., and Steven Mayer under Section 10(b) of the Securities Exchange Act and Rule 10b–5 issued thereunder. Amida sues Cerberus Capital Management, Cerberus Associates, RAM Holdings Company, LLC, Ram Holdings, Inc., Cerberus Partners, Steven Mayer and Stephen Feinberg as "control persons" under Section 20(a) of the Securities Exchange Act. Amida also sues all defendants for New York common law fraud, fraudulent inducement, and promissory estoppel.

### II. The Cerberus / United Rentals Transaction

#### A. April—July 2007: negotiations and signing of the Merger Agreement

In April 2007, URI announced that its board was contemplating a sale of the company, and retained UBS Investment Bank and Credit Suisse as advisers. In May 2007, Cerberus and five other potential purchasers indicated interest in an all-cash purchase of URI's outstanding shares. Cerberus initially indicated that it would offer a price of $35–$37 per share, but reduced its offer to $33 per share in early July. Price negotiations continued until July 21, 2007, when Cerberus made a final offer of $34.50 per share. While the deal price was being negotiated in June and July 2007, Cerberus and URI exchanged drafts of the Merger Agreement. On July 22, 2007, URI's Board of Direc-

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

tors approved the Merger Agreement at the price of $34.50 per share, and decided to recommend the merger to URI's shareholders. URI and RAM Holdings, Inc. entered into the Merger Agreement on July 22, 2007.

On July 23, 2007, URI issued a press release that announced the Merger and summarized certain provisions of the Merger Agreement. URI filed this press release with the Securities and Exchange Commission ("SEC") on form 8–K on July 24, 2007, and attached the entire Merger Agreement as an exhibit to that form.

RAM Holdings, Inc. filed a Schedule 13D (a "13D") with the SEC on August 1, 2007. In that 13D, RAM Holdings declared its intent to acquire control of URI for $34.50 per share of common stock. The Merger Agreement and other governing agreements were filed as exhibits to the 13D and incorporated into that document by reference.

**B. August and September 2007–Cerberus seeks a "discussion" of the terms of the Merger.**

July 2007 marked the beginning of what was then called the "credit crunch," the first phase of the financial crisis that culminated in the fall of 2008. On August 29, 2007, representatives of Cerberus requested a telephone call with UBS to discuss the terms of the transaction, particularly the purchase price, given the difference between that day's closing price of $32.33 and the merger price of $34.50. URI did not respond to Cerberus's invitation, and Cerberus followed up with a letter on August 31, 2007. That letter asked URI's Board of Directors to join Cerberus in a "constructive dialogue" concerning the "unanticipated developments in the credit and financial markets." (Am. Compl. Ex. B.)

**C. September 2007—URI rebuffs Cerberus's requests for a "discussion."**

URI responded by letter on September 6, 2007. In that letter, URI rejected Cerberus's invitation to discuss changes to the **\*434** Merger Agreement, characterizing Cerberus's request as "without cause or contractual support." The letter notes that RAM Holdings, Inc. had obtained committed debt financing, thus protecting it from the turmoil in the credit markets, and that changed conditions "generally affecting the economy or the financial, debt, credit, or securities markets in the Untied States" were expressly carved out of the Material Adverse Circumstances clause of the Merger Agreement. (Am. Compl. Ex. C.) There were no further attempts by Cerberus to renegotiate the terms of the Merger Agreement until about November 12, 2007.

According to Amida, URI's refusal to renegotiate the merger terms "created a stalemate situation that signaled the end of any possibility of a merger between URI and Cerberus." (Am. Compl. ¶ 49.)

URI filed its Definitive Proxy Statement on September 19, 2007, and scheduled the Special Meeting at which its shareholders would vote on the merger for October 19. About 99.8% of the votes entered at the October 19, 2007 Special Meeting were in favor of the merger.

During September and October, Amida bought a "net total" of $2.95 million in URI common stock. (Am. Compl. ¶ 52.)

**D. The November 5, 2007 Roadshow**

On November 5, 2007, Cerberus held a roadshow at a W Hotel in New York City to solicit interest among Qualified Institutional Buyers [FN2] in Notes that would be issued after the Merger closed. Amida attended the roadshow, received a copy of the preliminary Offering Circular, and heard a presentation by Carlton Donaway, a Cerberus employee. Amida believed that the occurrence of the roadshow meant that the merger was likely to close because "few mergers have failed to close following a roadshow." (Am. Compl. ¶ 57.) Between November 5 and 14, Amida bought about $14.4 million of URI common stock.

> FN2. Rule 144A under the Securities Act of 1933 permits the sale of certain unregistered securities to a Qualified Institutional Buyer, which is an entity of an enumerated type that "owns and invests on a discretionary basis at least $100 million in securities...." 17 C.F.R. § 230.144A

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

**E. The Merger Collapses**

On November 12, 2007, Cerberus met with UBS to discuss Cerberus's commitment to a renegotiated transaction. On November 14, 2007, URI announced that Ram Holdings, Inc. had informed URI that it was not prepared to proceed with the purchase of URI on the terms set forth in the Merger Agreement. Upon that news, URI's stock fell from the November 13 closing price of $34.01 per share to $23.50 per share on November 14, 2007. On November 15, RAM Holdings, Inc. amended its 13D.

On November 19, 2007, URI sued RAM Holdings, Inc. and RAM Acquisition Corp. in Delaware Chancery Court for specific performance of the Merger Agreement. After a trial in December 2007, that court decided that specific performance was unavailable under the Merger Agreement, and URI's recourse was limited to the $100 million limited guarantee provided in the Merger Agreement. *United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810 (Del.Ch.2007). URI then demanded the $100 million, which Cerberus paid.

Shareholders of URI filed a putative class action against URI, Cerberus, Steven Mayer, and Stephen Feinberg in the District of Connecticut. *See Decicco et al. v. United Rentals, Inc. et al.,* 602 F.Supp.2d 325 (D.Conn.2009). In *Decicco,* the plaintiffs alleged that URI had misled them by failing to disclose the unavailability of specific performance and the risk that Cerberus could elect to terminate the **\*435** agreement by paying the $100 million fee. They also alleged that the attempted renegotiation of late August and early September ought to have been publicly disclosed, and that RAM Holdings, Inc. ought to have amended its 13D. Judge Hall dismissed the complaint on March 10, 2009 (*Id.*) and dismissed the Amended Consolidated Complaint with prejudice on August 24, 2009. *First New York Sec. L.L.C., et al. v. United Rentals, Inc., et al.,* 648 F.Supp.2d 256 (D.Conn.2009).

**F. Amida's Allegations**

Amida alleges that Cerberus made three classes of false or materially misleading statements. First, Amida seeks to hold Cerberus liable for alleged misstatements and omissions in URI's press releases and SEC filings during the merger period. Second, Amida alleges that RAM Holdings, Inc.'s 13D was false or misleading when issued or ought to have been amended to prevent it from becoming false or misleading upon later events. Third, Amida contends that Donaway's statements at the roadshow were materially false or misleading.

## DISCUSSION

**I. Standard on a Motion to Dismiss**

On a motion to dismiss under Fed.R.Civ.P. 12(b)(6), I accept the factual allegations of the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *ECA and Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009). In addition to the allegations of the complaint, I may consider documents that are attached to or incorporated into the complaint by reference, or documents publicly filed with the SEC, upon which the plaintiff relied in bringing this suit. *ATSI Commc'ns v. Shaar Fund,* 493 F.3d 87, 98 (2d Cir.2007).

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ――― U.S. ―――, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

**II. Analysis**

**A. Section 10(b)**

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 (codified at 15 U.S.C. 78j(b)) and Rule 10b5, 17 C.F.R. § 240.10b–5, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) made by the defendant with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

relied; and (5) that plaintiff's reliance was the proximate cause of its injury. *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 153 (2d Cir.2007); *see also JP Morgan Chase,* 553 F.3d at 197.

A securities fraud claim must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed.R.Civ.P. 9(b). The PSLRA requires that the complaint specify "each statement alleged to have been misleading," and, if the allegation is on information and belief, "state with particularity" the facts upon which the belief is formed. 15 U.S.C. § 78u–4(b)(1)(B). In addition, the complaint must "state with particularity facts giving rise to a strong inference" of scienter for each alleged misrepresentation. 15 U.S.C. § 78u–4(b)(2). This means that the allegations of the complaint must raise an inference of scienter for each actionable statement that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *see* **\*436** *also ATSI Commc'ns,* 493 F.3d at 99 (*quoting Tellabs* ).

As outlined above, Amida alleges that the § 10(b) defendants are liable for three classes of false or misleading statements: statements made by URI in SEC filings, the 13D filing of RAM Holdings, Inc., and statements made at the roadshow.

### 1. URI Statements

The first class of allegedly false or misleading statements that underlie Amida's § 10(b) claim are contained in fifteen SEC filings and press releases that URI issued between July 22, 2007 and November 7, 2007. Section 6.9 of the Merger Agreement required both Cerberus and URI to obtain the other's input or consent before issuing public statements about the merger. The parties dispute whether § 6.9 required URI to obtain Cerberus's consent prior to filing or only required URI to use "commercially reasonable efforts" to give Cerberus time to comment. Either interpretation compels the same analysis under § 10(b). [FN3]

> FN3. Section 6.9 of the Merger Agreement reads as follows: "Each of the Company [URI], Parent [RAM Holdings, Inc.] and Merger Sub [RAM Acquisition Corp.] agrees that no public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior written consent of the Company and Parent (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any applicable United States securities exchange or regulatory or governmental body to which the relevant party is subject, wherever situated, in which case the party required to make the release or announcement shall use its commercially reasonable efforts to provide the other party reasonable time to comment on such release or announcement in advance of such issuance, it being understood that the final form and content of any such release or announcement, to the extent so required, shall be at the final discretion of the disclosing party."

Amida's theory of liability is somewhat ambivalent. First, it contends that Cerberus's contractual right to "approve or participate in the preparation" of URI's filings imposed upon Cerberus a duty to ensure the accuracy of those filings, and therefore liability for "failing to correct URI's disclosures." Amida's second theory is that purchasers of URI stock had read Section 6.9 of the Merger Agreement, and so understood URI's statements to come with an implicit guarantee by Cerberus that those statements were accurate. Both of these theories of liability are foreclosed by decisions of the Supreme Court and the Second Circuit.

[1] The starting point for analysis is *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), in which the Supreme Court held that § 10(b) does not permit a private action for aiding and abetting, and thus imposes liability only on a person or entity that employs a manipulative device or makes a material misstatement or omission. *Id.,* at 191, 114 S.Ct. 1439. Because *Central Bank* unequivocally eliminated liability for aiding and abetting in a private action under § 10(b), Amida attempts to argue that Cerberus is liable as a "primary violator" for having participated in the drafting of URI's statements. [FN4] The established rule in this Circuit is that a person is only a primary violator in a misstatement case under § 10(b) "if a misstatement is attributed to it at the time of [the statement's] dissemination."**\*437** *Lattanzio,* 476 F.3d at 155 (*citing Wright v. Ernst*

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

*& Young LLP,* 152 F.3d 169, 175 (2d Cir.1998)). Imposing liability for "participation" or "approval" of a statement made by another party would contradict *Central Bank* by recreating liability for aiding and abetting by another name.[FN5] As the Second Circuit commented in *Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997), "if *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting ... no matter how substantial that aid may be...."

> FN4. The "substantial participation" test Amida advances was adopted by the Ninth Circuit in *In re Software Toolworks, Inc. Sec. Litig.,* 50 F.3d 615, 628 n. 3 (9th Cir.1994), which held an accountant liable for playing a "significant role in drafting and editing" a letter sent to the SEC. The Second Circuit examined and expressly declined to adopt the holding of *Software Toolworks* in (*Wright v. Ernst & Young LLP,* 152 F.3d 169, 176 (2d Cir.1998)).

> FN5. Indeed, one might "participate" in the drafting of a statement or consent to its issuance without even "knowingly assisting" the fraud as is required in SEC actions for aiding and abetting. *See* Securities Exchange Act § 20(e), 15 U.S.C. § 78t(e) (authorizing SEC to prosecute those who "knowingly provide substantial assistance" to another's fraud); *SEC v. Collins & Aikman Corp.,* 524 F.Supp.2d 477, 491 (S.D.N.Y.2007) (SEC must defendant knew about the primary violation and yet assistance.)

[2] Amida's second argument is that purchasers of URI securities understood Cerberus's contractual right to review URI's statements as Cerberus's adoption of those statements. This theory is identical to the one rejected by the Second Circuit in *Lattanzio.* There, the plaintiffs sought to hold Deloitte liable for false 10–Qs that Warnaco issued. Although the 10–Qs were not accompanied by an audit opinion, an SEC regulation required Deloitte to review Warnaco's quarterly statements. 17 C.F.R. § 210.10–01(d). The *Lattanzio* plaintiffs argued that because the law required Deloitte to review the statements, the market understood Warnaco's statements to contain an "implied assertion of accuracy" by Deloitte. *Lattanzio,* 476 F.3d at 155. The Court of Appeals rejected this argument, and held that liability could not be imposed on a defendant unless that defendant made an "articulated statement" adopting the issuer's statements; "public understanding that an accountant is at work behind the scenes does not create an exception ... unless the public's understanding [of attribution] is based on the accountant's articulated statement, the source for that understanding ... does not matter." *Id. See also Thomas H. Lee Equity Fund V L.P. v. Mayer Brown Rowe & Maw LLP,* 612 F.Supp.2d 267, 279 (S.D.N.Y.2009); *In Re Refco, Inc. Sec. Litig.,* 609 F.Supp.2d 304 (S.D.N.Y.2009). Because Cerberus never made any "articulated statement" adopting URI's statements or warranting their accuracy, under *Lattanzio* Amida cannot impute those statements to Cerberus.

Amida contends that the holdings of *Wright* and *Lattanzio* are undermined by the Supreme Court's 2008 decision in *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), which Amida reads as permitting it to recover from Cerberus for URI's alleged misstatements as long as Amida relied on Cerberus's participation as an implicit guarantee by Cerberus of the accuracy of URI's statements. Defendants argue that, insofar as *Stoneridge* is relevant to this case, its holding highlights that Amida cannot have relied on any statement by Cerberus when reading URI's releases.

The *Stoneridge* Court began from the premise that a defendant can only be held liable as a primary violator for a deceptive statement that it made and upon which the plaintiffs relied. Because the Court viewed "participat[ion] in a scheme to violate 10(b)" as a form of aiding and abetting liability precluded by *Central Bank,* the Court proceeded to consider whether the defendant's deceptive acts satisfied each element for liability under § 10(b). *Stoneridge,* **\*438** 552 U.S. at 161–63, 128 S.Ct. at 771. The Court ultimately held that Scientific–Atlanta's acts were "too remote to satisfy the requirement of reliance" because they were only communicated to the plaintiffs, shareholders of Charter Communications, through Charter's independently-prepared financial statements. *Id.,* 552 U.S. at 159–61, 128 S.Ct. at 770.

The holding of *Stoneridge* begins from the same premise as *Wright* and *Lattanzio,* and the Second Circuit has

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

continued to rely on those cases after *Stoneridge. Morrison v. National Australia Bank Limited,* 547 F.3d 167, 176 (2d Cir.2008) (relying on *Wright* for the proposition that a primary 10b–5 violation requires a false or misleading statement and later citing *Stoneridge.*)

Amida has not alleged that any of URI's statements were attributed to Cerberus, but only that the Merger Agreement either imposed upon Cerberus a duty to correct URI's statements or permits Amida to impute URI's statements to Cerberus. These arguments were rejected in *Central Bank, Wright,* and *Lattanzio.* Amida cannot state a claim against Cerberus for the alleged defects in URI's public releases and filings.

### 2. Cerberus's Schedule 13D

Amida also bases its § 10(b) claim upon the 13D of RAM Holdings, Inc., filed on August 1, 2007 and amended on November 14, 2007. Amida alleges that the 13D was materially false and misleading when it was issued, and that Cerberus's failure to amend the 13D in light of subsequent events rendered it materially misleading.

### a. The August 1, 2007 Schedule 13D as filed

Under Item 4 of its 13D, RAM Holdings, Inc. stated that "pursuant to the Merger Agreement, among other things, (i) the Merger Sub will merge with and into the Company [URI]." Amida alleges that this statement and the entire Schedule 13D were misleading because RAM Holdings, Inc. failed to disclose that (1) Cerberus had "misgivings regarding the merger and the offer price," (2) Cerberus "did not intend to pay $34.50 per share," and (3) Cerberus "[was] very reluctant to complete the Merger under the terms of the Merger Agreement." (Am. Compl. ¶ 72.)

[3] Failing to disclose material information is actionable only when the defendant is under a duty to disclose those facts. *Castellano v. Young & Rubicam,* 257 F.3d 171, 179 (2d Cir.2001) (*citing In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993)); *see also Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Here, the parties agree that Cerberus's duty to disclose was principally imposed by § 13(d) of the Securities Exchange Act, which requires certain disclosures to be filed on a Schedule 13D by a person that acquires an interest in more than 5% of certain classes of securities. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d–101. Item 4 of Schedule 13D requires the filer to disclose the purpose of acquisition of the issuer's securities and any plans regarding the issuer; Item 6 requires the disclosure of any contracts or agreements between the filer and the issuer.

The 13D contains neither a prediction about the likelihood of the merger ultimately being completed nor any representation about Cerberus's views on the merger. In addition, Amida has not attempted to specify what "misgivings" Cerberus is supposed to have had, which makes it difficult to understand how omitting those unidentified misgivings rendered the 13D false or misleading. Ultimately, Amida has not put forward an interpretation of any language in the 13D that is rendered materially misleading by the nondisclosure **\*439** of Cerberus's alleged "misgivings" or "reluctance."

Amida also alleges that Cerberus did not intend to pay $34.50 per share for URI as of August 1, 2007, the date the 13D was filed. Because Schedule 13D requires the disclosure of plans relating to the issuer, I assume for the purposes of this motion that it would be materially misleading for RAM Holdings to state a plan to merge with URI "pursuant to the Merger Agreement" if it had no such plan.

At the outset, Amida has not alleged any facts that give rise to a reasonable inference that on August 1, 2007, Cerberus did not intend to carry out the Merger Agreement. Amida points to the course of negotiations between Cerberus and URI, and relies heavily on the fact that Cerberus was "negotiated up" from $33 per share to $34.50 a share, and made its final offer with the admonition that "a penny more kills the deal." I have grave doubts about whether it is reasonable to infer even "reluctance" to complete a merger, let alone intent not to complete the merger as agreed, from the fact that two sophisticated businesses strenuously negotiated the price for a multi-billion-dollar transaction. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

missing a complaint because the factual allegations, taken as true, did not give rise to a plausible inference of a conspiracy); *see also Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009).

In addition, the PSLRA requires that the inference that Cerberus knowingly or recklessly misrepresented its intent to merge must be "cogent and compelling, and thus strong in light of other explanations." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499. Such a cogent inference can be shown by facts establishing either "(1) motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *JP Morgan Chase,* 553 F.3d at 198 (*citing Ganino v. Citizens Utilities Company,* 228 F.3d 154, 168–69 (2d Cir.2000)); *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). Amida has not provided any motive (and disclaimed any attempt to plead motive at oral argument on April 28, 2008). Thus, it must plead scienter though "strong circumstantial evidence" of scienter, although that evidence must be "correspondingly greater" when there is no motive shown. *JP Morgan Chase,* at 199 (*quoting Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir.2001)).

A number of competing inferences can be drawn from the pre-August 1, 2007 facts. Amida urges that the course of negotiations demonstrates that Cerberus only reluctantly agreed to the merger and shortly decided to either have the price lowered or abandon the deal altogether. Another inference from the negotiations was that Cerberus sought to pay as little as possible for URI and ultimately offered $34.50 because it wished to buy URI at that price. The inference that Cerberus knowingly or recklessly misrepresented its plan to merge with URI as of August 1, 2007 is not as strong as the inference that on August 1, 2007, Cerberus did plan to merge RAM with URI for $34.50 a share. Amida has therefore failed to plead a § 10(b) violation in the 13D of RAM Holdings when it was filed.

#### b. Alleged failure to update the 13D
Amida also alleges that Cerberus violated § 10(b) by failing to amend its Schedule 13D after the late August and early September communications between Cerberus and URI.

[4] The parties agree that liability under § 10(b) may be imposed for failure to amend a Schedule 13D as required by § 13(d) and the rules thereunder. *Azurite Corp. Ltd. v. Amster & Co.,* 52 F.3d 15, 18 (2d Cir.1995); *see, e.g.,* 17 C.F.R. **440** § 240.13d–101. When § 10(b) liability depends on failure to amend a Schedule 13D, the relevant inquiry is not whether the alleged omission is material standing alone under the rule of *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), but rather whether the statute and rules governing Schedule 13D would require filing of an amended Schedule 13D. *Azurite,* 52 F.3d at 18.

In *Azurite,* the Second Circuit held that a 13D filer must disclose any "definite" or "fixed" plans regarding an issuer, but need not disclose "tentative" or "inchoate" plans, or make predictions about future behavior. *Id.* Therefore, exploration of a proxy fight was not enough to require amendment to the prior 13D that indicated no "control purpose." *Id.,* at 19. An amendment was required only when the filer formed a definite plan to undertake a proxy contest. *Id.*

Amida relies on two cases that predate *Azurite, Kamerman v. Steinberg,* 123 F.R.D. 66 (S.D.N.Y.1988), and *In Re Gulf Oil/Cities Service Tender Offer Litig.,* 725 F.Supp. 712 (S.D.N.Y.1989). In *Kamerman,* Steinberg filed a 13D announcing a tender offer for Disney on Friday, June 8, 1984. Over the subsequent weekend, he abandoned the tender offer and reached an agreement with Disney by which Disney would repurchase his shares. *Id.,* 123 F.R.D. at 70. Steinberg did not publicly announce the abandonment of the tender offer until after the market had closed on Monday, June 11, and did not amend his Schedule 13D until June 13. *Id.* Judge Motley concluded that abandoning the tender offer and accepting a share repurchase was such a "sharp break" from his prior position that it rendered his previous statements materially misleading, particularly because he did not disclose the change until after the repurchase was consummated. *Id.,* at 72.

*Gulf Oil* relied on *Kamerman's* "sharp break" standard and held that Gulf Oil's statements extolling its planned merger with Cities Service became materially misleading when Gulf Oil's board concluded that instead of pursuing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

the merger, it would instead explore options to terminate or subvert the merger. *Gulf Oil,* 725 F.Supp. at 747–48.

[5] Amida has not alleged any facts that suggest that Cerberus adopted a plan not to merge RAM and URI, nor has it provided any facts that suggest that Cerberus's position on the merger at any point before November 14, 2007 was such a "sharp break" from its previous position that its 13D was rendered materially misleading under the logic of *Kamerman* and *Gulf Oil.* The late August and early September communications were a single, rebuffed attempt to "have a discussion" about the terms of the merger. Although Amida alleges that the merger was "dead," it has neither alleged that Cerberus and URI stopped working towards the merger nor pleaded any facts that would support such an allegation. The brief attempt to start "a discussion" about the terms of the Merger Agreement does not by itself plausibly suggest that Cerberus abandoned its previous plan to merge RAM with URI and instead formed a plan not to merge with URI at any point prior to November 14, 2007. Therefore, Amida has not alleged that Cerberus incurred a duty to amend its 13D as set out in *Azurite.*

The developments in this case are in marked contrast to the complete about-face presented in *Kamerman* and *Gulf Oil.* Because Amida has failed to allege facts that show that Cerberus incurred a duty to amend its 13D, Amida does not state a § 10(b) claim based on Cerberus's alleged failure to amend.

**\*441 3. The Roadshow**

The third class of alleged misrepresentations upon which Amida's § 10(b) claim is based were made at a November 5, 2007 roadshow in New York City. That roadshow was intended to solicit interest in a private placement of post-Merger notes of Cerberus-owned URI. Only Qualified Institutional Buyers were invited to attend, and each attendee was provided with a preliminary Offering Circular. Due to the limited scope of the private placement, the preliminary Offering Circular warned that it was a "confidential document that we are providing only to prospective purchasers of the notes solely for the purpose of making a decision whether to invest in the notes."

At the roadshow, Cerberus employee Carlton Donaway gave a presentation that Amida alleges "gave further comfort that the Merger would close as planned." [FN6] The particular misstatements that Donaway is alleged to have made are the following:

> FN6. Paragraph 55 of the Amended Complaint alleges that Donaway "said the Merger would close as planned." However, this statement is not in quotation marks and is not included in the "False and Misleading Statements" section of the Amended Complaint. Amida also does not point to this statement as an actionable misstatement in its Memorandum in Opposition. Because Amida does not identify this as a direct quotation, I take it that Amida offers it as a paraphrase of the specifically-identified statements in Paragraph 97 of the Amended Complaint.

1) "The poor condition of the credit and financial markets did not affect Cerberus's optimistic view of the Merger"; (Am. Compl. ¶ 97.)

2) "With an industry growing at 11% compound annual growth rate, or 'CAGR' Cerberus found its investment in URI to be attractive, notwithstanding the current credit environment;" *Id.*

3) "Cerberus had already asserted significant control over the management and operations of URI and Cerberus was actively involved in the day-to-day management and operations of URI;" *Id.*

4) "New management at URI, under the direction of new owner, Cerberus, had already taken steps to enhance cost savings at URI, transforming Cerberus-controlled URI from a 'growth story' to a 'cost story,' and that Cerberus-controlled URI was now focused on improving its core business, with the benefit of approximately $200 million in immediate cost savings;" *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

5) "New management at Cerberus-controlled URI had already sold URI's three corporate jets;" *Id.*

6) "New management at Cerberus-controlled URI would strive to outsource more functions;" *Id.*

7) "Cerberus had already completed an evaluation of the workforce of URI and new management at Cerberus–controlled URI planned on terminating 1,100 employees, resulting in a \$55 million cost savings for URI. This included terminating 700 employees by November 16, 2007, and the remainder of them by March 2008." *Id.*

It is clear how Donaway's statements could be materially misleading if Cerberus had abandoned its plan to merge with URI at the time of the roadshow. It is less obvious how Donaway's statements about Cerberus's plans for URI after the merger, or statements about steps already taken to make URI more profitable (sale of URI's corporate jets, e.g.) would be rendered false or misleading by Donaway's **\*442** failure to disclose "misgivings," "reluctance," or a desire to "rethink" the merger.

In essence, Amida's Amended Complaint equivocates between the theory that Donaway's statements were false because Cerberus had already abandoned the merger and the theory that those statements would lead a URI shareholder to believe that the merger was likely to occur, a materially misleading impression in light of the "increased risk" of non-consummation.

Ultimately, neither theory can be successful because the facts of Amida's Amended Complaint do not give rise to a strong inference of scienter. As explained above, the plaintiff must show "strong circumstantial evidence" of "conscious misbehavior or recklessness" when there are no allegations of motive. *JP Morgan Chase,* 553 F.3d at 198. Among the ways that a plaintiff may show such "strong circumstantial evidence" are showing that the defendant "engaged in deliberately illegal behavior" or "knew facts or had access to information suggesting that their public statements were not accurate." *Id.,* at 199 (*citing Novak,* 216 F.3d at 311).

The parties disagree sharply about what may be inferred from the fact that the roadshow was intended to market notes that would only issue should the merger close, and what that may imply about the materiality of the alleged omissions.

The circumstances of the roadshow are important when considering whether the facts alleged in the complaint are strong circumstantial evidence of scienter. Given the goal of his presentation, Donaway expressly addressed why post-Merger URI would be a good investment, not whether the Merger would occur. Amida has not argued that the nondisclosure of facts regarding an "increased risk" would tend to mislead an audience solely concerned with the value of post-Merger URI debt. I assume for purposes of this motion that the "increased risk" may have been material to potential purchasers of URI common stock. Thus, Amida in sum argues that Donaway knew or should have known that potential purchasers of URI shares were among his audience, anticipated that his statements about Cerberus's plans for post-Merger URI would lead them to believe that the merger was likely, and therefore understood that he might deceive those URI purchasers unless he disclosed the facts suggesting an increased risk that the merger would not close.

[6] Section 10(b) does not create a cause of action for negligence. As the Supreme Court stated in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), § 10(b) only prohibits conduct undertaken with "intent to deceive, manipulate, or defraud." *Id.* at 189, 96 S.Ct. 1375. The Second Circuit has interpreted *Ernst & Ernst* to permit a § 10(b) action based on reckless conduct that is "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak,* 216 F.3d at 308; *see also JP Morgan Chase,* 553 F.3d at 203. It is therefore not enough for Amida to allege that Donaway's presentation might have misled a potential URI purchaser about Cerberus's opinion of the Merger by implication; Donaway must have either acted knowingly or been "highly unreasonable" in disregarding that potential to mislead to incur § 10(b) liability. Amida has not alleged any facts from which it can be inferred that Donaway knew or was reckless in not knowing that potential purchasers of URI

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

common stock attended the roadshow, or, knowing that, it was an "extreme departure from the standard of ordinary care" not to disclose information which would have prevented a URI stock purchaser attending the Notes Roadshow from erroneously concluding **\*443** that Cerberus believed that there was a low risk that the merger would not close.

Amida thus falls back on the position adopted in the initial Complaint, that Cerberus had already determined that it would not merge by the time of the roadshow but chose to conduct the roadshow anyway and to have Donaway misrepresent Cerberus's position. This theory fails because Amida has not pleaded facts that make that culpable inference cogent.

Amida's inference that Cerberus had abandoned the merger by November 5 rests principally on the rebuffed attempt to renegotiate in late August and early September, and the fact that Cerberus indicated its intent not to close the deal as agreed on November 14, only nine days after the roadshow. Amida also points to the testimony of Cerberus founder and CEO Stephen Feinberg in the Delaware Chancery trial. There, he testified that Cerberus was not ready to close the deal "in November," and so "tol[d] both the company and the banks that were not prepared to go forward at $34.50." Amida interprets this to mean that Cerberus had already decided not to go ahead at $34.50 as of the date of the roadshow, although there are no facts pleaded that suggest Cerberus indicated that to URI and its banks any earlier than November 12, 2007.

[7] The factual allegations of the Amended Complaint give rise to competing non-culpable inferences. First, the fact that Cerberus held a roadshow at all would be at least curious if Cerberus had concluded that the transaction would not take place. While Amida argues the roadshow was a "deceptive nonverbal act," it has abandoned any attempt to suggest a motive for Cerberus to hold a roadshow knowing that it would never issue the notes that were the subject of that roadshow. While a § 10(b) plaintiff is not required to plead a motive, Amida's inability to suggest any logical reason for Cerberus to hold a roadshow for notes that would never be issued weakens the inference that Amida urges. Next, Amida relies on the late August and early September communications to show that Cerberus had abandoned the merger by November. Amida has alleged no other facts that would suggest that Cerberus and URI had not been working towards the merger in the intervening months. Finally, the inference from the temporal proximity of the roadshow to the November 14 announcement is not "strong circumstantial evidence" that Cerberus had knowingly misrepresented the state of affairs on November 5.

In sum, the inference that Cerberus was working towards the merger as of November 5 is stronger than the culpable inference that it had abandoned the merger and knowingly or recklessly misrepresented to the contrary at the roadshow. Ultimately, Amida has not explained either why Cerberus would hold a false roadshow, or alleged facts that are "strong circumstantial evidence" that Cerberus had already decided not to merge with URI when it held the roadshow. Therefore, Amida's § 10(b) claim based on the roadshow fails because the facts of Amida's complaint do not give rise to an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 308, 127 S.Ct. 2499.

Thus Amida's § 10(b) allegations do not meet the pleading standard for each element of a § 10(b) claim with respect to any class of alleged misstatements.

**B. Section 20(a)**

Because Amida's complaint does not state a claim under § 10(b), its § 20(a) claim must be dismissed for lack of a primary violation. *See JP Morgan Chase,* 553 F.3d at 207 (*citing SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)).

**\*444 C. New York Common Law Claims**
### 1. Common Law Fraud and Fraudulent Inducement
[8][9][10] Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the inten-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

669 F.Supp.2d 430
**(Cite as: 669 F.Supp.2d 430)**

tion of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996). The elements of a claim for fraudulent inducement are similar: the defendant must have made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that the plaintiff justifiably relied on that misrepresentation to its injury. *Braddock v. Braddock,* 60 A.D.3d 84, 86, 871 N.Y.S.2d 68 (1st Dept.2009). State law claims of fraud and fraudulent inducement must be based on facts giving rise to a "strong inference" of fraudulent intent. *See, e.g., Lerner v. Fleet Bank,* 459 F.3d 273, 290 (2d Cir.2006) (to state a claim for fraud under New York law, a complaint must plead facts giving rise to a "strong inference of fraudulent intent.")

### 2. Promissory Estoppel

[11] The elements of a claim for promissory estoppel under New York law are: (1) a clear and unambiguous promise; (2) upon which the plaintiff reasonably and foreseeably relied; (3) to the plaintiff's detriment. *Cyberchron Corp. v. Calldata Sys. Dev.,* 47 F.3d 39, 44 (2d Cir.1995) (citing *Ripple's of Clearview Inc. v. LeHavre Assoc.,* 88 A.D.2d 120, 122 452 N.Y.S.2d 447 (2d Dept.1982)). Amida's complaint does not allege that Cerberus made any promise to Amida that the URI deal would close, much less a "clear and unambiguous" one.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is granted. Leave to replead is not granted because further amendment would be futile. *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008) (*citing Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). The Amended Complaint has not cured the defects of the initial complaint. Amida has not demonstrated how it might "transform the facts pleaded into a sufficient allegation" of fraud under § 10(b) of the Securities Exchange Act or New York common law. *See Lewis ex rel. American Express Co. v. Robinson* (*In re American Express Co. Shareholder Litig.*), 39 F.3d 395, 402 (2d Cir.1994). The Clerk of the Court is instructed to close the case.

SO ORDERED.

S.D.N.Y.,2009.
Amida Capital Management II, LLC v. Cerberus Capital Management, L.P.
669 F.Supp.2d 430

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**D'Antonio**



Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
*D'Antonio v. MTA, et al*, 2008 WL 582354 (SDNY 3/4/08)

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Daniel P. D'ANTONIO, et al., Plaintiffs,
v.
METROPOLITAN TRANSPORTATION AUTHORITY; New York City Transit Authority; Transport Workers
Union of America, AFL-CIO, Local 100; Roger Toussaint as President of Transport Workers Union Local 100; and
John Doe and Jane Doe and other persons to be named later as officials of Transport Workers Union, AFL-CIO,
Local 100, Defendants.

No. 06 cv 4283(KMW).
March 4, 2008.

*Opinion and Order*

WOOD, District Judge.

**\*1** This action arises from Defendants' alleged wrongful diversion of money from Plaintiffs' employee retire-
ment health benefit funds. In this Order, the Court resolves three motions pending before the Court (the "three mo-
tions"): (1) Defendant Metropolitan Transportation Authority (the "MTA")'s motion for reconsideration of the
Court's April 27, 2007 order denying the MTA's motion to dismiss the Complaint;[FN1] (2) Defendant New York City
Transit Authority (the "NYCTA")'s motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure
12(b)(6);[FN2] and (3) Defendants Transport Workers Union of America Local 100 (the "Union"), Roger Toussaint,
John Doe, and Jane Doe (together, the "Union Defendants")'s motion for partial judgment on the pleadings.

> FN1. Although the MTA characterized its original motion as a motion to dismiss, the Court recharacterizes
> it as a motion for judgment on the pleadings because the MTA answered the Complaint prior to filing its
> motion. *See* MTA Answer (D.E.4); *United States v. Rivera,* 376 F.3d 86, 92 (2d Cir.2004) ("The court is
> not required to accept labels the parties place on their motions if those characterizations are inapt ....").

> FN2. The NYCTA was named as a defendant in Plaintiffs' Amended Complaint (D.E.30). The Court shall
> refer to the Amended Complaint as "the Complaint" for the purposes of this motion.

For the reasons stated below, the Court (1) GRANTS the MTA's motion for reconsideration and GRANTS in
part and DENIES in part the MTA's earlier motion for judgment on the pleadings; (2) GRANTS in part and DE-
NIES in part the NYCTA's motion to dismiss; and (3) GRANTS in part and DENIES in part the Union Defendants'
motion for partial judgment on the pleadings.

I. *Background*[FN3]

> FN3. For the purpose of considering a motion to dismiss or a motion for judgment on the pleadings, the
> Court must accept as true the allegations in the Complaint. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518,
> 521 (2d. Cir.2006); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts WorldWide, Inc.,*
> 369 F.3d 212, 217 (2d Cir.2004).

A. *The Parties*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

Plaintiffs are allegedly employees of the MTA and members of the Union, and are currently about to retire. Compl. ¶¶ 1, 3. Defendant MTA is a public authority and public benefit corporation, created and operated pursuant to the Public Authorities Law of the State of New York. *See* N.Y. Pub. Auth. Law § 1263. It is responsible for operating, *inter alia,* all of the rapid transit lines within New York City. *See* Compl. ¶ 12. Defendant NYCTA is also a public authority and public benefit corporation, created and operated pursuant to the Public Authorities Law of the State of New York. *See* N.Y. Pub. Auth. Law § 1201. It provides subway and bus transportation throughout New York City. Plaintiffs allege that the NYCTA is a subsidiary of the MTA. *See* Compl. ¶ 13. Defendant Union is Plaintiffs' collective bargaining representative. Defendant Toussaint is President of the Union.

B. *Plaintiffs' Retirement Health Benefit Plans*
The Complaint alleges that Plaintiffs are participants in or beneficiaries of two health benefit plans. First, under the "25/55 Plan," "some" of the Plaintiffs, as well as thousands of similarly-situated MTA and NYCTA employees, were "assured of" certain health benefits upon retirement in exchange for contributing 2.3 percent of their wages to a fund maintained by the MTA (the "Health Benefit Fund").[FN4] Compl. ¶¶ 1, 2, 46. Plaintiffs' briefing clarifies that they allege the 25/55 Plan was established pursuant to a Collective Bargaining Agreement between the NYCTA and the Union (the "25/55 CBA"). *See* Pl. Counterstatement (D.E.47) ¶ 13; *see also Pegram v. Herdrich,* 530 U.S. 211, 230 n. 10 (2000) (noting that the Court may use a plaintiffs' brief to clarify allegations in the complaint whose meaning is unclear). Second, the Complaint also alleges the existence of an "Active Benefit Fund," which was established "for ... [Plaintiffs'] benefit" to pay for health benefits upon retirement. The Active Benefit Fund was also funded through wage deductions from Plaintiffs. However, the Complaint does not specify how the Active Benefit Fund was created, or whether the Active Benefit Fund was also established pursuant to the 25/55 CBA. *See* Compl. ¶¶ 2, 3, 62.

> FN4. According to the Complaint, the 25/55 plan allowed eligible MTA and/or NYCTA employees to retire at age fifty-five with full medical benefits. Compl. ¶ 48. The MTA and/or NYCTA allegedly deducted wages from some Plaintiffs' paychecks as part of this program from January 1995 until December 1996. Compl. ¶¶ 2, 60.

C. *Diversion of Funds*
**\*2** The Complaint alleges that the "MTA and/or NYCTA" took and misapplied money from the Health Benefit Fund and Active Benefit Fund (the "Funds"), with the active or tacit consent of the Union. Compl. ¶ 63. Money from the Funds is no longer available to fund Plaintiffs' retirement health benefits, and Plaintiffs are allegedly going to be deprived of retirement health benefits as a result of this diversion of funds. Compl. ¶¶ 3, 63, 65, 90. In addition, the Complaint alleges that the Union induced Plaintiffs to vote for approval of the 25/55 Plan, while knowing that the MTA and/or the NYCTA intended to use the Health Benefit Fund as their own "slush fund." Compl. ¶¶ 5, 56.

D. *Plaintiffs' Claims*
Plaintiffs allege the following claims, arising from Defendants' alleged diversion of money from the Funds: (1) wrongful misappropriation of funds by the MTA, NYCTA, and Union (claims 1 and 10); (2) conversion and bad faith by the MTA, NYCTA, and Union (claims 2(a) and 11(a)); (3) breach of the duty of fair representation by the Union (claims 2(b) and 11(b)); (4) breach of fiduciary duties by the Union in violation of New York Labor Law § 723 (claims 3 and 12); (5) breach of the Union's duty to hold Plaintiffs' money solely for the benefit of the Union and its members, in violation of 29 U.S.C. § 501 and New York Labor Law § 720 (claims 4 and 13); (6) fraud by the MTA, NYCTA, and Union (claims 5 and 14); (7) unjust enrichment of the MTA and NYCTA by the MTA, NYCTA, and Union (claims 6 and 15); (8) wrongful garnishment of Plaintiffs' wages by the MTA and NYCTA in violation of New York General Municipal Law § 92-a(2) (claims 7 and 16); (9) wrongful garnishment of Plaintiffs' wages by the MTA and NYCTA in violation of New York Labor Law § 193(1)(b) (claims 8 and 17); and (10) breach of contract by the MTA, NYCTA, and Union by unlawfully diminishing Plaintiffs' retirement benefits in violation of the New York Constitution, Article 5, § 7 (claims 9 and 18).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

In addition, the Court infers from the Complaint a claim for breach of contract against the NYCTA and MTA, arising from their alleged breach of the 25/55 CBA by diverting money from the Funds (the "25/55 contract claim"). *See Newman v. Silver,* 713 F.2d 14, 16 n. 1 (2d Cir.1983) ("The nature of federal pleading ... is by statement of claim, not by legal theories.").

II. *Discussion*

A. *The MTA's Motion for Reconsideration*

The MTA asks the Court to reconsider its April 27, 2007 order (the "April 2007 Order") denying the MTA's motion for judgment on the pleadings.[FN5] In the April 2007 Order, the Court converted the MTA's motion to a motion for summary judgment, and concluded that summary judgment was inappropriate because "the parties have not yet engaged in discovery, and the briefing ... reveals that there are disputed issues of material fact." Order 2. The Court concludes that reconsideration of the April 2007 Order is appropriate.

> FN5. Plaintiffs argue that the Court should not consider this Motion for Reconsideration because (1) it was filed after Local Rule 6.3's 10-day deadline, and (2) the MTA did not file a notice of motion as required by Local Rule 6.1. The Court concludes that it should overlook the motion's procedural defects. The MTA filed its motion only a day late. *See* Local Rule 6.3; Fed.R.Civ.P. 6(a). Plaintiffs had actual notice of the MTA's motion and do not argue that they were prejudiced by the MTA's delay or by the absence of a properly-filed notice of motion. The Court therefore uses its "broad discretion" to "overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001).

**\*3** Although the MTA attached exhibits not referenced in the Complaint, the MTA also made arguments for dismissal based solely on facts alleged in the Complaint. For example, the MTA argued that Plaintiffs' tort claims should be dismissed because Plaintiffs did not file a notice of claim, and that the statutes relied upon by Plaintiffs do not apply to the MTA. *See* MTA Mem. of Law 14-18 (D.E.16). The Court erred by not evaluating these arguments on their merits. Because the April 2007 Order overlooked undisputed facts alleged in the Complaint, the Court will reconsider the MTA's motion for judgment on the pleadings. *See Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 739 F.Supp. 209, 211 (S.D.N.Y.1990) (noting that a court should grant a motion for reconsideration if it failed to consider factual matters that were put before the Court in the underlying motion). The Court analyzes the merits of the MTA's motion for judgment on the pleadings together with the NYCTA's motion to dismiss in Part II.C.

B. *Standard for Motion to Dismiss and Motion for Judgment on the Pleadings* [FN6]

> FN6. The Court notes that Defendants accompanied their motions with exhibits and declarations. At the motion to dismiss or motion for judgment on the pleadings stage, the Court will consider only (1) those documents attached to the pleadings as an exhibit or any statements or documents incorporated in the Complaint by reference, and (2) any documents that are integral to the Complaint or an appropriate subject for judicial notice. *See Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154-56 (2d Cir.2006). The Court analyzes whether it should consider specific documents offered by Defendants when it discusses the merits of Defendants' arguments for dismissal in Parts II.C.5 and II.D.1. The Court also notes that it does not convert Defendants' motions to motions for summary judgment. "Summary judgment is strongly disfavored prior to the parties having had an adequate opportunity for discovery." *Park Avenue Bank, N.A. v. Bankasi,* No. 93 Civ. 1483, 1995 WL 739514, at \*1 (S.D.N.Y. Dec. 13, 1995).

The NYCTA moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. The MTA and the Union Defendants each move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

In weighing a Rule 12(b)(6) motion to dismiss, the Court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor." *Scutti Enters., LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 214 (2d. Cir.2003). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1969 n. 8 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the Complaint's allegations are true (even if doubtful in fact)." *Id .* at 1965 (citations omitted).

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). A motion for judgment on the pleadings " 'is appropriate where material facts are undisputed' after a court has considered the complaint, the answers and incorporated documents or materials, and a judgment 'is possible merely by considering the contents of the pleadings.' " *B.K. Solomon-Lufti v. New York City Dep't of Educ.,* No. 05 Civ. 7260, 2006 WL 2664218, at *2 (S.D.N.Y. Sept. 13, 2006) (quoting *United States v. 44 Autumn Ave.,* 156 F.R.D. 26, 30 (E.D.N.Y.1994)).

C. *The MTA's Motion for Judgment on the Pleadings and the NYCTA's Motion to Dismiss*
**\*4** The MTA and NYCTA each argue that the entire Complaint should be dismissed against them because, *inter alia,* (1) Plaintiffs did not state a claim for contract breach under Article 5, § 7 of the New York Constitution ("Article 5, § 7") because health insurance benefits are not within the constitution's protection; (2) New York General Municipal Law § 92-a and New York Labor Law § 193 do not apply to either the MTA or the NYCTA; (3) Plaintiffs did not file a notice of claim with respect to their tort claims; (4) Plaintiffs' 25/55 contract claim is barred by the statute of limitations and by Plaintiffs' failure to follow mandatory grievance procedures; (5) Plaintiffs' 25/55 contract claim is non-meritorious because subsequent collective bargaining agreements terminated the Funds; and (6) Plaintiffs' unjust enrichment claims should be dismissed because they are redundant, as well as barred by Plaintiffs' failure to file a notice of claim. The MTA further argues it is not an appropriate defendant with respect to the 25/55 contract claim because it was not a party to the 25/55 CBA.

For the reasons stated below, the Court dismisses claims 1-2, 5-11, 14, and 16-18 against the MTA and NYCTA.[FN7] The Court also dismisses the 25/55 CBA claim against the MTA, but does not dismiss this claim against the NYCTA.

> FN7. The Court notes that Plaintiffs did not raise claims 3-4 and 12-13 against the MTA or NYCTA. Thus, claim 15 (for unjust enrichment with respect to the Active Benefit Fund) is the only remaining numbered claim against the MTA and NYCTA.

1. *Breach of Contract Under N.Y. Constitution (claims 9 and 18)*
Pursuant to the New York Constitution ("N.Y.Constitution"), "membership in any pension or retirement system of the state or of a civil division thereof [is] ... a contractual relationship, the benefits of which shall not be diminished or impaired." N.Y. Const., Art. 5, § 7. Plaintiffs argue that Defendants' alleged diversion of money from the Funds constitutes a breach of contract under this provision. The Court concludes that Article 5, § 7 does not apply to changes to retirement health benefits. Therefore, Plaintiffs have not stated a claim for breach of contract under Article 5, § 7.

The N.Y. Constitution "does not impair the right of the public employer to alter retirement benefits other than pension contracts," *McDermott v. McDermott,* 119 A.D.2d 370, 382 (N.Y.App.Div.1986), and the New York Court of Appeals has explicitly held that retirement health insurance benefits are not within the N.Y. Constitution's protections. *See Lippman v. Bd. of Educ. of the Sewanhaka Cent. High Sch. Dist.,* 66 N.Y.2d 313, 315 (N.Y.1985).[FN8] Because the Complaint alleges that the MTA and NYCTA reduced Plaintiffs' retirement health benefits, it does not state a claim for breach of contract under Article 5, § 7. The Court therefore dismisses claims 9 and 18 against all defendants.[FN9]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

FN8. Plaintiffs do not offer contrary authority or even respond to the MTA's and NYCTA's argument that this claim should be dismissed.

FN9. Although the Union Defendants did not raise this argument, it is equally applicable to the Article 5, § 7 claims against them. Plaintiffs had the opportunity to brief this issue with respect to the MTA's and NY-CTA's motions, and they are therefore not prejudiced by the Court's application of this argument to the Union Defendants as well. Accordingly, the Court concludes that claims 9 and 18 should be dismissed against all defendants.

2. *Statutory Claims (claims 7-8, 16-17)*
The Complaint alleges that the MTA and NYCTA violated New York General Municipal Law § 92-a(2) and New York Labor Law § 193(1)(b), by wrongfully garnishing Plaintiffs' wages without written authorization. The MTA and NYCTA argue that Plaintiffs' claims should be dismissed because these statutes do not regulate the MTA or the NYCTA. The Court agrees.[FN10]

FN10. The MTA and NYCTA also argue that they are not employers under New York Labor Law §§ 720, 723 or 29 U.S.C. § 501. The Court does not reach this issue because the Complaint does not allege a cause of action against the MTA or NYCTA pursuant to these statutes. Rather, the Complaint alleges this cause of action only against the Union Defendants. *See* Compl. ¶¶ 74-78, 99-103.

a. *New York General Municipal Law § 92-a(2)*
**\*5** New York General Municipal Law § 92-a(2) authorizes "public corporations" to deduct employees' wages, with their consent, to pay for medical insurance plans. As public benefit corporations, neither the MTA nor the NY-CTA meet this statute's definition of "public corporations." *See* N.Y. Gen. Mun. Law § 92-a(1) (defining "public corporation" as "a municipal corporation, a district corporation, a school district, a consolidated health district and a county or town special district or a joint special district, governed by a separate board of commissioners").

The MTA and NYCTA are clearly not school districts, health districts, or county or town special districts. Likewise, they do not fall under the definition of a "district corporation." *See* N.Y. Gen. Constr. Law § 66 (defining a "district corporation" to include "any territorial division of the state, other than a municipal corporation ... which possesses the power to contract indebtedness and levy taxes or benefit assessments upon real estate or to require the levy of such taxes or assessments"). Finally, the MTA and NYCTA do not fall within the statute's definition of a "municipal corporation." *See* N.Y. Gen. Mun. Law § 2 (defining "municipal corporation" to "include[ ] only a county, town, city and village"); *Bender v. Jamaica Hosp.,* 40 N .Y.2d 560, 561-62 (N.Y.1976) (holding that a public benefit corporation does not "fit within" the General Municipal Law's definition of municipal corporation because it applies "only" to a county, town, city, or village). Plaintiffs do not offer contrary authority or even respond to the MTA's and NYCTA's argument. Because the Court concludes that the MTA and NYCTA do not fall under the statutory definition of a public corporation, it dismisses Plaintiffs' New York General Municipal Law § 92-a(2) claims (claims 7 and 16).

b. *New York Labor Law § 193(1)(b)*
New York Labor Law § 193(1)(b) states that "[n]o employer shall make any deduction from the wages of an employee, except deductions which ... are expressly authorized in writing by the employee and are for the benefit of the employee." The statute provides that "[t]he term 'employer' shall not include a governmental agency ." N.Y. Labor Law § 190(3). The MTA and NYCTA are both governmental agencies, and therefore do not fall under the terms of this statute. *See Innis Arden Golf Club v. Pitney Bowes, Inc.,* 514 F.Supp.2d 328, 338 (D.Conn.2007) ("The MTA ... is considered a state agency under New York law."); *Straker v. Metro. Transit Auth.,* 333 F.Supp.2d 91, 96 (E.D.N.Y.2004) ( "NYCTA is a government agency of the City of New York ...."). Plaintiffs do not offer contrary authority or even respond to the MTA and NYCTA's argument. The Court therefore concludes that New York Labor

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

Law § 193(1)(b) does not apply to the MTA or NYCTA, and dismisses claims 8 and 17.

3. *Tort Claims (claims 1, 2(a), 5, 10, 11(a), and 14)*
   **\*6** The MTA and NYCTA argue that the Court should dismiss Plaintiffs' tort claims against them for fraud, misappropriation, and conversion, because Plaintiffs failed to serve them with a notice of claim. The Court agrees, and dismisses Plaintiffs' fraud, misappropriation, and conversion claims against the MTA and NYCTA.

   A plaintiff may not commence an action "founded on tort" against the MTA or NYCTA, "unless a notice of claim shall have been served." *See* N.Y. Pub. Auth. Law §§ 1212(2), 1276(2).[FN11] Plaintiffs concede that they have not filed a notice of claim against either the MTA or the NYCTA. Plaintiffs argue, however, that the Court should not dismiss their tort claims because (1) the § 1212(2) and § 1276(2) notice of claim requirement applies only to personal injury actions; and (2) if Plaintiffs were required to file a notice of claim, the Court should grant them leave to file a late notice. Neither argument is persuasive.

>   FN11. "The notice shall be in writing, sworn to by or on behalf of the claimant, and shall set forth: (1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable ...." N.Y. Gen. Mun. Law § 50-e(2).

   Plaintiffs' argument that the notice of claim requirement applies only to personal injury actions is inconsistent with the plain language of § 1212(2) and § 1276(2), which require Plaintiffs to serve a notice of claim for any action "founded on tort." Plaintiffs offer no authority supporting an alternative reading of these statutes,[FN12] and the Court therefore follows the statutes' plain meaning. *See also Groves v. New York City Transit Auth.,* 843 N.Y.S.2d 452, 453 (N.Y.App.Div.2007) ("Timely service of a notice of claim is a condition precedent to the commencement of an action sounding in tort against the New York City Transit Authority [or] the Metropolitan Transportation Authority ....").

>   FN12. The only authority Plaintiffs cite is *Cervenka v. New York City Transit Auth.,* 216 A.D.2d 511, 511 (N.Y.App.Div.1995). However, *Cervenka* does not support Plaintiffs' argument. In *Cervenka,* the court held that a plaintiff was not required to serve a notice of claim in a statutory employment discrimination action because the action was "not a tort action." *Id.* In contrast, Plaintiffs allege a series of tort claims against the MTA and NYCTA.

   With respect to Plaintiffs' argument that the Court should grant them leave to file a late notice of claim, the Court concludes that it lacks jurisdiction to consider such a request. Pursuant to N.Y. General Municipal Law § 50-e(7), applications for leave to serve a late notice of claim may be filed only in certain state courts. *See* § 50-e(7) ("All applications ... shall be made to the supreme court or to the county court ...."). The Court agrees with the "overwhelming weight of authority among district courts in the Second Circuit" that this provision prohibits a federal court from granting leave to file a late notice of claim. *See Henneberger v. County of Nassau,* 465 F.Supp.2d 176, 200 (E.D.N.Y.2006); *see also Drees v. County of Suffolk,* No. 06-cv-3298, 2007 WL 1875623, at \*15 (E.D.N.Y. Jun. 27, 2007); *Costabile v. County of Westchester,* 485 F.Supp.2d 424, 431 (S.D.N.Y.2007); *Brown v. Metro. Transp. Auth.,* 717 F.Supp. 257, 258-61 (S.D.N.Y.1989).

   Accordingly, because Plaintiffs failed to file a notice of claim with respect to their tort claims for fraud (claims 5 and 14), misappropriation (claims 1 and 10),[FN13] and conversion (claims 2(a) and 11(a)), the Court dismisses these claims against the MTA and NYCTA.[FN14]

>   FN13. In their opposition to the MTA's motion, Plaintiffs argue that they were not required to file a notice of claim with respect to their misappropriation claim, because this claim is indistinguishable from their breach of contract claim. Assuming *arguendo* that Plaintiffs' misappropriation claim is really a claim for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

breach of contract, then it should be dismissed as redundant because Plaintiffs asserted contract breach claims. Plaintiffs have no separate tort remedy for an action based solely on breach of contract. *See IBM Credit Corp. v. Mazda Motor Mfg. (USA) Corp.,* 152 A.D.2d 451, 453 (N.Y.App.Div.1989) ("In the absence of a breach of a duty, independent of the contract, which results in injury, a tort claim will not lie."); *Clark-Fitzpatrick v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389 (N .Y.1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").

FN14. Plaintiff also alleges that the MTA and NYCTA acted in "bad faith" (claims 2(a) and 11(a)), although neither Plaintiffs nor Defendants discuss this claim in their briefing. Insofar as Plaintiffs allege a tort claim for bad faith against the MTA and NYCTA, the Court dismisses this claim as well, for failure to file a notice of claim. The Court also notes that in alleging "bad faith," Plaintiffs may have intended to allege a claim for breach of the implied covenant of good faith and fair dealing. The Court discusses this potential claim *infra* note 22.

4. *Unjust enrichment (claims 6 and 15)*[FN15]

FN15. In order to state a claim for unjust enrichment under New York law, a plaintiff must show that "(1) defendant was enriched, (2) the enrichment was at plaintiff's expense, and (3) the circumstances were such that equity and good conscience require defendant to make restitution." *Violette v. Armonk Assocs., L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995).

**\*7** The MTA and NYCTA argue that Plaintiffs' unjust enrichment claims should be dismissed because these claims arise from the 25/55 CBA.[FN16] The Court concludes that Plaintiffs' unjust enrichment claim with respect to the Health Benefit Fund should be dismissed, but that their claim with respect to the Active Benefit Fund should not be dismissed at this time.

FN16. The Court notes that Plaintiffs never responded to this argument.

a. *Health Benefit Fund Claim (claim 6)*

Plaintiffs allege a claim for unjust enrichment based on the MTA's and NYCTA's diversion of funds from the Health Benefit Fund. The Health Benefit Fund was created pursuant to the 25/55 CBA, a contract between the NYCTA and the Union. Because the 25/55 CBA governs Plaintiffs' rights with respect to the Health Benefit Fund, Plaintiffs cannot allege a claim against Defendants for unjust enrichment. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.,* 5 N.Y.3d 561, 572 (N.Y.2005).[FN17] Because the 25/55 CBA governs Plaintiffs' rights with respect to the Health Benefit Fund, the Court dismisses Plaintiffs' unjust enrichment claim against all defendants (claim 6).[FN18]

FN17. The Court notes that although the MTA is not a party to the 25/55 CBA, the contract still governs Plaintiffs' rights with respect to the Health Benefit Fund. Accordingly, Plaintiffs cannot state a claim for unjust enrichment against any of the defendants. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

FN18. Although the Union Defendants did not raise this argument, it is equally applicable to the unjust enrichment claim against them. Plaintiffs had the opportunity to brief this issue with respect to the MTA's and NYCTA's motions, and they are therefore not prejudiced by the Court's application of this argument to the Union Defendants as well. Accordingly, the Court concludes that claim 6 should be dismissed against all defendants.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

b. *Active Benefit Fund Claim (claim 15)*

Plaintiffs also allege an unjust enrichment claim with respect to the Active Benefit Fund, arguing that the "MTA and/or NYCTA" "effectively garnished wages of its employees ... with no authority to do so." Compl. ¶ 107. The Complaint does not make clear whether the Active Benefit Fund is governed by a valid contract, and none of the alleged contracts cited by the MTA and NYCTA as exhibits make reference to the "Active Benefit Fund." The Court therefore concludes that factual development is necessary in order to establish the origins of the Active Benefit Fund. Accordingly, the Court cannot conclude at this stage that Plaintiffs' unjust enrichment claim is precluded by the 25/55 CBA.[FN19]

> FN19. The NYCTA also argues that Plaintiffs' unjust enrichment claim should be dismissed for failure to file a notice of claim. The § 1212(2) and § 1276(2) notice of claim requirements generally do not apply to unjust enrichment claims. *See Schneider v. Town of Orangetown,* 673 N.Y.S.2d 281, 281 (N.Y.Sup.Ct.1998); *Accredited Demolition Constr. Corp. v. City of Yonkers,* 37 A.D.2d 708, 709 (N.Y.App.Div.1971). However, the NYCTA argues that Plaintiffs' claim should be dismissed because it arises out of a claim for conversion. *See Smith v. Scott,* 294 A.D.2d 11, 17 (N.Y.App.Div.2002) ("[A] notice of claim [requirement] ... may not be evaded by resort to an [action upon the equitable principle of unjust enrichment] instead of an action in tort for conversion ....").

> This argument is unpersuasive, because the facts Plaintiffs allege with respect to the Active Benefit Fund do not support a conversion claim against the MTA or NYCTA. Plaintiffs allege that the MTA and NYCTA diverted money from the Active Benefit Fund. In order to state a claim for conversion, Plaintiffs must allege that they had "title, possession, or control" of that Fund. *See Fiorenti v. Cent. Emergency Physicians, PLLC,* 305 A.D.2d 453, 454-55 (N.Y.App.Div.2003). Plaintiffs make no such allegation; rather, they allege that the Active Benefit Fund held money that was to be used to pay for their health benefits. *See* Compl. ¶ 62. Plaintiffs also cannot state a claim for conversion based on the MTA's and NYCTA's initial deduction of their wages. Plaintiffs allege that they contributed their money to a fund "for use of the benefit [Union] members." Compl. ¶ 62. Accordingly, Plaintiffs cannot state a claim for conversion because they authorized the deductions and no longer "ha[ve] legal ownership or an immediate right of possession" with respect to this money. *Whitman Realty Group, Inc. v. Galano,* 838 N.Y.S.2d 585, 592 (N.Y.Sup.Ct.2007). The NYCTA did not point the Court to another way to characterize Plaintiffs' unjust enrichment claim as sounding in tort. The Court therefore applies the general rule that Plaintiffs need not file a notice of claim for their unjust enrichment claim.

5. *25/55 CBA Contract Claim*

The MTA and NYCTA each argue that the 25/55 contract claim should be dismissed against them. The Court concludes that this claim should be dismissed against the MTA, but not against the NYCTA.

a. *The MTA*

The MTA argues that Plaintiffs' breach of contract claim should be dismissed against it because the MTA was not a party to the 25/55 CBA. The Court agrees, and dismisses the breach of contract claim against the MTA.

"[A] contract cannot bind a non-party." *Int'l Customs Assocs ., Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1256 (S.D.N.Y.1995); *see also Crabtree v. Tristar Auto. Group, Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract."). The 25/55 CBA is an agreement between the Union and NYCTA; the MTA is not a party. Although the Complaint alleges that the NYCTA is a subsidiary of the MTA, Compl. ¶ 13, Plaintiffs allege no facts regarding the MTA's participation in the negotiation of the 25/55 CBA or the MTA's relationship with the NYCTA that would indicate that the MTA should be liable for the NYCTA's contract. *See Horsehead Indus., Inc. v. Metallgesellschaft AG,* 239 A.D.2d 171, 171-72 (N.Y.App.Div.1997) (noting that a parent can be liable as a party to a subsidiary's contract "if the parent's conduct manifests an intent to be bound by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

the contract, which intent is inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes").[FN20] Accordingly, the Court dismisses the 25/55 contract claim against the MTA.

> FN20. The Complaint also alleges that the "MTA and/or NYCTA" deducted wages from Plaintiffs pursuant to the 25/55 Plan, Compl. ¶ 60, and that the "MTA and/or NYCTA" subsequently diverted these funds, Compl. ¶ 3. Although these allegations may support other claims against the MTA, they do not support Plaintiffs' breach of contract claim.

**b. *The NYCTA***

**\*8** The NYCTA argues that Plaintiffs' 25/55 contract claim against them should be dismissed because (1) the NYCTA's actions with respect to the Funds are permitted under a subsequent collective bargaining agreement between the NYCTA and the Union (the "2002 CBA"); (2) Plaintiffs failed to follow a mandatory grievance procedure outlined in the 2002 CBA to challenge the NYCTA's actions; and (3) Plaintiffs' claim is barred by New York's six-year statute of limitations for contract disputes. The Court denies the NYCTA's motion because (1) the Court cannot consider the 2002 CBA at the motion to dismiss stage; and (2) the facts alleged in the Complaint do not establish that Plaintiffs' claim is barred by the statute of limitations.

**i. *2002 CBA***

The NYCTA argues that Plaintiffs failed to state a claim for breach of the 25/55 CBA because its actions were permitted by the 2002 CBA. The NYCTA alleges that the 2002 CBA eliminated the Funds and created a guaranteed defined benefit plan for both active employees and retirees.[FN21] The NYCTA also argues that Plaintiffs failed to abide by a provision in the 2002 CBA that provides for mandatory grievance procedures for alleged breaches of the agreement by the NYCTA. The Court concludes that it cannot consider the 2002 CBA at this stage, and therefore does not reach the merits of the NYCTA's arguments.

> FN21. The 2002 CBA was submitted as an exhibit to the MTA's motion for judgment on the pleadings and to the NYCTA's motion to dismiss.

Because the pleadings do not attach or reference the 2002 CBA, the Court may only consider the 2002 CBA if it is "integral to [the] complaint." *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 156 (2d Cir.2006). Documents are integral to the Complaint when a plaintiff "*rel[ied]* on the terms and effect of a document in drafting the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (emphasis in original). The 2002 CBA is not integral to the Complaint. The Complaint never mentions the 2002 CBA, and alleges only that the MTA and NYCTA "wrongfully t[ook] and misapplied" money from the Funds. Compl. ¶ 63. Moreover, in their briefing, Plaintiffs state that they do not concede that the 2002 CBA was the cause of the Funds' alleged diversion, or that the 2002 CBA is valid. *See, e.g.,* Pl. Counterstatement (D.E.47) ¶ 8 ("Without discovery it cannot be ascertained what exactly occurred to the [Health Benefit Fund] and/or whether the CBA was valid."). Furthermore, the Court cannot conclude as a matter of law that the "Welfare Benefit Trust Fund" referred to in the 2002 CBA is synonymous with the Funds referred to in the Complaint.

The Court therefore concludes that because the Complaint does not rely on any of the 2002 CBA's terms, it is not integral to the Complaint and the Court cannot consider it with respect to the NYCTA's motion. Accordingly, the Court does not consider the NYCTA's arguments that (1) Plaintiffs failed to state a claim for breach of the 25/55 CBA because Defendants' actions were permitted by the 2002 CBA; and (2) Plaintiffs failed to follow mandatory grievance procedures in the 2002 CBA.

**ii. *Statute of Limitations***

**\*9** The NYCTA argues that any breach of the 25/55 CBA occurred in 1995-1996, when the NYCTA deducted wages from Plaintiffs, and that Plaintiffs' 25/55 contract claim is therefore barred by the statute of limitations. This

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

argument is unpersuasive. "A court may dismiss a claim on the basis of an affirmative defense only if the facts supporting the defense appear on the face of the complaint ...." *United States v. Space Hunters, Inc.,* 429 F.3d 416, 426 (2d Cir.2005) (internal quotation marks omitted). The Complaint alleges that the 1995-1996 deductions were made *pursuant* to the 25/55 CBA; the alleged breach occurred later, when Defendants allegedly diverted money from the Funds. *See* Compl. ¶¶ 61-62. The timing of this alleged diversion does not appear on the face of the Complaint, nor does the NYCTA point to undisputed facts regarding when the NYCTA's alleged diversion of funds occurred. Accordingly, the Court will not dismiss Plaintiff's 25/55 contract claim against the NYCTA on statute of limitations grounds.[FN22]

> FN22. In their Complaint, Plaintiffs allege that the MTA and NYCTA acted in "bad faith." The Court notes that Plaintiffs may have intended to allege a separate claim for breach of the implied covenant of good faith and fair dealing. Insofar as Plaintiffs allege such a claim, the Court dismisses it against the MTA and NYCTA. Because the MTA was not a party to the 25/55 CBA, it is not bound by any implied terms of the agreement. With respect to the NYCTA, any separate claim for breach of the implied covenant should be dismissed because Plaintiffs allege a separate claim for breach of contract. *See Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002) ("New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

In conclusion, the Court dismisses claims 1-2, 5-11, 14, and 16-18 against the MTA and NYCTA. It also dismisses the 25/55 contract claim against the MTA.[FN23] Finally, the Court dismisses claims 6, 9, and 18 against the Union Defendants, on the basis of arguments raised in the MTA's and NYCTA's motions. The Court next considers the Union Defendants' motion for partial judgment on the pleadings.

> FN23. Thus, the only claim remaining against the MTA is claim 15 for unjust enrichment with respect to the Active Benefit Fund. The only claims remaining against the NYCTA are (1) claim 15 for unjust enrichment with respect to the Active Benefit Fund; and (2) the 25/55 contract claim.

D. *Union Defendants' Motion for Judgment on the Pleadings*

The Union Defendants move for partial judgment on the pleadings. In their motion, they argue that (1) Plaintiffs' claims for misappropriation (claims 1 and 10), breach of the duty of fair representation (claims 2(b) and 11(b)), fraud (claims 5 and 14), unjust enrichment (claims 6 and 15), and breach of contract (claims 9 and 18) should be dismissed because they are barred by the applicable statutes of limitation; and (2) Plaintiffs' fraud claims should be dismissed for failure to allege fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b). The Court notes that it has already dismissed claims 6, 9, and 18 against the Union Defendants. With respect to the remaining claims, the Court denies the Union Defendants judgment on the pleadings regarding their statute of limitations argument, because factual development is necessary to determine when the alleged activities occurred. The Court grants the Union Defendants' motion with respect to the fraud claims.

1. *Statute of Limitations*

"The statute of limitations is normally an affirmative defense, on which the defendant has the burden of proof. The defendant's normal burden includes showing when the cause of action accrued." *Bano v. Union Carbide Corp.,* 361 F.3d 696, 710 (2d Cir.2004) (citations omitted). To establish that Plaintiffs' claims are barred by the applicable statutes of limitation, the Union Defendants present an alternative factual characterization of the allegations in the Complaint, and point the Court to a 1996 Collective Bargaining Agreement (the "1996 CBA") that was attached to their Answer. The Court concludes that the Union Defendants' allegations do not conclusively establish that Plaintiffs' claims are barred by the statute of limitations.

**\*10** The Union Defendants argue that the Complaint mischaracterized the facts regarding the Funds. They allege that the NYCTA made two wage deductions as part of the 25/55 Plan: (1) a 2.3 percent contribution to a pension plan made pursuant to a 1994 law, and (2) a 1.0 percent contribution to the Health Benefit Fund, made pursuant

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

to an arbitration award. According to the Union Defendants, Plaintiffs' allegations with respect to the Health Benefit Fund (claims 1-9) actually refer to their pension benefit contributions, not to their contributions to the Health Benefit Fund. Likewise, Plaintiffs' allegations with respect to the Active Benefit Fund (claims 10-18) actually refer to the Health Benefit Fund. Mem. of Law 3-4.

The Court cannot accept the Union Defendants' characterization of the facts. Read in the light most favorable to Plaintiffs, the Complaint alleges the existence of two health benefit funds: the Health Benefit Fund and the Active Benefit Fund. Absent factual development, the Court cannot conclude that there is in fact only one fund, and that Plaintiffs mistakenly characterized pension contributions as Health Benefit Fund contributions. *See Global Network Commc'ns,* 458 F.3d at 155 (holding that the Court may only "assess[ ] the legal feasibility of the complaint, [and may not] ... weigh the evidence that might be offered to support it"); *see also Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989) ("In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party.").

The Union Defendants' Answer also attaches the 1996 CBA, which the Union Defendants allege eliminated the requirement that the Health Benefit Fund maintain a reserve or fund balance, and which they argue is the source of Plaintiffs' alleged injury. The Court may consider the 1996 CBA in the Union Defendants' 12(c) motion because it is "part of the pleadings." *Canario v. City of New York,* No. 05 Civ. 9343, 2006 WL 2015651, at *2 (S.D.N.Y. Jul. 12, 2006).[FN24] However, the Court cannot conclude as a matter of law that the 1996 CBA is the source of the Funds' disappearance. In their briefing, Plaintiffs do not concede that the 1996 CBA caused the disappearance of the Funds. *See* Pl. Opp'n 3-4 (stating that discovery is required to determine "where, why, how, and by whom" the Funds were "spent down"). The 1996 CBA also does not unambiguously refer to the Funds at issue in the Complaint. The 1996 CBA refers only to a "Welfare Benefit Trust." The Complaint never mentioned a Welfare Benefit Trust, and the Court cannot assume that the Funds are synonymous with the Welfare Benefit Trust.

> FN24. The 1996 CBA states that "the Welfare Benefit Trust shall maintain current benefits through December 15, 1999. As a result there shall be no requirement that the Welfare Benefit Trust maintain reserves or a fund balance during the term of this agreement.... After December 15, 1999, the [NYCTA] will recommence making monthly defined contributions to the Welfare Benefit Trust Fund." 1996 CBA § 8.

Because the Union Defendants' statute of limitations arguments depend on their alternative factual characterization of Plaintiffs' claims and on the 1996 CBA, the Court concludes that they have not shown as a matter of law that Plaintiffs' claims are barred. Accordingly, the Court denies the Union Defendants' motion with respect to their statute of limitations argument.

*2. Adequacy of Fraud Claims*
**\*11** The Union Defendants argue that Plaintiffs' fraud claims (claims 5 and 14) should be dismissed for failure to plead a claim of fraud with particularity. The Court agrees, and dismisses these claims.

Under New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Kaufman v. Cohen,* 760 N.Y .S.2d 157, 165 (N.Y.App.Div.2003). "[T]he circumstances constituting fraud ... shall be stated with particularity," Fed.R.Civ.P. 9(b), and "fraud allegations ought to specify the time, place, speaker, and content of the alleged misrepresentations." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Plaintiffs have not adequately pleaded fraud, because they do not allege that the Union Defendants made any false representations.

Plaintiffs allege that the Union committed fraud through its promotional campaign to "induce" Union members to "ratify" the 25/55 Plan.[FN25] However, Plaintiffs fail to allege any false statements by the Union. The statements by the Union accurately describe the terms of the 25/55 Plan as alleged in the Complaint. The only alleged "misrepre-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)
**(Cite as: 2008 WL 582354 (S.D.N.Y.))**

sentation" is that the Union knew that the MTA and NYCTA intended to disregard the terms of the agreement. *See* Compl. ¶ 56. A misrepresentation about a party's intention to perform under a contract does not state a claim for fraud. *See Tesoro Petroleum Corp. v. Holborn Oil Co. Ltd.,* 108 A.D.2d 607, 607 (N.Y.App.Div.1985) ("A failure to perform promises of future acts is merely a breach of contract to be enforced by an action on the contract. A cause of action for fraud does not arise when the only fraud charged relates to a breach of contract."); *see also R. Freedman & Son Inc. v. A.I. Credit Corp.,* 226 A.D.2d 1002, 1003 (N.Y.A.D.1996) (distinguishing a false "promise to perform in the future," which does not state a claim for fraud, with an "intentional misrepresentation of the present state of affairs," which does state a claim for fraud). Because Plaintiffs do not allege that the Union misrepresented a present state of affairs, the Court concludes that Plaintiffs have not stated a claim for fraud. Accordingly, the Court dismisses claims 5 and 14 with respect to the Union Defendants.

> FN25. The Court notes that the Complaint is unclear regarding whether the Active Benefit Fund was established pursuant to the 25/55 CBA. The Court assumes *arguendo* that the Union's representations about the 25/55 CBA apply to the Active Benefit Fund, and concludes that Plaintiffs still fail to state a claim for fraud.

IV. *Conclusion*

   For the reasons stated above, the Court (1) grants the MTA's motion for reconsideration (D.E.49), and grants in part and denies in part their motion for judgment on the pleadings (D.E.16); (2) grants in part and denies in part the NYCTA's motion to dismiss (D.E.37); and (3) grants in part and denies in part the Union Defendants' motion for judgment on the pleadings (D.E.60). The Court orders that discovery in this action shall resume.

   SO ORDERED.

S.D.N.Y.,2008.
D'Antonio v. Metropolitan Transp. Authority
Not Reported in F.Supp.2d, 2008 WL 582354 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Heelan



Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
*Heelan v. Goord, et al*, 2006 WL 2335550 (NDNY 8/10/06)

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Edward J. HEELAN, Jr., Plaintiff,
v.
Glenn S. GOORD, in his official and individual capacity as Commissioner of the New York State Department of Correctional Services; and Gary Filion, in his official and individual capacity as former Superintendent of Coxsackie Correctional Facility, Defendants.

No. 05-CV-0507.
Aug. 10, 2006.

Stephen G. Denigris, Office of Stephen G. Denigris, Washington, DC, for Plaintiff.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff Edward J. Heelan, Jr., a former Correctional Officer with the New York State Department of Correctional Services, commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his First and Fourteenth Amendment rights. He seeks monetary damages as well as declaratory and injunctive relief based on his allegations that certain DOCS workplace regulations violated his constitutional rights. The central facts of the case are not in dispute, and both Plaintiff and Defendant [FN1] cross-move for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, Defendant's motion is granted and the action is dismissed.

> FN1. As indicated in the caption, Plaintiff brought claims against Glenn S. Goord and Gary Filion. However, the parties previously stipulated to dismiss all claims against Defendant Filion, and the dismissal was ordered by the Hon. David R. Homer, United States Magistrate Judge. *See* Jan. 24, 2006 Stip & Order [dkt. # 16]. Hence, Defendant Glenn S. Goord is the sole defendant remaining in this case.

**II. BACKGROUND**

From 1983 until 2004, Plaintiff was employed as a Correctional Officer ("CO") with the New York State Department of Correctional Services ("DOCS"). Def. Stat. of Mat. Facts ("Def.SOMF") ¶¶ 3-7. All COs are bound by certain employee rules designed to promote the safety and security of the prisons, including rules prohibiting unauthorized relationships with inmates and ex-inmates and requiring COs to report contacts between themselves and inmates and ex-inmates. *Id.* ¶¶ 15-16. In 1993, Plaintiff formed a music recording and producing business called "High Wire Records." *Id.* ¶ 8. In his business, Plaintiff contracted with musical performers, at least some of whom had been convicted of felonies in New York and had served time in DOCS prisons. *Id.* ¶¶ 10-11. Although Plaintiff was aware of the DOCS regulations and of the criminal histories of his clients, he did not notify DOCS officials of his business or of his contacts with these individuals. *Id.* ¶¶ 4-5, 9, 12.

On December 24, 2002, with his attorney present, Plaintiff was interviewed by the DOCS Inspector General regarding an investigation into Plaintiff's violations of DOCS' employee rules. *Id.* ¶ 13. On December 26, 2002, the DOCS Office of Labor Relations served Plaintiff with a Notice of Discipline ("NOD"). The NOD alleged, *inter alia,*

Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
**(Cite as: 2006 WL 2335550 (N.D.N.Y.))**

that Plaintiff maintained improper relationships with inmates and former inmates and that he failed to report a series of contacts with inmates and former inmates in violation of DOCS Employee Manual §§ 2.7,[FN2] 2.14,[FN3] and 2.15.[FN4] On December 26, 2002, DOCS notified Plaintiff of its intent to dismiss him from his employment as a CO for the reasons stated in the NOD.

> FN2. Section 2.7 prohibits affiliations with organizations that "will place [a CO's] personal interest or interest as a member of such group in conflict with or otherwise interfere with the impartial and effective performance of his duties as an employee."

> FN3. Section 2.14 prohibits, without the express consent of the Commissioner or his designee, (a) the acceptance of gifts, gratuities, and other considerations from or on behalf of inmates or former inmates, and (d) the giving or extending to any inmate or parolee any favor or privilege.

> FN4. Section 2.15 prohibits, without the express consent of the Deputy Commissioner or his designee, (a) association with "criminals or persons engaged in unlawful activities," and (b) engaging in any "conversation, communication, dealing, transaction, association, or relationship with any inmate, former inmate, parolee, or former parolee ... which is not necessary or proper for the discharge of the employee's duties."

Pursuant to the terms of the applicable Collective Bargaining Agreement ("CBA"), Plaintiff grieved the NOD and sought formal binding arbitration. An arbitration hearing was scheduled to address the charges levied in the NOD, but on March 11, 2003, prior to this arbitration taking place, Plaintiff filed suit in this court alleging that the disciplinary regulations cited above violated his rights secured under the First and Fourteenth Amendments to the United States Constitution. *See* Compl., dkt # 1, in *Heelan v. Goord,* 03-CV-0292 (N.D.N.Y.)("*Heelan I* ").[FN5] The defendant in *Heelan I,* "Glenn S. Goord in his official capacity as Commissioner of [DOCS]," moved to dismiss that action arguing, *inter alia,* that the Court should abstain under the doctrine set forth in *Younger v. Harris,* 401 U.S. 37 (1971). *See* Def. Mot. to Dismiss, dkt. # 6 in *Heelan I.* The arbitration hearing was postponed by agreement of the parties pending the determination of Defendant's motion to dismiss. *See* Dec. 27, 2003 Decision & Order, dkt. # 16 in *Heelan I.*

> FN5. In *Heelan I,* Plaintiff contended that Sections 2.7, 2.14 and 2.15 of the DOCS Employee Manual were void for vagueness, (compl.¶¶ 42-50); unduly over broad, (compl.¶¶ 51-63); violate his rights of freedom of speech and free association (compl.¶¶ 64-78), and deprive him of rights to enter contracts "on the basis of race because of the plaintiff's affiliation with artists of African-American descent" in violation of his rights secured by the Equal Protection Clause. Comp. ¶¶ 79-86.

**\*2** After a searching inquiry to determine whether a state judicial forum was available to review Plaintiff's constitutional challenges if the Court abstained, the Court determined that such a forum was available. *See* Dec. 27, 2003 Decision & Order, *Heelan I,* pp. 4-14. In this regard, the Court found that even though the governing CBA otherwise prevented state court review of the substantive merits of an arbitrator's decision, New York law allowed state court review of an arbitration decision that resulted in a violation of a grievant's constitutional rights. *See* Dec. 27, 2003 Decision & Order at pp. 9-13 ("While the terms of the CBA may bar the arbitrator from considering Plaintiff's defenses based on constitutional and statutory authority, and while the terms of the CBA and the law in the State of New York may bar a review of the substantive merits of the arbitrator's determination, the New York Court of Appeals has made clear that even when the parties have contracted for final and binding arbitration, a court may vacate an arbitral award 'when it violates a strong public policy ... embodied in constitutional, statutory or common law [that] prohibit a particular matter from being decided or certain relief from being granted by an arbitrator.' ")(quoting *Matter of New York State Correctional Officers & Police Benevolent Assn.,* 94 N.Y.2d at 326-27; and citing *United Federation of Teachers, Local 2, AFT, AFL-CIO v. Board of Educ. of City School Dist. of City of New York,* 2003 WL 22725405, at \* 2003 N.Y. Slip Op. 18511 (N.Y., Nov. 20, 2003)(same); *Matter of New York City Tr. Auth. v. Transport Workers Union of Am. Local 100, AFL-CIO,* 99 N.Y.2d 1, 9-11 (2002) (establishing a two-prong test for determining whether an arbitration award violates public policy); *Matter of Port Jefferson Sta. Teach-*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
**(Cite as: 2006 WL 2335550 (N.D.N.Y.))**

ers Assn. v. Brookhaven-Comsewogue Union Free School Dist., 45 N.Y.2d 898, 899 (1978)(a binding arbitration award may be set side "when the award contravenes a strong public policy, almost invariably involving an important constitutional or statutory duty or responsibility."). Accordingly, the Court abstained under *Younger* and dismissed the action. *Id.*

After abstaining, the underlying disciplinary proceeding then went forward. Before the arbitration commenced, the parties entered a stipulation that provided: "The grievant will pursue arbitration. If he does not get the relief sought in that forum, he may then go back to Federal Court." April 13, 2004 Arbitration Award, p. 4. "At his February 19, 2002 arbitration hearing the plaintiff did not controvert the material allegations underlying the charges contained in the NOD; rather, plaintiff's defense at his arbitration was based upon the challenges to DOCS employee rules which he pursues in this action." Def. SOMF ¶ 25. The arbitrator "considered, and rejected, plaintiff's facial and 'as applied' challenges to DOCS rules." *Id.* ¶ 28; *see* April 13, 2004 Arbitration Award, pp. 14-16. Plaintiff was found guilty of engaging in "unauthorized associations in violation of Manual § 2.15 and had unjustifiably failed to report inmate contacts to his employer." Def. SOMF ¶ 27 (citing, *inter alia,* the April 13, 2004 Arbitration Award). The arbitrator found that the proper penalty under the circumstances was termination, and, given that determination, Plaintiff was then formally discharged by DOCS. *Id.* ¶ 29. There is no indication that Plaintiff made any attempt to obtain state court review of the arbitrator's decision.

**\*3** On April 26, 2005, Plaintiff commenced the instant action asserting the same constitutional violations with regard to the DOCS Employee Manual as asserted in *Heelan I,* and requesting declaratory and injunctive relief as well as monetary damages. *See* Compl. [dkt. # 1]; fn. 5, *supra.* As noted in the caption, Plaintiff brings claims against Commissioner Goord in both his individual and official capacities.

### III. DISCUSSION

#### a. Jurisdiction to address constitutional challenges to the DOCS Employee Manual

First, although not raised by the parties, the Court raises *sua sponte* the question whether the abstention decision in *Heelan I* divests the Court of jurisdiction to adjudicate Plaintiff's current claims that the challenged provisions of the DOCS Employee Manual violate his constitutional rights. *See Thompson v. New York Cent. R. Co.,* 361 F.2d 137, 144-45 (2d Cir.1966) ( "[T]he District Court ... is duty bound to ... *sua sponte* [raise the question of jurisdiction ] whenever it appears that jurisdiction ... is lacking."); *Rohrer v. FSI Futures, Inc.,* 981 F.Supp. 270, 276 (S.D.N.Y.1997) ("[A]ll parties may agree among themselves that the district court has subject matter jurisdiction, but the courts, trial and appellate, are obligated to consider the matter *sua sponte.*"). The Court finds that it does and that, therefore, jurisdiction is lacking.

When the Court abstained under *Younger* in *Heelan I* and dismissed Plaintiff's constitutional challenges, it declined to accept jurisdiction over that dispute. *See Spargo v. New York State Com'n on Judicial Conduct,* 351 F.3d 65, 75 (2d Cir.2003)("*Younger* generally prohibits courts from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings so as to avoid unnecessary friction.") (interior quotes and citations omitted). The decision was based on the fundamental doctrine of federalism that recognizes the dual equal sovereigns of the federal and state courts, and on the fundamental principal of comity that recognizes that the state court is the arena where, if possible, constitutional challenges to important state interests should be addressed. *See New Orleans Public Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 364 (1989) (*Younger* abstention is rooted in principles of comity and federalism, and was designed to recognize a "proper respect for state functions.")(quoting *Younger,* 401 U.S. at 44); *see Spargo,* 351 F.3d at 74-75.[FN6] The dismissal was "without prejudice" to signify that the Court had not issued a decision on the merits and to allow Plaintiff to raise his constitutional challenges in state court-not to allow him to re-institute the matter in this Court at some later time.

FN6. The Second Circuit explained in *Spargo:*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
**(Cite as: 2006 WL 2335550 (N.D.N.Y.))**

As the Supreme Court emphasized in *Younger v. Harris,* 401 U.S. 37, 43-45, 91 S.Ct. 746 (1971), federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings. This principle of abstention is grounded in interrelated principles of comity and federalism. *See Schlagler v. Phillips,* 166 F.3d 439, 442 (2d Cir.1999). Both considerations require federal courts to be "cognizant that 'the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways .' " *Younger,* 401 U.S. at 44. "Our Federalism" in its ideal form, as the Supreme Court explained in *Younger,* strives towards "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* ... Giving states "the first opportunity ... to correct their own mistakes" when there is an ongoing state proceeding serves the vital purpose of "reaffirm[ing] the competence of the state courts," and acknowledging the dignity of states as co-equal sovereigns in our federal system. *Id.* at 200.

351 F.3d at 74-75.

While the parties might have originally been permitted to waive *Younger* abstention and proceed with the dispute in this court, *see Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 626 (1986), once *Younger* abstention was requested and granted, jurisdiction to adjudicate Plaintiff's constitutional challenges was extinguished. At that point, Plaintiff had one of two options. He could either have appealed the abstention decision to the Second Circuit Court of Appeals, or he could have pursued his constitutional challenges in New York state court. Having failed to appeal the Court's *Younger* abstention decision, that decision became final.

**\*4** Plaintiff cannot now do an end run around that determination by entering a stipulation designed to overrule the prior declination of jurisdiction and simply assert the rejected claims under a different caption. The parties' subsequent stipulation to allow Plaintiff to "go back to Federal Court" if he "[did] not get the relief sought" in arbitration does not bind this Court. *See Mehlenbacher v. Akzo Nobel Salt, Inc.,* 207 F.Supp.2d 71, 75 (W.D.N . Y.2002)( "[I]t is axiomatic that the parties cannot agree between themselves and stipulate to jurisdiction in federal court.")(citing cases). To allow the constitutional challenges to go forward in this court without even an attempt to litigate the claims in state court would make a mockery of the Court's *Younger* abstention decision and would be antithetical to the notions of federalism and comity upon which that decision was based. Accordingly, the Court finds that Plaintiff's challenges to the constitutionality of DOCS' employee regulations must be dismissed for lack of jurisdiction.

**b. Collateral Estoppel**

Further, the Court finds that adjudication of Plaintiff's constitutional challenges are barred by the doctrine of collateral estoppel. Defendant does not directly raise collateral estoppel but does raise it indirectly within the context of his Rooker-Feldman argument. *See* Def. Mem. L. pp. 11-13. This provides a sufficient basis to address the issue *sua sponte. See Curry v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003).[FN7]

FN7. In *Curry,* the Second Circuit noted that:

[W]e have previously upheld a district court's dismissal of a case on collateral estoppel grounds even where collateral estoppel was not raised as an affirmative defense in the answer, but was raised by the district court *sua sponte,* without permitting the party against which it was asserted an opportunity to argue the issue. *See Doe v. Pfrommer,* 148 F.3d 73, 80 (2d Cir.1998) ("Although the district court raised the issue of collateral estoppel *sua sponte,* this decision does not require reversal."). In so doing, we relied on "the strong public policy in economizing the use of judicial resources by avoiding relitigation." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
**(Cite as: 2006 WL 2335550 (N.D.N.Y.))**

316 F.3d at 331. In the instant case, Defendant raised the issues of collateral estoppel and res judicata in the context of the Rooker-Feldman argument with sufficient particularity to allow Plaintiff an opportunity to respond. Thus, the Court finds it appropriate to address the issue. *See Id.*

While the Rooker-Feldman doctrine does not apply because Plaintiff never sought state court judicial review of his constitutional challenges, *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005)(The Rooker-Feldman doctrine only applies when a plaintiff complains in federal court of injuries that are caused by a state-court judgment); *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 88 (2d Cir.2005)("A federal suit complains of injury from a state-court judgment ... when the [complained of] actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it."); *see also Verizon Md., Inc. v. PSC,* 535 U.S. 635, 644 n. 3 (2002)("[Rooker-Feldman] has no application to judicial review of executive action, including determinations made by a state administrative agency."), the Court may nonetheless determine whether collateral estoppel applies. *See Hoblock,* 422 F.3d at 85 ("*Exxon Mobil* teaches that Rooker-Feldman and preclusion are entirely separate doctrines.").

Under New York law, collateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.

*Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 109 (2d Cir.2002) (internal citations and quotation marks omitted). "Additionally, the issue that was raised previously must be decisive of the present action." *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir.2002)(internal citation and quotation marks omitted).

**\*5** The first requirement, that the issue being raised in the present case is identical to an issue that has already been decided, is satisfied. *Curry,* 316 F.3d at 331. Plaintiff raised the identical constitutional challenges as raised here in his arbitration proceeding. Def. SOMF ¶ 25. The arbitration proceeding constitutes a prior adjudication for purposes of collateral estoppel. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998)(collateral estoppel applies to arbitration decisions).

The second requirement, "that the party against whom estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior proceeding," has also been satisfied in this case. *Curry,* 316 F.3d at 332. As the Second Circuit has stated:

In determining whether a party had a full and fair opportunity to litigate the issue, the New York Court of Appeals has instructed that "the various elements which make up the realities of litigation," should be explored, including "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation."

*Kosakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706, 734 (2d Cir.2001)(quoting *Schwartz v. Public Adm'r,* 24 N.Y.2d 65, 72 (1969)). Plaintiff was represented by counsel at the arbitration hearing and was "afforded a full opportunity to adduce evidence, cross-examine witnesses, and make argument in support of [his] ... position [ ]." April 23, 2004 Arbitration Award, p. 1. Further, Plaintiff had a strong "incentive and initiative to litigate" the constitutionality of the relevant portions of the DOCS Employee Manual in light of the fact that this was his only defense to the NOD that sought his discharge from the employment he held for nearly twenty years. *Hickerson v. City of New York,* 146 F.3d 99, 109 (2d Cir.1998). Thus, "[t]he opportunity was clearly there." *Curry,* 316 F.3d at 332. Plaintiff had a full and fair opportunity to litigate the constitutionality of the DOCS' employee regulations, both facially and "as applied," before the Arbitrator.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
**(Cite as: 2006 WL 2335550 (N.D.N.Y.))**

Finally, the issues that were raised previously are decisive of all claims in the present action. "[A]n issue is 'decisive in the present action' if it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint." *Id.* The Arbitrator found against Plaintiff on all of his constitutional challenges to pertinent sections of the DOCS Employee Manual. The determination that there did not exist a constitutional violation by application of the challenged provisions, or on the face of the challenged provisions, is decisive of all of Plaintiff's Section 1983 claims in this action. That is, according the Arbitrator's decision collateral estoppel effect, the claims for injunctive and declaratory relief based on Plaintiff's constitutional challenges to the DOCS Employee Manual, and the claims for monetary damages based upon those challenges, fail as a matter of law. *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir .1994)("In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.").

**c. Claims seeking monetary damages**

**\*6** To the extent that the claims for monetary damages create a case or controversy not barred by the *Younger* abstention decision or by collateral estoppel, the claims are independently subject to dismissal. First, all claim for damages against Defendant Goord in his official capacity are, in essence, claims against the State of New York. *See Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997)("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....")(citing *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985)); *Aiken v. Nixon,* 236 F.Supp.2d 211, 226-28 (N.D.N.Y.2002)(A claim for monetary relief against the State of New York, one of its agencies, or a state official acting in an official capacity, is a claim against the State of New York), *aff'd* 80 Fed. Appx. 146, 2003 WL 22595837 (2d Cir. Nov. 10, 2003). Inasmuch as New York has not waived its immunity from a Section 1983 damages award, that much of the case seeking monetary damages against Defendant Goord in his official capacity is barred by the Eleventh Amendment. *See Aiken,* 236 F.Supp.2d at 226-28 (citing *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100-01 (1984); *Jones v. New York State Div. Of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999); *Kostok v. Thomas,* 105 F.3d 65, 68 (2d Cir.1997); *Trotman v. Palisades Interstate Park Commission,* 557 F.2d 35, 39 (2d Cir.1977); *Baird v. New York State Exec. Department,* 1998 WL 690951 \*2 (N.D.N.Y. September 28, 1998)).

Second, any claim for damages against Defendant Goord in is individual capacity must be dismissed because Plaintiff fails to present any evidence of Commissioner Goord's personal involvement in the application of the challenged DOCS employee regulations to Plaintiff. It is axiomatic that "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). To establish personal liability against a government official for a constitutional violation, a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). "Personal involvement" of a supervisory official may be established by evidence of: (1) direct participation in the alleged constitutional violation; (2) failure to remedy a wrong after learning of it; (3) creation or maintenance of a policy under which unconstitutional violations occurred; (4) gross negligence in managing subordinates who committed the unconstitutional acts; or (5) deliberate indifference by failing to act on information indicating that constitutional violations were occurring. *Colon,* 58 F.3d at 873.

Plaintiff asserts in broad, conclusory fashion that Defendant Goord must have been involved in implementing the employee regulations in issue, and must have been advised of Plaintiff's discharge, because Goord is the "chief executive officer of the Department of Correctional Services with direct supervision and control over all New York Correctional facilities." Pl. Mem L. in Opp., p. 19. However, "[t]he bare fact that [Goord] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim." Colon, 58 F.3d at 874. Plaintiff's conclusory allegations as to Goord's involvement do not create a question of material fact sufficient to withstand summary judgment. *See Collins v. Goord,* 2006 WL 1928646, at \* 15 (S.D.N.Y. July 11, 2006)(Dismissing § 1983 claim where, "[a]side from the entirely conclusory allegation that ... Goord [was] 'aware of and acquiesced to the unlawful practices,' [plaintiff] offers no factual allegations against Goord, assuming, erroneously, that his mere

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)
**(Cite as: 2006 WL 2335550 (N.D.N.Y.))**

status as DOCS Commissioner is enough to sustain this claim.").

**\*7** Accordingly, Defendant Goord is entitled to summary judgment dismissing all claims for monetary damages against him.

**IV. CONCLUSION**

For the reasons discussed above, Defendant's motion for summary judgment is **GRANTED** and the action is **DISMISSED.** Plaintiff's cross-motion for summary judgment is **DENIED.** The Clerk of the Court is directed to enter judgment in defendants' favor and close the file in this matter.

**IT IS SO ORDERED.**

N.D.N.Y.,2006.
Heelan v. Goord
Not Reported in F.Supp.2d, 2006 WL 2335550 (N.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Lautenberg**



Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
*Lautenberg Found. v. Madoff*, 2009 WL 2928913 *1 (DNJ 9/9/09)

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
The LAUTENBERG FOUNDATION, Joshua S. Lautenberg and Ellen Lautenberg, Plaintiffs,
v.
Peter MADOFF, Defendant.

Civil Action No. 09–816 (SRC).
Sept. 9, 2009.

West KeySummary**Securities Regulation 349B** 🔑➞**60.53**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
           349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.53 k. Misrepresentation. Most Cited Cases
    Investors' misrepresentation-based claim under Section 10(b) of the Securities Exchange Act failed to connect limited liability company's (LLC) director to the alleged misrepresentations with the specificity required, and therefore investors' claim was dismissed. Investors' complaint alleged LLC director was responsible for making, directly or indirectly, affirmative misrepresentations concerning the honesty of LLC's business, the ethics of LLC's business, the profitability of LLC's business, the financial condition of LLC, and the accuracy of account statements. However, the complaint did not allege that LLC director authored, published or made the statements. The Third Circuit had expressly held that mere responsibility for published reports, without a specific allegation of actual involvement in the preparation of the public statement or report, would not suffice to plead a claim under the Private Securities Litigation Reform Act of 1995 (PLSRA). Securities Exchange Act of 1934, § 21D(b) (1)(B), 15 U.S.C.A. § 78u–4(b) (1)(B).

Greg Trif, Louis A. Modugno, Ronald J. Riccio, Mcelroy Deutsch Mulvaney & Carpenter LLP, Morristown, NJ, for Plaintiffs.

William F. Maderer, Michael Grohs, Saiber LLC, Newark, NJ, for Defendant.

## OPINION

CHESLER, District Judge.
    **\*1** This matter comes before the Court on the motion by Defendant Peter Madoff ("Defendant" or "Peter Madoff") to dismiss the Complaint in this federal securities fraud action. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the Complaint pleads claims arising under the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.* (the "Exchange Act"), and pursuant to 28 U.S.C. § 1367 with respect to various state law causes of action also asserted in the Complaint. Plaintiffs The Lautenberg Foundation, Joshua S. Lautenberg and Ellen Lautenberg (collectively "Plaintiffs") have opposed the motion to dismiss. The Court heard oral argument on the motion on August 11, 2009. After consideration of the parties' briefing and arguments, the Court has determined that it will grant in part and deny in part the motion to dismiss. In the following discussion, the Court gives its reasons for the decision.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

## I. BACKGROUND

This action arises out of the now-notorious Ponzi scheme perpetrated by Bernard Madoff through the investment advisory services provided by his company, Bernard L. Madoff Investment Securities, LLC ("BMIS"). It is no exaggeration to say that the Madoff scandal has received daily publicity since the time it came to light. The Court, however, cannot be guided by facts or events extraneous to the pleading before it. In accordance with the Federal Rules of Civil Procedure and Third Circuit jurisprudence, the Court examines the sufficiency of the claims pled in this lawsuit based on the facts alleged in the Complaint. Those facts are as follows:

BMIS, organized in 1960 as a New York limited liability company, functioned as an investment adviser, broker-dealer and proprietary trader. BMIS took custody of clients' money to invest in its full discretion. Plaintiffs were among the many clients of BMIS, which included banks, hedge funds and institutional as well as individual investors. They each had accounts with BMIS, and their combined investment was approximately $8,922,000.

In December 2008, Bernard Madoff confessed that BMIS's investment advisory business was a giant Ponzi scheme, in which funds received from some investors were used to pay monies to other investors, that BMIS's losses totaled approximately $50 billion and that BMIS had been insolvent for years. The Securities and Exchange Commission ("SEC") charged BMIS and Bernard Madoff with securities fraud, and on February 9, 2009 Bernard Madoff entered into a partial judgment on consent, which among other things, precludes him from arguing that he did not violate securities laws as charged. The Complaint before the Court also alleges that Bernard Madoff was charged with criminal securities fraud by the federal government. Bernard Madoff has since pled guilty to securities fraud, among various other charges, and been sentenced to 150 years in prison for his crimes. While the plea and conviction are not pled in this Complaint, which was filed about 4 months before the sentencing, the Court takes judicial notice of these facts, because as matters of public record extensively and globally covered in news, legal, financial and other media, it seems to the Court that not to take notice of them would be to isolate this Complaint from reality.

**\*2** The Defendant in this action, of course, is not Bernard Madoff. The sole named defendant is Peter Madoff, his brother. Peter Madoff worked at BMIS for almost 40 years. He served as its senior managing director, director of trading, chief compliance officer and general counsel. According to the Investment Adviser Registration filed with the SEC by BMIS, attached as an exhibit to the Complaint, the two control persons of BMIS were Bernard and Peter Madoff. The Complaint alleges that Peter Madoff created the technology that permitted customers to perform trade transactions via computer. He was responsible for the day-to-day management of the trading desk at BMIS. His other duties included:

(i) directing the management and policies of BMIS; (ii) regularly verifying and accurately reporting the financial condition of BMIS; (iii) establishing, implementing controlling, monitoring and enforcing a compliance program of internal controls (the "Compliance Program") designed to ensure BMIS' compliance with all laws; and (iv) the detection, prevention, and reporting of all violations of any laws or regulations by BMIS or its employees.

(Compl., ¶ 15).

Plaintiffs allege that as a result of the BMIS Ponzi scheme, they have lost millions of dollars. According to the Complaint, various actions and inactions by Peter Madoff render him liable for their loss under Sections 10(b) and 20(a) of the Exchange Act and under the common-law tort theories of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation and negligence. Defendant moves to dismiss the Complaint in its entirety.

## II. DISCUSSION

Defendant brings this motion pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the claims asserted in the Complaint for failure to state a claim upon which relief may be granted. When evaluating the suffi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

ciency of claims subject to the pleading requirements of Rule 8(a), the Court must apply the plausibility standard articulated by the Supreme Court in Bell *Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In *Twombly* and *Iqbal,* the Supreme Court stressed that a complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556.) The cases are also clear about what will not suffice: "threadbare recitals of the elements of a cause of action," an "unadorned, the-defendant-unlawfully-harmed-me accusation" and conclusory statements "devoid of factual enhancement." *Id.* at 1949–50; *Twombly,* 550 U.S. at 555–57. While the complaint need not demonstrate that a defendant is *probably* liable for the wrongdoing, allegations that give rise to the mere *possibility* of unlawful conduct will not do. *Iqbal,* 129 S.Ct. at 1949; *Twombly,* 550 U.S. at 557.

**\*3** Certain claims in the action before the Court, however, must satisfy a pleading standard more stringent than Rule 8. Plaintiffs' claims under Section 10(b) and Rule 10b–5 are subject to the heightened pleading standard imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which the Court will review in its analysis of those claims below. Moreover, the securities fraud claims must also comply with the heightened pleading requirement of Rule 9(b). *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 275 (3d Cir.2006).

Regardless of what standard the Court must apply in examining the sufficiency of a claim, the law is clear that the Court must consider the Complaint in its entirety and review the allegations as a whole and in context. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Iqbal,* 129 S.Ct. at 1950. In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the allegations of the complaint, documents attached or specifically referenced in the complaint if the claims are based upon those documents and matters of public record. *Tellabs,* 551 U.S. at 322; *Winer Family Trust v. Queen,* 503 F.3d 319, 327 (3d Cir.2007). Moreover, though *Twombly* and *Iqbal* have abrogated the "any set of facts" pleading standard of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), these cases leave undisturbed the principle that, on a motion to dismiss, the issue before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." *Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) (relying on *Twombly* to hold that to survive a motion to dismiss a Complaint must assert "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element").

Having set forth the standards of review applicable to the Complaint, the Court will proceed to review the sufficiency of the pleading as to each claim asserted.

## A. Section 10(b) Claim For Securities Fraud

Count One of the Complaint asserts a cause of action under Section 10(b) of the Exchange Act. Section 10(b) prohibits "manipulative" or "deceptive" conduct violating SEC rules "in connection with the purchase or sale of a security." 15 U.S.C. § 78j(b). Its implementing regulation, SEC Rule 10b–5, further specifies that it shall be unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

**\*4** 17 C.F.R. § 240. 10b–5. The United States Supreme Court has recognized a private cause of action under Section 10(b) for violations of the statute and SEC rule. *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008) (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)).

As Rule 10b–5 reflects, securities fraud violations may be based on a misleading statement or omission of material fact, addressed in subsection (b) of the rule, as well as on deceptive acts or devices, as provided by subsections (a) and (c). *See, e.g., In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 336 (2004) (observing that under Rule 10b–5, a cause of action exists not only for wrongdoing related to statements or omissions but also for behavior defrauding another in connection with the purchase or sale of a security without regard to any statement); *see also Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128,152–53 (1972) (observing that actionable violations of Rule 10b–5 are not restricted to false statements or omissions). As recently observed by another judge of this Court, although "the majority of Section 10(b) and Rule 10b–5 actions are brought under Rule 10b–5(b) for false or misleading statement or omissions ... deceptive conduct alone may premise liability under Section 10(b) and Rule 10b–5." *S.E.C. v. Lucent Techs., Inc.,* 610 F.Supp.2d 342, 349–50 (D.N.J.2009).

All Section 10(b) claims, whether premised on statements or on conduct, must comply with the exacting pleading standard of the PSLRA, which among other things, requires that plaintiffs plead scienter with particularity. *Tellabs,* 551 U.S. at 313–14; *Global Crossing,* 322 F.Supp.2d at 329. Scienter, a necessary element of any section 10(b) claim, has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The PSLRA states that, in all private actions for securities fraud under federal law, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

The Complaint at bar does not invoke a particular subsection of Rule 1 0b–5 in pleading a claim thereunder, but Plaintiffs have argued to the Court that it asserts a Section 10(b) claim based on misleading statements and omissions, under Rule 10b–5(b), and based on deceptive act or scheme, under Rule 10b–5(a) and (c).

1. *Section 10(b) Claim for Fraudulent Statements and Omissions*
To maintain a private right of action for securities fraud under Section 10(b) and Rule 10b–5(b), Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge,* 128 S.Ct. at 768 (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). As the language of Rule 10b–5(b) makes plain, a violation of the securities law may be based on either an affirmative misrepresentation or omission. *Suprema Specialties,* 438 F.3d at 275. Plaintiffs allege that Peter Madoff is liable for Rule 10b–5(b) violations based on both statements and omissions of material fact. The Court will first deal with the claim insofar as it is founded on allegations of misleading statements by Defendant.

**\*5** The Complaint charges Peter Madoff with "making and/or acquiescing in the making of affirmative misrepresentations" that fall into three categories: (1) statements in BMIS promotional literature touting the company's "unblemished record of value, fair-dealing and high ethical standards"; (2) information in reports filed with the SEC misrepresenting BMIS's assets, income, cash flow and other financial data; and (3) false and nonexistent transactions reported in account statements provided by BMIS to investors. (Compl., ¶ 34 and Ex. A.) It alleges that "he was ... responsible for making, directly or indirectly, affirmative misrepresentations concerning the honesty of BMIS' business, the ethics of BMIS, the profitability of BMIS' business, the financial condition of BMIS, and the accuracy of account statements provided to Plaintiffs and other investors." (*Id.,* ¶ 36.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

Plaintiffs' misrepresentation-based claim is, however, fundamentally flawed because it fails to connect Peter Madoff to the alleged misrepresentations with the specificity required by the PSLRA and Rule 9(b). The PSLRA provides that a Section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b) (1)(B). Under Rule 9(b), Plaintiffs must "identify the source of the allegedly fraudulent misrepresentation or omission." *Suprema Specialties,* 438 F.3d at 276.

The Complaint does not allege that Peter Madoff authored, published or made the statements; rather it asserts in the alternative that he "made and*/or acquiesced in* the making of materially false and misleading misrepresentations" and that he is legally accountable for those statements under Section 10(b) based on his responsibility for the issuance of the statements. (Compl., ¶¶ 36, 38.) As expressly held by the Third Circuit, mere responsibility for published reports, without a specific allegation that the defendant was actually involved in the preparation of a public statement or report will not suffice to plead a claim under the PSLRA. *Winer Family Trust,* 503 F.3d at 334–35. The Complaint's allegations with respect to Peter Madoff's liability for the misrepresentations amount to group pleading, a doctrine which presumes "that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Id.* at 335. Indeed, at oral argument, Plaintiffs argued to the Court that the Complaint contained detailed allegations demonstrating that as a controlling person of BMIS and the person in charge of trading and compliance, these various statements and publications concerning the company's ethics, financial health and trading could be "attributed" to Peter Madoff. The Third Circuit, however, has concluded in a precedential opinion that the group pleading doctrine is inconsistent with the PSLRA's heightened pleading requirement and does not survive its enactment. *Id.* at 335, 337. In *Winer Family Trust,* the court reasoned that the presumption on which the group pleading doctrine is based runs afoul of the statutory requirement that the involvement of "the defendant" must be set forth with particularity. *Id.* at 335 (quoting 15 U.S.C. § 78u–4(b)). It noted, as a contrasting example, that the claims against one defendant in that case remained viable because it had been alleged that the defendant had been regularly quoted in press releases. *Id.* at 337 n. 8. The *Winer Family Trust* court, however, dismissed the Rule 10b–5 claims against various other individual defendants, finding the allegations that they "were responsible for the accuracy of the public reports and releases" and that they had "access to, control over, and ability to edit and withhold dissemination of [the corporation's] press releases and SEC filings" did not adequately plead a claim under Section 10(b). *Id.* at 334–35, 337.

**\*6** Here, too, the allegations concerning Peter Madoff's involvement with the alleged misrepresentations suffer from the same deficiencies found in *Winer Family Trust.* The BMIS promotional piece, the SEC filings and the account statements are all group published documents, and the Complaint fails to allege what, if any, was the Defendant's participation in their production and/or how Defendant is or could be considered the source of those statements. The Court will therefore dismiss without prejudice Plaintiffs' Rule 10b–5(b) claim insofar as it is based on alleged affirmative misrepresentations.

The omissions-based Rule 10b–5(b) claim, however, survives this motion to dismiss. The Complaint alleges that Peter Madoff committed actionable misconduct by failing to disclose that BMIS was engaged in a Ponzi scheme or some kind of fraud in conscious disregard of numerous indicators of fraudulent activity. (Compl., ¶ 31.) In paragraph 32 of the Complaint, Plaintiffs list 16 indicators of fraud, which the Complaint terms "red flags." The items listed generally regard the secrecy of the investment advisory services, the extraordinary performance of BMIS customers' accounts and unusual business practices for a company handling a purported $17 billion in assets. Though the Court will not repeat the list here, it notes a few examples: The investment advisory services arm was segregated from the rest of BMIS. It was located on a separate floor, known as the "cage", which was off-limits to all but a few select employees. The records of the investment advisory business were also secret and segregated from other BMIS records. Returns on accounts handled by investment advisory services were abnormally profitable. They were consistently positive over 144 months of reported operations. Funds run by other entities using BMIS's "split-strike conversion" strategy failed to produce returns even remotely as good. Account statements generated by BMIS

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

showed a pattern of purchases regularly at or close to daily lows and sales regularly at or close to daily highs. Customers, which included feeder funds and other sophisticated entities, did not have electronic real-time access to their accounts. BMIS did not use its own trading desk or outside brokers when buying or selling the securities it purported to manage and sell on a monthly basis. Despite managing billions of dollars in client funds, BMIS employed an auditing firm in Rockland County, New York consisting of three employees-one of whom was a 78–year–old accountant living in Florida and one of whom was a secretary. (*See, generally,* Compl., ¶ 32.)

Defendant attacks the omissions-based claim on the grounds that the Complaint has failed to allege facts establishing that Peter Madoff owed Plaintiffs a duty of disclosure. It is well-established in the securities fraud jurisprudence that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see also Winer Family Trust,* 503 F.3d at 329 ("to impose liability for non-disclosure, a defendant must be under a duty to disclose the omitted information"). The Third Circuit has held that an affirmative duty to disclose generally "arises when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." *Oran v. Stafford,* 226 F.3d 275, 229 (3d Cir.2000). Plaintiffs argue that the Complaint adequately pleads that Peter Madoff owed them such a duty on two grounds: one, that they had discretionary accounts with BMIS and two, that Peter Madoff made prior false disclosures. The latter argument clearly fails to carry the day, as the Court has concluded that the Complaint is deficient with regard to allegations that Peter Madoff made material misrepresentations. The former argument, however, appeals to the duty to speak grounded in a fiduciary relationship.

**\*7** The Supreme Court has held that silence can give rise to liability under Section 10(b) and Rule 10b–5 where the party who fails to disclose information owes the other a fiduciary duty. *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *see also S.E.C. v. Zandford,* 535 U.S. 813, 823, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (holding that for purposes of Section 10(b) liability "any distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to her clients."). In *Chiarella,* a criminal securities fraud action, the Supreme Court reversed the conviction against the defendant employee of a financial printer, who traded on non-public information regarding a corporate takeover, because he did not owe a duty of disclosure to the corporation's stockholders or its target companies. *Id.* at 231. The *Chiarella* court held that "the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Id.* at 228 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

The critical question on this motion to dismiss is, then, whether the Complaint alleges facts which would establish that Plaintiffs and Peter Madoff were in a fiduciary relationship, thus imposing upon Defendant a duty of disclosure. The parties take opposing positions on this question in light of diverging authority between New York and New Jersey law. There is no dispute that, holding discretionary accounts for Plaintiffs, *BMIS* owed a fiduciary duty to Plaintiffs. Under both New York and New Jersey law, a fiduciary duty exists between a broker and a client "where the customer has delegated discretionary trading authority to the broker ." *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940 (2d Cir.1998); *S.E.C. v. Pasternak,* 561 F.Supp.2d 459, 499 (D.N.J.2008) (citing *McAdams v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 767 (3d Cir.1994)). However, the target of Plaintiffs' Rule 10b–5 claims in this case is Peter Madoff, not BMIS. Defendant argues that the facts alleged in the Complaint cannot establish that he owed Plaintiffs a fiduciary duty, because New York law does not impose a fiduciary duty on a corporation's controlling shareholder, officer or director to the investing public or to the corporation's customers. *See Am. Fin. Int'l Group–Asia, L.L.C. v. Bennett,* No. 05 Civ. 8988(GEL), 2007 WL1732427, at *4 (S.D.N.Y. June 14, 2007) (granting Refco officers' motion to dismiss breach of fiduciary duty claim brought by putative class of customers of a Refco subsidiary that provided currency trading services). Plaintiffs cite New Jersey authority for their position that Defendant owed them a fiduciary duty. *See Francis v. United Jersey Bank,* 87 N.J. 15, 432 A.2d 814 (1981).

The Court notes preliminarily that it need not, and will not resolve this choice of law issue at this very early stage of the litigation. The Court is bound to apply the choice of law rules of New Jersey, the forum state. *Klaxon*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

*Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey applies the governmental interest analysis to determine which state's substantive law should apply, a test the Third Circuit has opined is fact-intensive. *Warriner v. Stanton,* 475 F.3d 497, 500 (3d Cir.2007). The Court will thus defer its choice of law decision on the issue of fiduciary duty until the factual record is developed enough to allow the Court to apply the various factors involved in deciding which state has the greatest interest in resolving the issue. *Harper v. LG Elec. USA, Inc.,* 595 F.Supp.2d 486, 489 (D.N.J.2009) (refraining from making choice of law determination on a Rule 12(b)(6) motion to dismiss until development of needed factual record, in reliance on district court's example in *Warriner* and Third Circuit's holding on appellate review). Accepting the allegations of the Complaint as true, the Court finds that Plaintiffs have alleged facts that support the application of New Jersey law to this issue, at least preliminarily for the purpose of determining whether the Section 10(b) omissions-based claim may withstand the instant Rule 12(b)(6) challenge. Plaintiff The Lautenberg Foundation is a charitable foundation based in New Jersey. As the home state of one of the Plaintiffs, New Jersey has an interest in protecting that litigant's rights through application of its laws regarding fiduciary duty. *See Warriner v. Stanton,* No. 03–2211(JBS), 2005 WL 1397015, at *3 (D.N.J. June 14, 2005) (holding that nature of a state's contacts to litigation and parties a critical factor under government interest analysis).

   **\*8** The Court finds that the Complaint alleges sufficient facts to establish that Plaintiffs and Peter Madoff were in a fiduciary relationship, as that relationship is defined by New Jersey law, and thus sufficient facts to satisfy the duty of disclosure element of Rule 10b–5(b) claim. The Court so holds based on the decision of the New Jersey Supreme Court in *Francis. Francis* concerned the liability of a director of a reinsurance broker, Pritchard & Baird Intermediaries Corp. ("Pritchard"), to the broker's clients for breach of fiduciary duty in failing to prevent misappropriation of funds by other directors. *Francis,* 87 N.J. at 20, 432 A.2d 814. Pritchard, as the broker, acted as the intermediary between insurance companies wishing to obtain coverage for risk that they insured against (the ceding insurers) and the reinsurance companies, which assumed that ceded risk of loss in return for a premium. *Id.* at 22, 432 A.2d 814. Pritchard's clients, ceding insurers and reinsurance companies, had given premium and loss funds, respectively, to the broker to hold in trust. *Id.* at 37–38, 432 A.2d 814. Based on the nature of the services provided by the reinsurance broker to its clients and the trust placed by clients in the broker to hold their funds, the New Jersey Supreme Court concluded that the director in question, Mrs. Pritchard, owed the broker's clientele a fiduciary duty. *Id.* As in this case, there was no question that the broker's holding of client funds in an implied trust gave rise to a fiduciary duty by the broker to the clients. *Id.* at 38, 432 A.2d 814. In its analysis of whether that duty should run to an individual officer or director of the broker, the *Francis* court noted that directors of some corporations, such as banks, are deemed to owe a fiduciary duty to those who turn over funds to the corporation to hold in trust. *Id* . at 36, 432 A.2d 814. It observed:

   Courts in other states have imposed liability on directors of non-banking corporations for the conversion of trust funds, even though those directors did not participate in or know of the conversion. The distinguishing circumstances in regard to banks and other corporations holding trust funds is that the depositor or beneficiary can reasonably expect the director to act with ordinary prudence concerning the funds held in a fiduciary capacity.

   *Id.* at 37, 432 A.2d 814 (citations omitted). The New Jersey Supreme Court reasoned that, given Mrs. Pritchard's responsibilities at the brokerage and the turnover of funds by clients in trust to the brokerage, the director's relationship to the broker's clientele was "akin to that of a director of a bank to its depositors." *Id.* at 38, 432 A.2d 814. The following analysis by the New Jersey Supreme Court is particularly instructive to the Court in finding that the Complaint sufficiently alleges that Peter Madoff bore a fiduciary duty, and thus a duty of disclosure, to Plaintiffs:

   Mrs. Pritchard [the director] was charged with the obligation of basic knowledge and supervision of the business of Pritchard & Baird. Under the circumstances, this obligation included reading and understanding financial statements, and making reasonable attempts at detection and prevention of the illegal conduct of other officers and directors. She had a duty to protect the clients of Pritchard & Baird against policies and practices that would result in the misappropriation of money they had entrusted to the corporation. She breached that duty.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

* * *

**\*9** To conclude, by virtue of her office, Mrs. Pritchard had the power to prevent the losses sustained by the clients of Pritchard & Baird. With power comes responsibility. She had a duty to deter the depredation of the other insiders, her sons. She breached that duty and caused plaintiffs to sustain damages.
*Id.* at 39, 45, 432 A.2d 814. Following an analysis of proximate cause, the New Jersey Supreme Court affirmed the Appellate Division's judgment for plaintiffs on their negligence claim. *Id.* at 45, 432 A.2d 814.

The Court acknowledges, as highlighted by Defendant at oral argument, that unlike the director defendant in *Francis,* Peter Madoff was not on a corporate board of directors, and indeed BMIS, unlike the broker in *Francis,* was not organized as a corporation and did not even have a board of directors. In the context of the fiduciary duty recognized by *Francis,* this difference is of no moment. The *Francis* court was not concerned with a corporate director's duty to shareholders, but rather with a company insider's fiduciary obligations to clients, that is, to company outsiders without a proprietary interest in the broker. The key factors informing the *Francis* court's decision were the defendant's responsibilities, including maintaining awareness of the company's operations and finances, and the fact that clients entrusted their money to the broker. In the case at bar, this Court is presented with the same factors. The Complaint alleges that Peter Madoff had significant powers and responsibilities at BMIS, particularly with respect to its financial condition and legal compliance. Plaintiffs "gave custody to and entrusted BMIS on a fully discretionary basis" with millions of dollars to manage and invest. (Compl., ¶¶ 16–23).

In light of these facts, the Court finds the holding of *Francis* concerning fiduciary duty to clients directly applicable. To borrow the New Jersey Supreme Court's language, the facts alleged would plausibly support the conclusion that Peter Madoff had a duty to protect the clients of BMIS against policies and practices that would result in the misappropriation of money they had entrusted to the company. Under *Chiarella,* this fiduciary duty charges Peter Madoff with a duty of disclosure to Plaintiffs.

Having found that the Complaint sufficiently alleges that Defendant was under a duty to disclose fraudulent conduct at BMIS to its clients, the Court also finds that the allegations, taken as true, establish that Peter Madoff was in possession of material information about which to keep silent. Reading the Complaint as a whole, and with the common sense *Iqbal* reminds courts to employ, the allegations concerning Peter Madoff's responsibilities at BMIS, his sophistication as general counsel and member or officer of various securities organizations, and the ample list of unusual business practices and other indicia of fraud at BMIS together set forth facts establishing circumstantial evidence that Peter Madoff knew of some fraud or wrongdoing occurring at BMIS. Put plainly, it alleges that there was material information that, though known by Defendant, was not disclosed to Plaintiffs, who were misled by the silence.

**\*10** The Complaint also satisfies the element of scienter. This state of mind "embracing intent to deceive" may be shown by either conscious misbehavior or recklessness. *Suprema Specialties,* 438 F.3d at 438; *see also S.E.C. v. The Infinity Group Co.,* 212 F.3d 180, 192 (3d Cir.2000) ("the scienter required for securities fraud includes recklessness"). Under the PSLRA, the inference of scienter drawn from the Complaint, considered in its entirety, must be "strong." *Tellabs,* 551 U.S. at 323. The Supreme Court has held that determining whether the Complaint pleads the requisite strong inference of scienter requires that the Court "consider plausible nonculpable explanations for the defendant's conduct." *Id.* at 324. Under *Tellabs,* "[a] complaint will survive [a Rule 12(b)(6) motion] ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

As discussed by the Court above, the various indicia of wrongdoing and fraud alleged in the Complaint paired with Peter Madoff's responsibilities and role at BMIS constitute strong circumstantial evidence of recklessness by Defendant in his omissions regarding this information. Recklessness has been defined by the Third Circuit as

[H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is ei-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

ther known to the defendant or is so obvious that the actor must have been aware of it.

*Infinity Group,* 212 F.3d at 192. As Plaintiffs point out, Peter Madoff was the BMIS director of trading and responsible for the company's day-to-day operations. He was responsible for ensuring that BMIS complied with all laws and SEC regulations. He knew, or clearly should have known, that the purchase and sales reflected in the statements of clients with BMIS accounts were not being executed by BMIS's own traders and that BMIS was not employing outside brokers to conduct these securities transactions. From this, one can infer that Defendant recklessly failed to investigate how the purported securities sales and purchases were being executed, which would have led to the discovery of the BMIS fraud. The Complaint alleges that the investment advisory services arm of BMIS, out of which the Ponzi scheme was perpetrated, was completely sequestered from the rest of the company, from its physical office location to the files and records related to this arm of the business. Access to the investment advisory services operation was limited to only a handful of people within the company. These allegations give rise to the strong inference that one charged with the responsibility for directing company policies, knowing its financial situation and ensuring legal compliance was aware of the investment advisory operations or would at the very least be reckless in failing to find out. These facts, of course, must be considered together with the many others alleged in the Complaint, including the unusual timing of the transactions reported, the extraordinary performance of investment accounts, the lack of real-time online access by clients to accounts coupled with Peter Madoff's technological sophistication in computerized securities trading and the use of essentially one individual accountant to handle BMIS affairs. One can reasonably infer from the Complaint that, in his role as control person, general counsel and chief compliance officer, Peter Madoff, who grew the company with his brother and confessed criminal defrauder Bernard Madoff, knew or should have known what was occurring in the investment advisory services and by an extreme departure of ordinary care failed to discover and disclose the massive illegal scheme lasting two decades and involving billions of dollars in funds that were never used to purchase or sell securities as represented to clients. Defendant argues that the "red flags" of fraud at BMIS were susceptible of innocent explanation because they were either common knowledge, such as the consistent and unusually high returns, or merely describe BMIS business practices. Defendant's argument defies common sense and runs counter to the express holding of *Tellabs* on the task of evaluating whether a Complaint sufficiently plead scienter. "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322–23 (emphasis in original). It strikes the Court that, reading the Complaint in its entirety, allegations of the secrecy of the very aspect of the business engaging in the multi-billion dollar Ponzi scheme and other "business practices" of BMIS, even if publicly reported, render the inference that Peter Madoff, in his unique, inside and executive role at BMIS, acted with the requisite culpability "at least as compelling as any opposing inference one could draw" from these facts. *Tellabs,* 551 U.S. at 324.

**\*11** As to next element of a Section 10(b) claim, the wrongdoing's connection with the purchase or sale of a security, the Complaint avers that Plaintiffs, not knowing material facts about the fraudulent manner in which BMIS conducted its investment advisory business, turned money over to BMIS for management, including the purported purchase and sale of securities on Plaintiffs' behalf in BMIS's discretion. Defendant argues that the Complaint's allegations concerning the admitted Ponzi scheme perpetrated by BMIS, in which no securities were actually bought or sold, inherently negates its pleading of any facts that could plausibly support that the omissions were made "in connection with the purchase or sale of any security" as required by Section 10(b). The Court finds this argument unavailing, in light of the clear instruction by the Supreme Court that Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford,* 535 U.S. at 819. The *Zandford* court observed that the statute sought to "promote investor confidence" and "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Id.* Given the wrongdoing targeted in this case, which goes to the heart of investor confidence and concerns about transparency and ethics, Section 10(b) clearly applies.

The remaining elements of Plaintiffs' Rule 10b–5 omissions claim are also satisfied by the facts alleged in the Complaint. Reliance by an investor to whom a duty of disclosure is owed is presumed in cases in which there is an omission of material fact by one with a duty to disclose. *Stoneridge,* 128 S.Ct. at 769. The operation of this rebut-

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

table presumption to which Plaintiffs are entitled excuses them from pleading positive proof of reliance in the Complaint. Economic loss and loss causation are adequately pled. The Complaint alleges that Peter Madoff's silence misled Plaintiffs into entrusting money to BMIS for investment and that as a result of this deception, Plaintiffs have lost millions of dollars placed into BMIS accounts.

In sum, for the foregoing reasons, the Court finds the Complaint deficient with regard to Plaintiffs' Rule 10b–5(b) claim against Defendant based on affirmative misrepresentations but pled with the required specificity under the PSLRA with regard to the omissions-based Rule 10b–5(b) claim.

2. *Section 10(b) Claim for Deceptive Act or Scheme*

Though Plaintiffs have argued to the Court in their papers and at oral argument that Count One of the Complaint asserts a cause of action under Rule 10b–5(a) and (c), this claim is not readily apparent from the Complaint. Though under these subsections of Rule 10b–5 a defendant can be liable for his deceptive conduct in violation of the securities fraud laws, without making a misleading statement or omission, *Stoneridge,* 128 S.Ct. at 769, the scant and conclusory references in the Complaint to Defendant's "acts and conduct" in violation of Rule 10b–5 (Compl.¶ 39) hardly puts him on notice that Plaintiffs claim they are entitled to relief under Section 10(b) for this "scheme liability." *See Lucent,* 610 F.Supp.2d at 350, n. 5 (citing *Stoneridge,* 128 S.Ct. at 770). Moreover, as a claim brought under Section 10(b), the scheme liability theory of securities fraud must meet the heightened pleading requirements of Rule 9(b) and the PSLRA.

**\*12** To state a claim under Rule 10b–5 (a) and/or (c), a "private plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Lucent,* 610 F.Supp.2d at 350; *see also Global Crossing,* 322 F.Supp.2d at 336 (setting forth elements). The Complaint fails to allege facts regarding what deceptive acts, separate and apart from the omissions of material fact, Defendant undertook in furtherance of the Ponzi scheme. Though Plaintiffs aver that Defendant recklessly failed to investigate obvious indicia of fraud and that he failed to disclose these indicia to Plaintiffs, government regulators and others, this alleged wrongdoing cannot form the basis of their scheme liability claim. Plaintiffs label this conduct a concealment or cover-up of the fraudulent scheme (Compl., ¶ 38) when in fact it merely re-states his failure to disclose material facts in violation of Rule 10b–5(b). A Rule 10b–5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b–5(b) claim. *Lucent,* 610 F.Supp.2d at 359 (citing *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 177 (2d Cir.2005)). Moreover, the Supreme Court has cautioned against an overly broad interpretation of Rule 10b–5(a) and (c) such that all acts which facilitate the fraud be actionable under Section 10(b). *Stoneridge,* 128 S.Ct. at 771. It reasoned that an expansive reading would undermine Congress's decision to restrict actions for aiding and abetting securities fraud to the SEC. *Id.* "If the scope of 'scheme liability' is too broad, there is a risk that it becomes 'a back door into liability for those who help others to make a false statement or omission,' thus reviving aiding and abetting liability in private actions." *Lucent,* 610 F.Supp.2d at 359 (quoting *In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 503 (S.D.N.Y.2005)). Without even reaching the adequacy of the pleading as to the other elements of a section 10(b), which of course includes the requirement that scienter be pled with particularity, the Court concludes that the Complaint fails to state a claim under Rule 10b–5(a) and/or (c) for failure to identify what deceptive device Defendant employed in furtherance of BMIS's Ponzi scheme and/or what deceptive act Defendant himself committed.

Accordingly, Plaintiffs' claim under Section 10(b) and Rule 10b–5(a) and/or (c) will be dismissed without prejudice for failure to state a claim upon which relief could be granted.

**B. Section 20(a) for Control Person Liability**

Count Three of the Complaint asserts that Defendant is liable under Section 20(a) of the Exchange Act. Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

trolled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**\*13** 15 U.S.C. § 78t(a).

The seminal case in the Third Circuit on liability pursuant to Section 20(a) of the Exchange Act is *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880 (1975). In that case, the Third Circuit considered the legislative history of the statute to interpret what the "control" of another means. *Id.* at 884–85. It considered that Section 20(a) was intended to impose liability on those "able to directly or indirectly exert influence on the policy and decision-making process of others." *Id.* at 884. After comparing the Senate and House versions of the legislation, the *Rochez Bros.* court concluded that the statute did not impose liability based on the principle of respondeat superior. *Id.* at 885. It reasoned that "Congress did not intend anyone to be an insurer against the fraudulent activities of another. What Congress did intend was to impose liability on those who were controlling persons and who were 'in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.' " *Id.* (quoting *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973)). Thus, the elements of a Section 20(a), or "control person" claim are as follows: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. *Suprema Specialties,* 486 F.3d at 286; *Rochez Bros.,* 527 F.2d at 890. Once the plaintiff establishes a prima facie claim under Section 20(a), the burden shifts to defendant to show that he acted in good faith. *Pasternak,* 561 F.Supp.2d at 502–03 (citing *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1473 (2d Cir.1996)).

There is no real dispute that the first two elements of the claim are adequately pled. Defendant characterizes the allegations in support of these elements as conclusory, but this argument is untenable. The Court finds that the Complaint plausibly sets forth that Peter Madoff was a controlling person of BMIS and that BMIS committed a predicate violation of Section 10(b) and Rule 10b–5.

In the instant motion, the battleground on the control person claim centers on the culpable participation element. Defendant attacks the sufficiency of the claim for failure to plead culpable participation with particularity. Plaintiffs counter that, though an element of a Section 20(a) claim under Third Circuit law, culpable participation need not be pled at all. In support of this proposition, Plaintiffs cite various District of New Jersey cases interpreting Third Circuit precedent. *See, e.g., In re Able Labs. Sec. Litig.,* No. 05–2681(JAG), 2008 WL 1967509, at *29 (D.N.J. Mar.24, 2008) (so holding and noting that trend in the jurisdiction is not to require that element be pled). Plaintiffs also raise two alternative arguments for why this claim must proceed past Defendant's 12(b)(6) motion: that assuming the element must be pled, it need only satisfy the pleading requirement of Rule 8 and that, in any event, the heightened pleading requirements applicable to fraud claims under Rule 9(b) have been met.

**\*14** The Court is aware of the difference of opinion among district court judges in this district regarding the pleading requirements for a Section 20(a) claim. *Compare* Able Labs, 2008 WL 1967509, at * 29 (holding that "the Third Circuit does not require that culpable participation be pled in order to establish controlling person liability") *with In re Nice Sys. Ltd. Sec. Litig.,* 135 F .Supp.2d 551, 588 (D.N.J.2001) (taking contrary view, relying on case decided by Second Circuit, which also espouses minority view that culpable participation is an element of Section 20(a) claim). The Court, however, need not jump into the fray and reach any definitive conclusion about what is required. The Court finds that, even under the most rigorous pleading requirement raised in the debate—that is, that culpable participation must be pled with particularity—Plaintiffs' control person claim states a claim upon which relief may be granted.

In reaching this conclusion, the Court is guided by *Lapin v. Goldman Sachs Group, Inc.,* a decision issued by the Southern District of New York, which also follows the view that culpable participation is an element of a Section 20(a) claim. The *Lapin* court espoused the opinion that the burden of pleading culpable participation is "akin to pleading section 10(b) scienter." *Id.* at 246. It held that, to withstand a motion to dismiss, a control person claim "must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Id.* at 247 (quoting *Burstyn v. Worldwide Xceed Group, Inc.,* No. 01–1125(GEL), 2002 WL 31191741, at *8 (S.D.N.Y. Sept.30, 2002)).

As the analysis in Section II.A.1 above discusses at length, the Complaint adequately pleads that Peter Madoff knew or should have known that BMIS was engaging in a massive, multi-billion dollar Ponzi scheme. Yet, the Complaint alleges, he failed to act in accordance with his duties and responsibilities at BMIS and thus facilitated and prevented the discovery of the fraud. It specifically alleges as follows:

> By virtue of his status as a control person under the law as well as his duties and responsibilities at BMIS, as more particularly described herein, Peter Madoff had the power to directly or indirectly control the management and policies of BMIS and the ability, obligation, power, duty and control to directly or indirectly detect, prevent and/or report the fraudulent conduct confessed to by his brother, and by recklessly failing to do so, Peter Madoff facilitated, endorsed, acquiesced in, and covered up the fraudulent conduct of BMIS ...

> Peter Madoff had direct and supervisory involvement in the day-to-day operations of BMIS. He had the obligation to maintain a system of internal controls and the power to control the system in diligent manner by developing and implementing precautionary measures or otherwise, but recklessly failed to do so.

**\*15** (Compl., ¶¶ 47–48.) The Third Circuit has held that inaction that intentionally furthers the fraud committed by the controlled person or entity or prevents its discovery establishes the controlling person's culpable participation in the fraud. *Rochez Bros.,* 527 F.2d at 890. While mere inaction is not enough to rise to culpable participation, this Complaint pleads more than that. *Id.* Peter Madoff was charged with the responsibility and authority to run BMIS in accordance with the law. Assuming the truth of the allegations, his reckless failure to detect the fraud through en-forcement of a reasonably adequate system of internal controls establishes his participation in the fraud for purposes of the Section 20(a) claim. *See, e.g., Henricksen v. Henricksen,* 640 F.2d 880, 884–85 (7th Cir.1981) (finding in-vestment firm liable under Section 20(a) based on broker mismanagement of customer's discretionary account for failure to enforce system of internal supervision and control with reasonable diligence); *cf. Pasternak,* 561 F.Supp.2d at 502–03 (holding that defendant may establish affirmative defense of good faith to Section 20(a) claim by demonstrating that he maintained and enforced reasonable system of internal supervision and control).

Finding that, for the foregoing reasons, the Complaint satisfactorily pleads all elements of a prima facie control person claim, the Court will deny Defendant's motion insofar as it seeks dismissal of the claim under Rule 12(b)(6).

**C. State Law Causes of Action**

In the remaining four counts of the Complaint, Plaintiffs seek relief under state common law theories. They are breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation and negligence. The Court has supplemental jurisdiction over these claims, pursuant to 28 U.S.C. § 1367. It must therefore apply the law of the forum state in reviewing the adequacy of these claims as pled. *Chin v. Chrysler,* 538 F.3d 272, 278 (3d Cir.2008) (holding that federal court hearing state law claim in exercise of its supplemental jurisdiction must apply law of forum state to determine substantive matter). Where choice of law issues are presented, the Court must apply the choice of law analysis of the forum state to determine which state's substantive law will apply. *Id.* (citing *Klaxon,* 313 U.S. at, 496). A choice of law question is not presented unless the potentially applicable bodies of law conflict. *Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir.2006). "If there is no conflict, then the district court sitting in di-versity may refer interchangeably to the laws of the states whose laws potentially apply." *Id.*

*1. Breach of Fiduciary Duty*

Plaintiffs' breach of fiduciary duty claim satisfies the pleading requirement of Rule 8. Under both New York and New Jersey law, this tort claim requires a plaintiff to prove the existence of a fiduciary relationship between the plaintiff and the defendant and the defendant's breach of the duties imposed by the relationship. *Rafter v. Bank of*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

*Am.,* No. 04 Civ. 3341, 2009 U.S. Dist. LEXIS 21542, at \*34, 2009 WL 691929 (S.D.N.Y. Mar. 12, 2009); *In re Estate of Lash,* 169 N.J. 20, 26–27, 776 A.2d 765 (2001). As identified earlier in this Opinion, the Court has been presented with an apparent conflict between New York and New Jersey law regarding the existence of a fiduciary duty by Defendant to Plaintiffs. For the reasons discussed above, the Court has determined that, based on New Jersey's choice of law analysis, the Complaint sets forth sufficient facts militating in favor of applying New Jersey law in evaluating whether fiduciary duty has been adequately pled. Again, as stated by the Court above in its choice of law discussion with regard to fiduciary duty as a basis for a duty of disclosure, the Court is not making an ultimate choice of law determination. Nor is it drawing any conclusions about the merits of the breach of fiduciary duty claim, which will depend on the applicable state substantive law and a sufficiently developed factual record. Rather, it is satisfied that the facts alleged in the Complaint support application of New Jersey law for purposes of determining whether a cognizable breach of fiduciary duty claim has been pled.

**\*16** The Court will not repeat its discussion, set forth in Section II .A.1, regarding the existence of a fiduciary relationship between the parties under New Jersey law, assuming the truth of the facts alleged. Further, the Complaint permits the reasonable inference that through his actions and/or inaction, Defendant breached his fiduciary duty to Plaintiffs and as a result caused Plaintiffs to suffer a loss of millions of dollars. The breach of fiduciary duty claim thus survives the instant motion to dismiss.

2. *Aiding and Abetting Breach of Fiduciary Duty*
    Under New York law, "[a] claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,* LLC, 479 F.Supp.2d 349, 360 (S.D.N.Y.2007). Similarly, under New Jersey law, one who "knowingly aids and abets the agent of another in breach of fiduciary duty is liable to the principal." *Bondi v. Citigroup, Inc.,* No. BER–L–10902–04, 2005 WL 975856, at \* 18 (Law Div. Feb.28, 2005). In this case, there is no dispute that the Complaint pleads that another person or entity, namely BMIS, has breached its fiduciary duty to Plaintiffs. Nor is there any issue raised with regard to the damages element. The parties do take opposing views on whether Peter Madoff, according to the factual allegations, acted with the required state of mind. Because both New York and New Jersey law require that a defendant "knowingly" aid and abet a breach of fiduciary duty, the Court discerns no true conflict and will thus refer to the jurisdictions' laws interchangeably in determining whether the claim may survive this Rule 12(b)(6) motion.

    New York law sheds more light than New Jersey's on what may satisfy a defendant's "knowing" participation in another's breach. Knowledge of the primary violation, an essential element of the aiding and abetting claim, requires more than recklessness; it requires "actual knowledge" by the defendant. *Fraternity Fund Ltd.,* 479 F.Supp.2d at 367. "[P]leading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a "strong inference" of actual knowledge." *Id.* The Southern District of New York held that a defendant's *conscious avoidance* of facts regarding the primary violation would demonstrate that he or she had actual knowledge of the breach for purposes of aiding and abetting liability. *Id.* at 368. The court explained that conscious avoidance "occurs when 'it can almost be said that the defendant actually knew' because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Id.* (quoting *United States v. Nektalov,* 461 F.3d 309, 315 (2d Cir.2006)). It reasoned that this standard satisfied the actual knowledge requirement because conscious avoidance involves a culpable state of mind, rather than mere negligence on the part of the defendant in failing to investigate and discover the primary violation. *Id.*

    **\*17** The Court finds that, based on this standard, the Complaint pleads sufficient facts giving rise to a "strong inference" that Peter Madoff knew that BMIS was engaged in a massive fraudulent scheme, that is, to put it mildly, not honoring its fiduciary responsibility to investors such as Plaintiffs. In its analyses of the scienter element of the Rule 10b–5(b) claim and again in its discussion of a control person's culpable participation in the securities fraud, this Court has amply discussed the detailed allegations of the Complaint concerning Defendant's job responsibilities at BMIS and facts indicating fraud. Together, these allegations, taken as true, have the effect of establishing that Defendant was at the very least willfully blind of BMIS's wrongdoing for failure to investigate those facts and con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

firm what the indicia of fraud would suggest to him.

Contrary to Defendant's argument that the claim fails because it is not supported by an allegation that that Defendant actively induced or participated in any breach of fiduciary duty, this Complaint pleads more than "mere inaction" by Defendant. The Second Circuit has held that under New York law, " '[a] person knowingly participates in a breach of fiduciary duty only when he or she provides substantial assistance to the primary violator.' Substantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.' " *In re Sharp Int'l Corp.,* 403 F.3d 43, 50 (2d Cir.2005) (quoting *Kaufman v. Cohen,* 307 A.D.2d 113,126 (N.Y.A.D. 1st Dep't 2003)). Plaintiffs have alleged in their Complaint that by failing to maintain and enforce a system of internal controls, as he was required to do in his role as BMIS's compliance officer, Peter Madoff substantially assisted the company in breaching its fiduciary duty to Plaintiffs.

Accordingly, insofar as Defendant's motion seeks dismissal of the claim for aiding and abetting breach of fiduciary duty, it will be denied.

### 3. *Negligent Misrepresentation*

Under either New York or New Jersey law, a claim under the theory of negligent misrepresentation requires that the defendant have made false statements. *See Miller v. Forge Mench P'ship Ltd.,* No. 00 Civ. 4314(MBM), 2001 U.S. Dist. LEXIS 13046, at *8–9 (S.D.N.Y. Aug. 28, 2001); *In re NorVergence, Inc.,* 384 B.R. 315, 360 (Bankr.D.N.J.2008). The Complaint, the Court has previously observed, fails to allege that Defendant himself made any affirmative misrepresentation. *See* Section II.A.1, *supra.* Plaintiffs nevertheless argue that under both New Jersey and New York law, the control person of a corporation may be liable for misrepresentations technically made by the entity. Under either state's law, Plaintiffs' argument is unpersuasive.

The New Jersey cases cited by Plaintiffs deal with the personal liability of corporate officers for a tort committed by the corporation based on the participation theory. *See, e.g., Saltiel v. GSI Consultants, Inc.,* 170 N.J. 297, 303, 788 A.2d 268 (2002) (discussing liability based on corporate officer's misfeasance). For the theory to apply, however, the officer must have been "sufficiently involved" in the commission of the tort. *Id.* at 303, 788 A.2d 268. The New Jersey Supreme Court has held that participation by the officer is essential to ground liability in this theory. *Id.* at 309, 788 A.2d 268. The Complaint fails to allege in what way Defendant participated in the making of the three categories of alleged misrepresentations—statements in BMIS sales literature, SEC filings and BMIS account statements. The allegations that Defendant "negligently misrepresented and/or acquiesced in" the making of materially false statements and was "directly or indirectly" involved in transmitting to Plaintiffs fall short of identifying his participation in BMIS's alleged affirmative misrepresentation in compliance with *Iqbal's* plausibility standard of pleading. The Complaint parrots the elements of a negligent misrepresentation claim but fails to provide facts supporting the assertion that Peter Madoff made materially false statements.

**\*18** So, too, does the claim fail to satisfy Rule 8 based on the substantive law of New York. New York law is clear that to prevail on a claim for negligent misrepresentation, "the author must express words directly to one whom the author is bound by some relation of duty or care." *Miller,* 2001 U.S. Dist. LEXIS 13046, at *8–9. The Complaint, of course, lacks factual allegations that Peter Madoff expressed the false statements. The New York cases cited by Plaintiffs in an effort to surmount this hurdle also concern the proposition that a corporate officer may be held personally liable for torts in which he or she participates. *See, e.g., Model Imperial Supply Co. v. Westwind Cosmetics, Inc.,* 808 F.Supp. 943, 946 (E.D.N.Y.1992) (denying summary judgment as to negligent misrepresentation claim on motion brought by corporate officers due to issues of fact as to officers' personal role in the corporation's sale of allegedly counterfeit goods).

Plaintiffs' negligent misrepresentation claim fails to state a claim upon which relief may be granted and will accordingly be dismissed without prejudice.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)
**(Cite as: 2009 WL 2928913 (D.N.J.))**

4. *Negligence*

The negligence claim survives the motion to dismiss. It is hornbook law that a negligence claim consists of the elements of (1) a duty owed to the plaintiff by the defendant; (2) breach of that duty; and (3) injury proximately caused by the breach. *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir.2002) (reciting elements under New York law); *Polzo v. County of Essex,* 196 N.J. 569, 584, 960 A.2d 375 (2008). For the reasons discussed, the Court has found that the Complaint adequately alleges that Peter Madoff owed Plaintiffs a fiduciary duty to safeguard the money entrusted to BMIS against fraud, misappropriation or other wrongdoing by BMIS and that this duty of care was breached by Defendant, causing Plaintiffs a loss.

**III. CONCLUSION**

Plaintiffs' claims under Section 10(b) of the Exchange Act predicated on violations of Rule 10b–5(a) and/or (c) and on violations of Rule 10b–5(b) for affirmative misrepresentations fail to state a claim upon which relief may be granted. Those claims will accordingly be dismissed without prejudice. The Section 10(b) and Rule 10b–5(b) claim based on omissions of material fact, however, does survive this motion to dismiss. The claim under Section 20(a) of the Exchange Act also survives this motion to dismiss. As to the state law causes of action asserted in the Complaint, the motion to dismiss the claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty and negligence will be denied. The negligent misrepresentation claim will be dismissed without prejudice.

An appropriate form of Order will be filed.

D.N.J.,2009.
Lautenberg Foundation v. Madoff
Not Reported in F.Supp.2d, 2009 WL 2928913 (D.N.J.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Levine**



Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
*Levine v. Paterson, et al*, 2011 WL 4593739 (NDNY 9/30/11)

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Brian LEVINE, John Barnett, Arthur Breen, Gregory Brown, Patricia Chichester, Chris Covert, Shelley Dross,
Nancy Ferrante, Robert Godley, Annette Grant, Constance Graves, Kathryn Jamison, William Lightbody, Mickey
Massiano, William McCartney, Andrew Niven, Daniel Osborne, Michael Resnick, Rosemary Sawyer, Linda Shaw,
Thomas Sloan, John Stellar, Robin Taylor, Annette Tombolillo, Kimberly Vile, Sarah Washington, on behalf of
themselves and all other similarly situated, and the Organization of New York State Management Confidential Em-
ployees (OMCE on behalf of its members and by its Executive Director, Joseph Sano, Plaintiffs,
v.
David A. PATERSON, Individually and as Governor of the State of New York, Thomas P. Dinapoli, Individually
and as Comptroller of the State of new York, Robert L. Megna, Individually and as Budget Director for the Division
of Budget, Laura L. Anglin, Individually and as the former Budget Director for the Division of Budget, New York
State Division of Budget, Office of the State Comptroller, New York State Department of Audit and Control, and
the State of New York, Defendants.

No. 1:10–cv–1007(NAM/DRH).
Sept. 30, 2011.

Hinman, Straub P.C., John F. Black, Esq., Joseph M. Dougherty, Esq., of Counsel, Albany, NY, for Plaintiffs.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Cathy Y. Sheehan, James B. McGowan,
Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

Hon. NORMAN A. MORDUE, Chief Judge.

### I. BACKGROUND

**\*1** This action is brought pursuant to 42 U.S.C. § 1983 and 1988 by twenty-six "Management and Confidential"
("M/C") employees of the State of New York, as well as the Organization of New York State Management Confi-
dential Employees ("OMCE"), on behalf of its members, and OMCE's Executive Director, Joseph Sano. Plaintiffs
allege their federal and state constitutional rights were violated by defendants' decision to "administratively with-
hold" general salary increases, performance advances, merit awards, and longevity payments (collectively "compen-
sation increases") in 2009 and 2010 that were provided for by law in Chapter 10 of the Laws of 2008, (the "Pay-
Bill"). Plaintiffs, who are prohibited from engaging in collective bargaining, allege that defendants' provision of
compensation increases to unionized state workers, some of whom occupy the same jobs as plaintiffs, violates: the
Equal Protection Clause of the Fourteenth Amendment; the Due Process Clause of the Fourteenth Amendment; Con-
tracts Clause of the United States Constitution; the New York State Constitution; and the New York State Civil Ser-
vice Law. As a result of these alleged violations, plaintiffs seek declaratory relief, an award of retroactive and/or
prospective payment of the withheld compensation increases, an award of attorneys' fees, and an award of costs.

Presently before the Court is defendants' motion to dismiss the amended complaint pursuant to Rule 12(b)(6) of
the Federal Rules of Civil Procedure. Plaintiffs oppose defendants' motion.

### II. AMENDED COMPLAINT

There are 26 individual plaintiffs in this case. They occupy the following 13 positions: Senior Budgeting Ana-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

lyst; Supervising Parole Officer; Senior Personnel Administrator; Park Manager I; Traffic Maintenance Engineer 2; Treatment Team Leader; Secretary 2; Chief Psychologist; Law Department Investigator; Community Outreach Specialist 2; Organizational Developmental Specialist 3; Associate Attorney; and Nutrition Services Administrator 2. Plaintiffs claim they have union counterparts with identical job responsibilities. Each plaintiff attached an affidavit to the amended complaint stating that he or she is employed by the State of New York in a position designated Management and Confidential ("M/C" and that his or her job responsibilities are "substantially similar" to those of a similarly-titled position in a bargaining unit. For example, plaintiff Brian Levine states: "I am a Senior Budgeting Analyst, Grade 18 Competitive Class, employed by the State of New York and designated Management and Confidential." Levine avers that "[a]s a Senior Budgeting Analyst, Grade 18 my job responsibilities are substantially similar to those of the position of Senior Budgeting Analyst, SG–18, in the Professional, Scientific and Technical Negotiating Unit."

In January 2008, then Governor Eliot Spitzer signed the PayBill into law authorizing compensation increases to plaintiffs and unionized employees. The PayBill is comprised of two parts. Part A addresses "Collective Bargaining Agreement Between the State of New York and the Civil Service Employees Association, Inc. for 2007–2011". Part B addresses "Salaries and Benefits for Certain State Officers and Employees Excluded from Collective Negotiating Units for 2007–2011". According to the "Introducer's Memorandum in Support" of the Pay Bill, the purpose of Part B "is to provide the States's approximately 12,000 unrepresented employees who are prohibited from collective negotiations ... including managerial or confidential ('M/C') employees, with benefits and increases in compensation at levels that are comparable to the benefits and increases in compensation received by the employees represented by employee organizations." Compl. Ex. 36. The PayBill authorized longevity payments to certain M/Cs, an increase in basic annual salary for M/Cs as follows: three percent effective April 2, 2007; three percent effective April 1, 2008; three percent effective April 1, 2009; and four percent effective April 1, 2010. It also authorized performance advances, merit awards, and longevity payments. According to the amended complaint, the PayBill authorized identical compensation increases for unionized employees.

**\*2** Plaintiffs allege that on or about February 19, 2009, then Governor David Paterson granted pay increases, ranging from five to forty-six percent, to twelve M/C employees in the following positions: secretary; chief of staff; assistant counsel, confidential assistant; press aide; special office assistant; legal assistant; confidential secretary; confidential aide; and confidential stenographer. The amended complaint identifies the individual employees who received these raises; none of whom are alleged to occupy the same positions as plaintiffs.

On March 25, 2009, the Division of Budget authorized the M/C payroll actions necessary to implement the compensation increases provided for in the PayBill, which were scheduled to go into effect on April 1, 2009. However, on April 2, 2009, the Director of State Operations, Dennis Whalen, issued a memorandum stating that the 2009 compensation increases would be administratively withheld:

New York State is facing an unprecedented fiscal emergency, resulting in record budget deficits. We have asked you to administratively implement spending reduction actions, and we appreciate your continuing efforts to do so. We have continued to review our other available administrative options, including the salary increases and other payment actions for [M/C] employees.

As a result of our review, we will be withholding from M/C and other unrepresented employees the April 1, 2009 three percent general salary increases and the 2009–10 performance advances, merit awards, and longevity payments. In the context of taking this action, M/C and other unrepresented employees will be exempt from the layoff actions that were announced on March 24, 2009 whenever legally permissible in light of layoffs of unionized employees.

Our ability to withhold the salary increase and the other payments is pursuant to a provision of Chapter 10 of the Laws of 2008 that allows these forms of pay increases to be withheld when the Budget Director determines it is necessary "to reduce state expenditures to acceptable levels or when, in the opinion of the Director of the

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

Budget, such increase is not warranted or is not appropriate."

This determination, like others announced recently regarding the State workforce, was not made lightly. We recognize the vital roles filled by our M/C staff and the hard work they provide to serve all our residents. However, these actions are necessary to reduce the State's financial obligations in the face of a severe fiscal situation.

Compl. Ex. 43.

According to the amended complaint, on or about April 1, 2009, the compensation increases were implemented for unionized employees.

In January 2010, Governor Paterson announced that the 2010 compensation increases contained in the PayBill would again be administratively withheld from M/C employees.[FN1]

> FN1. On or about April 8, 2010, Governor David Paterson announced that the state would withhold unionized state employees' collectively negotiated four percent general salary increases authorized by the PayBill. The state unionized employees sought, and on or about May 28, 2010, obtained, a preliminary injunction which enjoined the New York State defendants from enacting or implementing bills providing for, *inter alia,* unpaid furlough, a wage freeze, and a benefits freeze on certain groups of state unionized employees. *Donohue v. Paterson,* 715 F.Supp.2d 306 (N.D.N.Y.2010). In *Donohue,* the court found that the plaintiffs, whose organizations were party to collective bargaining agreements with the state, had established a likelihood of success on the issue of whether the provisions authorizing unpaid furlough and a wage and benefits freeze violated the Contracts Clause. *Id.*

The amended complaint alleges that the New York State budget for fiscal years 2009 and 2010 included funding for the payment of the compensation increases contained in the PayBill.

**\*3** Plaintiffs bring the first cause of action pursuant to 42 U.S.C. § 1983 and allege that defendants' "administrative withholding" of compensation increases from M/C employees in 2009 and 2010, while granting such increases for unionized state employees whose job duties are identical to plaintiffs' job duties, violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

Plaintiffs bring the second cause of action pursuant to § 1983 and allege that under the PayBill, plaintiffs' contractual guarantee of compensation increases are a protected property interest and the "administrative withholding" violates the Due Process Clauses of the Fourteenth Amendment and New York Constitution.

In the third cause of action, plaintiffs allege the State of New York and plaintiffs entered into a contract through the enactment of the PayBill and that the failure to provide for compensation increases in 2009 and 2010 constitute an impairment of contract in violation of Article I, § 10 of the Constitution-the Contracts Clause and Article I, § 6 of the New York Constitution.

In the fourth cause of action, plaintiffs allege that defendants' conduct violates the doctrine of separation of powers, in violation of the New York Constitution.

In the fifth cause of action, plaintiffs allege that defendants' conduct violates the "Equal Pay Provision" of § 115 of the New York State Civil Service Law.

## II. DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

**A. Standard**

Defendants move to dismiss the amended complaint pursuant to Rule 12(b)(6) for failure to state a cause of action. To survive a Rule 12(b)(6) motion, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'n, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

**B. Equal Protection**

Plaintiffs assert they were denied equal protection of the law in violation of the Fourteenth Amendment of the United States Constitution because defendants had no rational basis for withholding their compensation increases while providing such increases to unionized employees performing identical jobs. Defendants assert the distinction drawn between M/C employees, who, as a group, are not party to a collective bargaining agreement, and union employees, whose collective bargaining agreements contractually require the state to provide compensation increases, serves the legitimate governmental purpose of reducing state expenditures in response to the budget crisis and is rationally related to that purpose.

It is well-settled that "unless the legislature utilizes a classification that is inherently invidious because it disadvantages a suspect class, or because it infringes upon the exercise of a fundamental right" the Court will exercise "only a limited review power over the acts of legislators." *Hayden v. Paterson,* 594 F.3d 150, 169 (2d Cir.2010) (citing *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)). The parties agree that the challenged classification in this case is subject to the "rational basis" level of scrutiny. Indeed, the amended complaint does not allege the distinction drawn between union and non-union workers in this case disadvantages a suspect class or infringes an fundamental right. Thus, to satisfy the requirements of Equal Protection the challenged classification must "rationally further[ ] a legitimate state interest." *Weinstein v. Albright,* 261 F.3d 127, 140 (2d Cir.2001). "Where rational basis scrutiny applies, the Government has no obligation to produce evidence, or empirical data to sustain the rationality of a statutory classification, and instead can base its statutes on rational speculation". *Lewis v. Thompson,* 252 F.3d 567, 582 (2d Cir.2001) (internal quotation marks and citation omitted).

**1. Pay Increases to Twelve M/C Employees**

**\*4** The Court will first address plaintiffs' claim that the award of pay increases (ranging from five to forty-six percent) to twelve M/C employees, but none to plaintiffs, violates the Equal Protection Clause. As an initial matter, these pay increases were awarded on February 19, 2009, prior to the April 2, 2009, announcement that compensation increases were going to be administratively withheld. Further, the amended complaint does not allege that, unlike plaintiffs, these employees received the three and four percent general salary increases provided for in the PayBill. Nor does the amended complaint allege that plaintiffs had the same or comparable jobs as these employees. Thus, the allegations in the amended complaint concerning pay raises to twelve M/C employees who are not alleged to have jobs comparable to plaintiffs, prior to the announcement that the general salary increases would be administratively withheld, fail to state a plausible claim for relief under the Equal Protection Clause. Accordingly, the Court turns to plaintiffs' argument that the administrative withholding of compensation increases from M/C employees, but not unionized employees, violated the Equal Protection Clause.

**2. M/C Employees and Union Employees**

Citing *Shelofsky v. Helsby,* 32 N.Y.2d 54, 60, 343 N.Y.S.2d 98, 295 N.E.2d 774 (1973), defendants assert that the state of New York prohibits M/C employees from joining employee associations and treats them "differently than its rank and file employees because it needs a loyal and efficient cadre of supervisors and managers to perform its work separate and apart from its rank and file." Plaintiffs do not dispute the distinction drawn at this level nor do they contend their M/C designation is in error.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

**a. Legitimate Governmental Purpose**

The Supreme Court has stated that courts should "not overturn such a[law] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). In this case, defendants administratively withheld compensation increases from M/C employees in response to the state's fiscal crisis and budgetary deficits. "[T]here can be no question that generating budget savings, particularly during a budget crisis, is a legitimate governmental purpose." *New York City Managerial Emps. Ass'n v. Dinkins,* 807 F.Supp. 958, 966 (S.D.N.Y.1992) (citing *Pineman v. Fallon,* 842 F.2d 598, 602 (2d Cir.1988)). Thus, defendants' attempts to reduce state expenditures in response to the fiscal crisis is a legitimate governmental purpose. *See F.C.C. v. Beach Comm 'cs, Inc.* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

**b. Means Rationally Related to the Purpose**

To establish an equal protection violation, plaintiffs must demonstrate that defendants' distinction between M/C and union employees is " 'so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that [their] actions were irrational.' " *Gregory v. Ashcroft,* 501 U.S. 452, 471, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The Supreme Court has stated that courts should "not overturn such a[law] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance,* 440 U.S. at 97.

**\*5** Defendants assert that: (1) given the different statutory schemes applicable to union and M/C employees, "it is entirely rational to treat the classes of employees differently"; (2) the "State's fiscal crisis provided a rational basis for the Director of the Budget to withhold raises to M/C employees." Plaintiffs argue that because the PayBill was enacted to ensure parity in compensation between union and M/C employees, there can be no rational basis for drawing a distinction between them and providing, *inter alia,* compensation increases for unionized employees but withholding them from M/C employees.

The PayBill is constructed in two parts: Part A addresses the collective bargaining agreement between New York and the employees' association; and Part B addresses salaries and benefits for M/C employees excluded from collective negotiating units. New York entered a collective bargaining agreements for the years 2007 through 2011. These agreements and the PayBill provide for annual compensation increases. The PayBill does, as plaintiffs point out, provide the same compensation increases for M/C employees. However, Part B also provides that such salary increases may be withheld "when, in the opinion of the director of the budget, such withholding is necessary to ... reduce state expenditures to acceptable levels or when, in the opinion of the director of the budget, such increase is not warranted or is not appropriate." Part B, § 15.1.

Plaintiffs argue that because § 8.13 in Part A [FN2] of the PayBill includes "similar language applicable to unionized employees" that permits the withholding of general salary increases, defendants' reliance on § 15.1 in Part B for the authorization to withhold salary increases from M/C employees is "irrational and arbitrary" because "the New York State Legislature included such language for both unionized and M/C employees." Plaintiffs further assert that the group of M/C employees is smaller than the group of unionized employees thus demonstrating the arbitrariness of defendants' exercise of authority to withhold salary increases in order to aid in the remediation of the fiscal crisis.

> FN2. Part A, § 8.13 states: "Notwithstanding any of the foregoing provisions of this section, any increase in compensation may be withheld in whole or in part from any employee to whom the provisions of this section are applicable when, in the opinion of the director of the budget and the director of employee relations, such increase is not warranted or is not appropriate."

There are two key distinctions between Part A § 8.13 and Part B § 15.1. First, although Part A § 8.13 authorizes the withholding of compensation increases, it contains no authority for withholding such increases "to reduce state

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

expenditures". Second, unlike Part B § 15.1, which places the discretion solely in the province of the director of the budget, under Part A § 8.13, there can be no withholding unless both the director of the budget *and* the "director of employee relations" believe that a salary increase is unwarranted. Thus, reliance on Part B § 15.1 was neither irrational nor arbitrary.

Further, the decision to administratively withhold compensation increases from M/C employees bears a rational relationship to the state's legitimate interest in addressing the fiscal crisis and budgetary deficits. The state is not bound by a collective bargaining agreement with M/C employees; indeed, as stated, the PayBill provides the director of the budget with the discretion to withhold compensation increases from M/C employees to "reduce state expenditures to acceptable levels". Thus, in deciding to administratively withhold compensation increases from M/C employees, defendants employed a pre-existing legislative classification. Moreover, as a party to collective bargaining agreements entered into prior to the onset of the state's fiscal crisis, defendants could not unilaterally withhold compensation increases they were bound to provide under the terms of the agreements.

**\*6** As referenced above, plaintiffs argue that defendants "chose to exercise [withholding] authority against a smaller group of M/C employees rather than the larger group of unionized employees, resulting in substantially lower fiscal savings to the State." Plf's Mem. of Law, 9. However, "[a]s long as the classificatory scheme chosen ... rationally advances a reasonable and identifiable governmental objective, [the court] must disregard the existence of other methods of allocation ...." *Schweiker,* 450 U.S. at 235. Thus, defendants rationally concluded that state expenditures could be reduced by administratively withholding compensation increases from M/C employees over whose salaries the director of the budget, pursuant to the PayBill, possessed direct discretion.

Plaintiffs further argue that the almost identical nature of their job titles and duties to those of their union counterparts, demonstrate the irrationality of defendants' decision to withhold compensatory increases from M/C employees. Indeed, plaintiffs have attached to the amended complaint affidavits in which they demonstrate that their union counterparts share substantially similar job titles and responsibilities.[FN3] Even assuming, however, that the classifications between M/C and union employees are imperfect, this imperfection does not call into question the overall rationality of defendants' decision to administratively withhold compensation increases from M/C employees but not unionized employees. As the Supreme Court has explained, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Gregory,* 501 U.S. at 473 (internal quotation marks omitted); *see also New York City Managerial Emps. Ass'n,* 807 F.Supp. at 970 (S.D.N.Y.1992) (finding the plaintiffs' allegations that certain city employees were improperly designated as managerial and therefore prohibited from collective bargaining did not call into question "the overall rationality of defendants' classification scheme."). Since administrative withholding of compensation increases from M/C employees was rationally related to the legitimate governmental purpose of reducing state expenditures in the wake of a budgetary crisis, plaintiffs fail to state a plausible equal protection claim. Accordingly, defendants' motion to dismiss the equal protection claim is granted.

> FN3. To the extent plaintiffs rely on *Matter of Scime v. County Legislature of the County of Erie,* 90 Misc.2d 764, 395 N.Y.S.2d 952 (1977), it is distinguishable. Here, defendants administratively withheld compensation increases from all M/C employees, not just plaintiffs. In *Flaherty v. Giambra,* 446 F.Supp.2d 153 (W.D.N.Y.2006), the court analyzed and distinguished *Scime* as follows:

>> In *Scime*-as in this case-the Legislature, by resolution, had extended the benefits of the collective bargaining agreements to non-unionized employees, including managerial/confidential employees. In S*cime* the Legislature determined for the years 1976 and 1977 to institute a salary freeze whereby the managerial/confidential employees would not receive salary increments under the collective bargaining agreements. However, in *Scime,* the Legislature's institution of the salary freeze notwithstanding, the vast majority of managerial/confidential employees still received the scheduled salary increases. *Scime,* at 954. The plaintiffs were the only exceptions. Thus, the handful of plaintiffs were treated disparately from the remainder of managerial/confidential employees and from the unionized employees. The *Scime* court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

found no rational basis for the disparate treatment and therefore concluded that such treatment violated the plaintiffs' equal protection rights. In the instant case-in stark contrastall managerial/confidential employees whose compensation was set by the Legislature were subject to the salary freeze. The salary freeze was applied even-handedly among the entire classification.

*Id.* at 161. Plaintiffs in this case refer to twelve M/C employees who received five to forty-six percent pay raises. However, according to the amended complaint, those employees, who do not occupy the same positions as plaintiffs, received their raises on February 19, 2009, more than a month before the decision to administratively withhold the three percent general salary increases scheduled to go into effect in April 2009.

**C. Due Process**

Plaintiffs claim that defendants' administrative withholding of compensatory increases from M/C employees in 2009 and 2010 violates the Due Process Clause of the Fourteenth Amendment and the New York State Constitution. Defendants argue that plaintiffs fail to state a plausible due process claim because they have no property interest in the compensation increases at issue.

"In order to be protected by the Constitution against the deprivation of a government benefit without due process of law, a claimant must have a 'legitimate claim of entitlement to it.' " *Leventhal v. Knapek,* 266 F.3d 64, 77 (2d Cir.2001) (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "The expectation of entitlement is typically derived from 'existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.' " *Id.* (quoting *Roth,* 408 U.S. at 577) (citing *Bernheim v. Litt,* 79 F.3d 318, 322 (2d Cir.1996) ("To state a cause of action under the [D]ue [P]rocess [C]lause, a plaintiff must show that she has a property interest, created by state law, in the employment or the benefit that was removed.")).

**\*7** Because the decision regarding compensation increases for M/C employees is within the discretion of the director of the budget, plaintiffs cannot establish a property interest in them. "[W]here the complained-of conduct concerns matters that are within an official's discretion, entitlement to that benefit arises only when the discretion is so restricted as to virtually assure conferral of the benefit." *Bernheim,* 79 F.3d at 323; *see also Leventhal,* 266 F.3d at 77 (finding that the plaintiff could not "satisfy the threshold requirement that the salary increase was his 'property' because the salary increase could by law, be withheld from any employee who, in the opinion of the director of the budget, had substandard job performance or when the increase was otherwise unwarranted."). As stated above, Part B § 15.1 provides that any compensation increases may be withheld when, in the opinion of the director of the budget, such withholding is necessary to reduce state expenditures to acceptable levels. Since plaintiffs fail to allege a property interest in the compensation increases, they cannot state a plausible due process claim. Accordingly, defendants' motion to dismiss plaintiffs' due process claim is granted.

**D. Contracts Clause**

Plaintiffs claim that defendants' administrative withholding of compensation increases in 2009 and 2010 violated the Contracts Clause of the United States Constitution. Defendants seek dismissal of this claim. The Contracts Clause of the Federal Constitution provides that "[n]o state shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. 1, § 10, cl. 1. "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *General Motors Corp. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). The Supreme Court has held that when a state statute is alleged to create a contract, the surrender of legislative authority must be expressed in " 'terms too plain to be mistaken' " *United States v. Instar Corp.,* 518 U.S. 839, 875, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (quoting *Jefferson Branch Bank v. Shelly,* 1 Black 436, 446, 17 L.Ed. 173 (1862)). The state legislation at issue in this case, the PayBill, contains no reference to contractual rights and states that compensation increases may be withheld to reduce state expenditures when, in the opinion of the director of the budget, such withholding is warranted. In the absence of a contractual relationship, the amended complaint fails to state a plausible Contracts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4593739 (N.D.N.Y.)
**(Cite as: 2011 WL 4593739 (N.D.N.Y.))**

Clause claim. Accordingly defendants' motion to dismiss the Contracts Clause claim is granted.

**E. Pendent State Claims**

  Having dismissed plaintiffs' § 1983 claims, the Court declines to exercise supplemental jurisdiction over their remaining state law claims. 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *Powell v. Gardner,* 891 F.2d 1039, 1047 (2d Cir.1989) ("[I]n light of the proper dismissal of the § 1983 claim against [the defendants], the district court should have declined to exercise pendent jurisdiction over [the plaintiff's] state-law claims ...."). Accordingly, plaintiffs' state law claims are dismissed without prejudice.

**III. CONCLUSION**

  **\*8** For the foregoing reasons, it is hereby

  **ORDERED** that defendants' motion to dismiss is granted; and it is further

  **ORDERED** that plaintiffs' state law claims are dismissed; and it is further

  **ORDERED** that the amended complaint is dismissed without prejudice; and it is further

  **ORDERED** that the Clerk of the Court is directed to close this case.

  **IT IS SO ORDERED.**

N.D.N.Y.,2011.
Levine v. Paterson
Slip Copy, 2011 WL 4593739 (N.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Local 342



Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)
*Local 342 v. Town Board of the Town of Huntington*, 1993 WL 735042 (EDNY 9/15/93)

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
LOCAL 342, LONG ISLAND PUBLIC SERVICE EMPLOYEES, UMD, ILA, AFL–CIO; Local 342 Insurance
Trust by Harry Hennessey and SAL Fabrocino, Its Trustees; All Present and Former Employees of the Town of
Huntington Represented by Local 342, individually; and Harry Hennessey and SAL Fabrocino, individually,
Plaintiffs,
v.
TOWN BOARD OF THE TOWN OF HUNTINGTON; Stephen C. Ferraro As Town Supervisor and Individually;
Anne Hurley, As Councilman and Individually; Kenneth Christensen, As Councilman and Individually; Josephine
L. Gambino, As President of the New York State Department of Civil Service; and the New York State Department
of Civil Service, Defendants.

No. 93 CV 2869 (TCP).
Sept. 15, 1993.

*MEMORANDUM AND ORDER*

PLATT, Chief Judge.
**\*1** Plaintiffs move for a preliminary injunction compelling the Town of Huntington to discontinue its arrangement with the New York State Health Insurance Program (the "Empire Plan") and resume purchasing health insurance for its employees and retirees from the Local 342 Insurance Trust. This Court heard oral argument on the motion on June 29, 1993 and reserved decision on the issue of whether the union's claims pursuant to the Contract Clause and Due Process Clause are sufficient to vest this Court with federal jurisdiction.

*BACKGROUND*

Prior to February 1, 1990, the Town of Huntington provided group health and hospitalization coverage to its employees and retirees through the Empire Plan. In late 1989, the Town and Local 342 established an insurance trust, the terms of which are governed by the parties' collective bargaining agreement. The Town makes monthly payments to the insurance trust and the trust in turn pays covered claims. The Town and Local 342 exercise joint oversight of the plan by establishing a Health Insurance Advisory Committee comprised of three members from each party to the collective bargaining agreement. The trust is administered by a Board of Trustees appointed by the executive board of Local 342. Plaintiffs Harry Hennessey and Sal Fabrocino are now and have always been the sole trustees.

The terms of the collective bargaining agreement expressly require the health insurance program to be administered by Provident Life and Casualty Insurance Company. Notwithstanding that provision, the union and the insurance trust terminated their relationship with Provident in late 1991 and advised the Town that the plan would henceforth be self-insured and self-administered. There is no indication that the Town ever objected to what it now terms a "material breach" of the collective bargaining agreement. Indeed, notwithstanding the existence of a "sunset clause" pursuant to which the parties had no obligation to continue with the insurance trust after the expiration of the collective bargaining agreement on December 31, 1991, the Town continuing paying public monies into the trust.

Concerned about employee complaints of reduced benefits, increased deductibles, and late or non-existent claim payments, the Town initiated negotiations with the union, during which the Town repeatedly requested financial and administrative information regarding the trust. The union ignored the Town's demands and the volume of employee complaints about the trust increased. Finally, on May 7, 1993, the Town Board resolved to cease contributing to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)
**(Cite as: 1993 WL 735042 (E.D.N.Y.))**

union trust for health and medical benefits and to resume providing such benefits through the Empire Plan, beginning on July 1, 1993. No such action by the Town was taken with respect to the welfare benefit plan which is handled by the same insurance trust. Following the May 7 resolution, the Town formally notified the trustees and the employees of the change in insurance carriers and began processing enrollment forms for the affected employees and retirees. To date, the Town has processed and forwarded all of the necessary enrollment forms and these employees and retirees have been receiving coverage under the Empire Plan since July 1, 1993.

*DISCUSSION*

**\*2** Plaintiffs move for a preliminary injunction against the Town, declaring the May 7 resolution to switch from the self-insured program to the Empire Plan null and void, restraining the Town Board from taking any action in furtherance of this resolution, and directing the Town to continue to make contributions to the union trust. Plaintiffs contend that the implementation by the Town Board of its May 7 resolution is violative of the Contract Clause of the Constitution in that it impairs the Town's obligation under 1989–91 collective bargaining agreement to Local 342, to the Local 342 trust as an intended third-party beneficiary, and to the individual trust beneficiaries. Plaintiffs further contend that the defendants' actions deprived plaintiffs of their right to substantive due process under the Fourteenth Amendment.

This Court agreed to examine whether plaintiffs' claims were sufficient to give rise to federal question jurisdiction. Having given close consideration to this matter, this Court finds that the complaint fails to state a claim arising under the provisions of the United States Constitution and that, as such, this Court does not have subject matter jurisdiction to hear the matter.

I. *Contract Clause*

Article I, Section 10, Clause 1 of the Constitution provides in pertinent part that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." In scrutinizing a claim under the Contract Clause, a court must first determine whether the law in question has in fact substantially impaired a contractual obligation. *General Motors Corp. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 1109 (1992); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978). This inquiry has three elements: (1) whether there is a contractual relationship; (2) whether a change in the law impairs that contractual relationship; and (3) whether the impairment is substantial. *General Motors,* 112 S.Ct. at 1109.

Although this inquiry would not appear to exert much of a limiting effect on claims brought pursuant to the Contract Clause, the Supreme Court has counseled repeatedly that the prohibition is not absolute and must yield to the state's inherent power to protect the vital interests of its people. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–12 (1983); *United States Trust Co. v. New Jersey,* 431 U.S. 1 25 (1977); *City of El Paso v. Simmons,* 379 U.S. 497, 508 (1965) Thus, where substantial impairment is found to exist, the court must then proceed to the more difficult step of examining the nature and purpose of the offending legislation. *Association of Surrogates & Supreme Court Reporters v. New York,* 940 F.2d 766, 771 (2d Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 936 (1992). Where the legislation is self-serving and impairs the municipality's own contracts, the impairment may be constitutional if it is reasonable and necessary to serve an important public service. *Id.; see also United States Trust Co.,* 431 U.S. at 25. Absolute deference to the legislative body's assessment of what actions meet this standard is not justified; the court must scrutinize the proffered reasons and reach its own conclusion. *Court Reporters,* 940 F.2d at 771, 772–74.

**\*3** While in most Contract Clause inquiries only the degree of impairment is problematic, in the present case, all three factors raise issues of sufficiency. In the first instance, the Town currently has no contractual obligation to obtain health insurance through the union trust. The Town is not a signatory to the trust agreement and has no contractual relationship with the trust. Moreover, under the express provisions of the collective bargaining agreement between the Town and Local 342, the Town never agreed to pay money into the union trust to operate a self-administered plan run exclusively by union officials; it agreed only to an insurance plan to be administered by Provident Life.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)
**(Cite as: 1993 WL 735042 (E.D.N.Y.))**

Second, no "law" within the meaning of the Contract Clause has been enacted that would impair the union's contractual relationship with the Town. While it is true that the action of the Contract Clause is not limited to statutes enacted by a legislature and can reach to municipal legislation passed under supposed legislative authority from the state, *see Northern Pacific Railway Co. v. Minnesota ex rel. City of Duluth,* 208 U.S. 583, 590 (1908); *Ritzie v. City Univ. of N.Y.,* 703 F.Supp. 271, 277 (S.D.N.Y.1989), the action of the Huntington Town Board simply does not pass constitutional muster.

Here, the offending action by the Town was a resolution, and not an ordinance or statute. A resolution is a formal expression of the opinion or will of an official body and as such does not properly constitute the law. Black's Law Dict. at 1178 (5th ed.). Plaintiffs claim in their papers that the Town of Huntington's resolution had the force of law but cite no municipal or state authority that would support this assertion. Indeed, simply because an official document authorizes someone to do something does not endow it with the force of law. Court orders routinely operate in this fashion and they do not rise to the level of law for the purposes of the Contract Clause. *Barrows v. Jackson,* 346 U.S. 249, 260 (1953). There is no evidence that failure to follow the directive outlined in the resolution would result in some sort of sanction or penalty. Absent enforceability, the resolution does not amount to the kind of governmental interference with contractual relations that the Framers envisioned.

Finally, and most importantly, the Town's enactment of the May 7 resolution to discontinue contributions to the self-insured trust does not amount to a substantial impairment of the union's constitutional rights. At most, it is a simple breach of contract compensable by monetary damages.

Plaintiffs insist that the Town Board's resolution effectively prevented the union and the trust from performing their duties to the trust beneficiaries. But it would appear that plaintiffs have "confused impairment of performance of a contract with impairment of the obligation of the contract. The constitution does not provide a federal action for simple breach of contract." *Jackson Sawmill Co. v. United States,* 580 F.2d 302, 312 (8th Cir.1978), *cert. denied,* 439 U.S. 1070 (1979).

**\*4** *Chasan v. Village Dist. of Eastman,* 572 F.Supp. 578 (D.N.H.1983), *aff'd,* 748 F.2d 43 (1st Cir.1984), is instructive on this point. There, the Village District of Eastman impaired a contract between the Eastman Community Association and members of its condominium community, setting forth the agreed-upon method and rate of payment for acquisition of a water company, by increasing water rates and establishing taxes. Citing to *Hayes v. Port of Seattle,* 251 U.S. 233, 237 (1920), the District Court noted the crucial distinction between a breach of contract and an impairment of the obligation of that contract:

The distinction depends on the availability of a remedy in damages in response to the state's (or its subdivision's) action. If the action of the state does not preclude a damage remedy the contract has been breached and the non-breaching party can be made whole. If this happens there has been no law impairing the obligation of the contract.

*Chasan,* 572 F.Supp. at 581; *see also E & E Hauling, Inc. v. Forest Preserve Dist. of DuPage Co.,* 613 F.2d 675, 679 (7th Cir.1980). The District Court rejected the plaintiff's Contract Clause claim, finding that "[i]t remains unseen how [the statute] precludes plaintiff's recovery." *Chasen,* 572 F.Supp. at 581–82.

Here, too, this Court fails to see how the resolution bars a damage remedy. Like the Village District of Eastham in *Chasan,* the Town of Huntington's use of a resolution directing the cessation of contributions to the union trust and the resumption of coverage under the Empire Plan did not make anything unlawful. The Town did not pass a law and through enforcement prevent the union or the trust from fulfilling their contractual obligations. *Id.* at 581. The resolution was merely an expression of the will of the Town Board and in no way prohibits the union from seeking to recover damages for breach of contract.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)
**(Cite as: 1993 WL 735042 (E.D.N.Y.))**

Plaintiff's reliance on *Association of Surrogates and Supreme Court Reporters v. New York,* 940 F.2d 766 (2d Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 936 (1992), does not alter this result. In *Court Reporters,* the New York legislature enacted a statute mandating lag payrolls in violation of a collective bargaining agreement which required biweekly paychecks. If any employee sought to recover damages due to the delayed receipt of pay, the statute would have provided a valid defense to the claim. This predicament was precisely that described by the Seventh Circuit Court of Appeals in *E & E Hauling* and by the District Court in *Chasan:* The legislation would have served as a complete bar to a suit for damages.

In stark contrast, the May 7 Resolution is merely an authorization for Town to discontinue paying public monies into a self-insured trust it never agreed to fund. This would not serve as an automatic defense to an action for damages. Indeed, this Court has learned that the union has commenced an arbitration proceeding alleging breach of the collective bargaining agreement by the Town and there is no indication that the Town has raised this defense.

**\*5** Finally, even assuming *arguendo* that substantial impairment exists in this case, the Town's resolution may nevertheless be upheld because it was reasonable and necessary to serve an important public purpose. *See United States Trust Co.,* 431 U.S. at 22–23; *see also Energy Reserves Group,* 459 U.S. at 411–12; *Court Reporters,* 940 F.2d at 771. The resolution itself gives at least five reasons for the proposed change: (1) concern for the viability, security costs, and quality of the benefits provided by the union trust; (2) excessive administrative cost, waste and unnecessary problems associated with providing insurance to the Town's employees through different carriers; (3) the repeated refusal of the insurance trust to disclose pertinent information regarding the trust's costs, financial condition, operations, expenditures, benefits, and the allocation of expenses and disbursements between the union and the trust; (4) concern over complaints by employees regarding the trust; and (5) unexplained irregularities with the administration and operation of the trust. The resolution concluded that, because these factors effectively precluded the Town from rendering effective oversight of the public monies transferred to the union trust, the Town was under an obligation to discontinue its payments to the union trust and to resume Empire Plan coverage.

Preserving and safeguarding the public assets, as well as protecting the interests of a municipality's taxpayers, constitute legitimate public goals for the purposes of Contract Clause analysis. *See, e.g., City of El Paso,* 379 U.S. at 508 ("the 'economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts' ") (quoting *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 437 (1934); *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark,* 310 U.S. 32, 39–40 (1940) (statute restricting withdrawals from building and loan associations and abolishing members' right to recover withdrawal value of shares justified because of threat of insolvency); *Maryland State Teachers Ass'n v. Hughes,* 594 F.Supp. 1353, 1370 (D.Md.1984) (Pension Reform Act was justified by rational legislative purpose of financially stabilizing retirement systems). In the instant case, the Town had genuine concerns about the union trust's viability in light of the union's refusal to provide full financial disclosure, the growing number of complaints regarding the trust's failure to pay claims, and its reduction in benefits. Thus, unlike the governmental entities criticized in *Court Reporters* and *United States Trust Co.,* the Town Board's motive in passing the resolution was not simply to control expenditures.

Moreover, the decision to switch from the self-insured union trust to the Empire Plan was reasonably related to the public purpose justifying the resolution's adoption. *See Energy Reserves Group,* 459 U.S. at 412. The Town Board's decision to cease contributing to the union insurance trust was not a hasty one, but rather, came after months of negotiations with the union, during which time the Town attempted to reach an amicable resolution of the situation. The Town could not have foreseen the numerous problems with the trust when it entered the collective bargaining agreement with Local 342 in 1989. For this Court now to nullify the effect of the May 7 resolution would be to deny the Town the right to exercise an essential element of its sovereign powers—that of preservation and oversight of public monies. This Court's authority does not extend that far.

II. *Substantive Due Process*

**\*6** Plaintiffs also claim that defendants violated the parties' collective bargaining agreement, the New York State Taylor Law, unspecified "existing practices and understandings", thereby depriving plaintiffs of a property

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)
**(Cite as: 1993 WL 735042 (E.D.N.Y.))**

right without due process of law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. Specifically, plaintiffs contend that the Taylor Law proscribes the unilateral alteration of the terms of a collective bargaining agreement and that the Town's unauthorized and unilateral modification of the terms of the collective bargaining agreement in passing the May 7 resolution deprived plaintiffs of a legitimate entitlement without due process of law.

In order to establish a deprivation of property without due process of law, a plaintiff must "first identify a property right, second show that the state has deprived him of *that* right, and third show that the deprivation was effected without due process." *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir.1990) (emphasis in original); *see also Fusco v. Connecticut,* 815 F.2d 201, 205 (2d Cir.), *cert. denied,* 484 U.S. 849 (1987).

The range of interests protected by § 1983 is limited. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577. Although entitlement to protected benefits may be conferred by statute or contract, a contract dispute, in and of itself, is not sufficient to give rise to a "legitimate claim of entitlement" and thus a constitutionally protected property interest under *Roth. See S & D Maint. Co. v. Goldin,* 844 F.2d 962, 966 (2d Cir.1988); *Costello v. Town of Fairfield,* 811 F.2d 782, 784 (2d Cir.1987).

At its core, the instant case is a contract dispute over what entity, the union or the Empire Plan, is entitled to provide medical insurance benefits to the Town's employees. Resolution of this dispute will necessarily hinge in large part on the interpretation of the terms of the collective bargaining agreement and whether the terms of that agreement prohibited the Town Board from authorizing the cessation of payments to the self-insured trust.

Moreover, even if we were to consider continued payments by the Town into the union trust an entitlement for the purposes of substantive due process analysis, we find no due process deprivation because adequate post-deprivation remedies are available to plaintiffs. *See Hudson v. Palmer,* 468 U.S. 517, 531 (1984); *Costello,* 811 F.2d at 784. Indeed, plaintiffs have availed themselves of two such remedies by bringing an improper practice charge before the Public Employee Relations Board and by commencing an arbitration proceeding pursuant to the collective bargaining agreement. *See, e.g., Costello,* 811 F.2d at 784–85 (dismissing § 1983 action based on claim of deprivation of increased retirement benefits because grievance procedure outlined in collective bargaining agreement constituted adequate post-deprivation remedy).

**\*7** Plaintiffs argue that these remedies are not sufficient and that they were entitled to pre-deprivation notice and hearing. But plaintiffs were given the opportunity to be heard at a meaningful point in time when plaintiff Harry Hennessey, president of Local 342 and trustee of the union trust, was notified that the Town Board was considering a resolution authorizing a return to the Empire Plan. Plaintiff Hennessey submitted correspondence and supporting documentation to the Town Board and then appeared and argued plaintiffs' case before it. This opportunity to be heard came after months of negotiations, brought about on the initiative of the Town, during which time the Town sought to avoid the necessity to switch insurance plans. Notwithstanding these efforts on the part of the Town, the union repeatedly refused to provide financial and administrative information regarding the trust and employee complaints regarding unpaid claims mounted.

Moreover, even after the Town Board passed the resolution on May 7, 1993, plaintiffs had two months before the actual change in insurance carrier during which time they could have initiated arbitration or a state court proceeding. Instead, plaintiffs waited until the end of June 1993, literally days before the scheduled July 1, 1993 switch-over, to bring this action. Given plaintiffs' laissez-faire attitude in the face of the many pre- and post-deprivation remedies available to them, this Court may not now say that they were denied constitutionally meaningful notice and opportunity to be heard. Plaintiffs have failed to state a claim for the deprivation of substantive due process pursuant to the Fourteenth Amendment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)
**(Cite as: 1993 WL 735042 (E.D.N.Y.))**

*CONCLUSION*

Based on the foregoing discussion, this Court finds that plaintiffs' complaint fails to provide any basis for federal subject matter jurisdiction over this action. Accordingly, plaintiffs' motion for a preliminary injunction must be and hereby is denied and this action is dismissed.

E.D.N.Y.,1993.
Local 342, Long Island Public Service Employees, UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington
Not Reported in F.Supp., 1993 WL 735042 (E.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Toussaint



Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
*Toussaint v. J.1. Weiser & Co., et al*, 2005 WL 356834 (SDNY 2/13/05)

United States District Court,
S.D. New York.
Roger TOUSSAINT, as President of Transport Workers Union, Local 100, ED Watt, as Secretary Treasurer of
Transport Workers Union, Local 100, James Mahoney, as the Director of the Transport Workers Union Retirees
Association, and Joseph Allman, Bernard Beaver, Frank Ingram, Laverne Stuckey, Maurice Schierman, and Mat-
thew Tarnowski on Their Own Behalf and on Behalf of All Other Similarly Situated Persons, Plaintiffs,
v.
JJ WEISER & COMPANY, Sanford J. Cohen, Harvey T. Gluck, Michael J. Fitzpatrick, and John Meehan,
Defendants.

No. 04 Civ. 2592(MBM).
Feb. 13, 2005.

Thomas M. Kennedy, Daniel R. Bright, Kennedy, Schwartz & Cure, P.C., New York, NY, for Plaintiffs.

Brian L. Greben, Traub, Eglin, Lieberman & Straus LLP, Hawthorne, NY, for Defendants JJ Weiser & Company
and Sanford J. Cohen.

Brian T. Carr, Babchik & Young LLP, White Plains, NY, for Defendant Harvey T. Gluck.

Suzanne Tongring, New York, NY, for Defendants Michael J. Fitzpatrick and John Meehan.

OPINION AND ORDER

MUKASEY, J.

**\*1** Plaintiffs in this case are participants in a health benefits plan (the "Plan") open to members of the Transport
Workers Union Retirees Association ("Retirees Association"), which is composed of retired employees of the New
York Metropolitan Transit Authority ("MTA") who were members of Transport Workers Union, Local 100 ("Local
100"). Defendants are JJ Weiser ("Weiser")-an insurance brokerage firm that helped issue the Plan to the Retirees
Association, former and current officers of Weiser, and two former directors of the Retirees Association.[FN1] Plain-
tiffs claim that defendants "grossly overcharged the Plaintiffs for insurance benefits provided" through the Plan.
Based on this allegation, as explained more fully below, plaintiffs bring claims for breaches of fiduciary duty under
the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1104(a)(1), 1105(a)(2), and 1106(a)(1)(A),
(C) & (D), breach of fiduciary duty under New York State Insurance Law Section 2120(a) & (c), deceptive business
practices, unjust enrichment, breach of contract, fraud, unconscionability, and negligent misrepresentation. Defen-
dants move to dismiss on various grounds. For the reasons set forth below, plaintiffs' claims sounding in fraud, all
claims by plaintiffs Toussaint and Watt, and all of plaintiffs' state law claims are dismissed. Defendants' motions are
otherwise denied.

> FN1. Interboro Mutual Insurance Company ("Interboro"), the insurance company that issued the Plan, was
> originally named a defendant in this action. Plaintiffs dropped their claims against Interboro upon learning
> that it was undergoing a reorganization. (Pls.' Mem. of Law in Opp. to Defs. Fitzpatrick and Meehan's Mot.
> to Dismiss ("Pls. Opp'n to Former Directors") at n. 5)

I.

The following facts, which are accepted as true for purposes of this motion, are alleged in plaintiffs' complaint,
responses to defendants' motions to dismiss, and attached exhibits.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

Plaintiffs Roger Toussaint and Ed Watt are officers of Local 100. (Compl.¶ 1) Plaintiff James Mahoney is the Director of the Retirees Association. (*Id.*) The Retirees Association operates the Plan, which includes a Limited Medical Expenses and Accidental Death and Dismemberment Policy (the "Policy"). (*Id.*) Plaintiffs Allman, Beaver, Ingram, Stuckey, Schierman, and Tarnowski (collectively the "Individual Plaintiffs") are members of the Retirees Association and participants in the Plan. (*Id.*)

Plaintiffs claim that Weiser, former Weiser President Sanford J. Cohen, and current Weiser Vice President Harvey T. Gluck (collectively, the "Broker Defendants") are fiduciaries with respect to the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over administration of the Plan and disposition of Plan assets. (Compl.¶ 32). According to plaintiffs, these defendants controlled the Plan with regard to the Policy's premiums, enrollment, claim determinations, solicitation of membership, and distribution of dividends. (*Id.*) Plaintiffs also allege that Weiser offers a "claim service." (*Id* . ¶ 29)

Defendants Meehan and Fitzpatrick (the "Former Directors") are former Directors of the Retirees Association, Meehan from 2000 to 2002 and Fitzpatrick from 1990 to 2000. (*Id.* ¶ 31) Plaintiffs claim that the Former Directors were fiduciaries with respect to the Plan within the meaning of 29 U.S.C. § 1002(21)(A) during the period in which they were Directors of the Retirees Association because they exercised discretionary authority or control over administration of the Plan and disposition of Plan assets. (*Id.*) Their functions included signing checks to participants for benefits under the Plan, paying premiums to Weiser and Interboro from the Plan, and determining which bills the Plan would pay. (*Id.*) They also determined whether the Plan would continue to employ Weiser and Interboro to provide benefits to Plan participants. (*Id.*)

**\*2** On January 1, 1978, the Transport Workers Union obtained the Policy from Interboro and Weiser. The Policy guarantees certain benefits to members of the Retirees Association who hold certificates under the Policy. (*Id.* ¶ 19) All 8,000 members of the Retirees Association are certificate holders in the Policy. (*Id.* ¶ 20)

Policy members pay dues of $75 per year for family membership and $45 per year for a single membership. (*Id.* ¶ 21) Of that amount, Weiser receives $65 per year for each participating family and $35 per year for each single participant as premiums for benefits through Interboro. (*Id.*) The premiums paid by Retirees Association members to Weiser and Interboro total approximately $350,000 per year. (*Id.*)

The Policy provides the following lines of coverage. Part I provides reimbursement for out-of-pocket costs of up to $25 for blood replacement, oxygen, and rental of crutches, wheelchairs, and hospital equipment for home use. (*Id.* ¶ 22) Part II provides accidental death and dismemberment coverage for up to $2,000. (*Id.*) Part III offers Hospital Income Benefits of $75 per week for stays in acute care hospitals and $37.50 per week for up to four weeks of convalescent care. (*Id.*) Further, approximately 85 members of the Retirees Association pay an additional $240 per year for higher levels of coverage. (*Id.*)

In 2001, there were 250 claims under the Policy for which Interboro paid a total of $41,842 in claims. (*Id.* ¶ 25) In 2002, there were 163 claims under the Policy for which Interboro paid a total of $16,047 in claims. (*Id.* ¶ 26) The Broker Defendants did not provide plaintiffs with information regarding mailing or administrative expenses they had incurred during 2001 and 2002. (*Id.* ¶¶ 25-26) In 2003, there were 150 claims made on the policy for which Interboro paid a total of $14,257 in claims. (*Id.* ¶ 27) Defendants claimed mailing expenses of $7,950 for 2003. (*Id.*) The total claims and expenses incurred by Interboro for those three years was $80,096. (*Id.* ¶ 28) During that same period, plaintiffs paid premiums of approximately $1,050,000. (*Id.*) Weiser and Interboro did not disclose this data on amounts of claims and expenses for 2001, 2002, and 2003, until January 8, 2004. Plaintiffs claim that the benefits offered under the Policy were not proportional to the premiums charged. They claim also that since 1991, defendants have "realized millions of dollars in unconscionable profits by retaining over 80% of the premiums paid under the policy, by failing to pay dividends to the policy holders and by misrepresenting and failing to advise the Plaintiffs of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

their actual expenses under this policy." (*Id.*) No reason is given for why this trend commenced in 1991 and not any-time between then and 1978, when the Policy was purchased. Nor do plaintiffs provide claims and expense figures for the pre-2001 period.

An undated Letter of Engagement sent to Mahoney in 2003 reflects an agreement among Weiser, Interboro, and the Retirees Association that the Transport Workers Union is charged annual premiums to pay for hospital income and a limited medical expense policy. (*Id.* ¶ 29) It states further that Weiser agrees to provide billing and mailing services. (*Id.*)

**\*3** On October 8, 1991, Weiser and Interboro contributed $1,000-allegedly a portion of the premiums paid to Weiser-to a reelection campaign for then President of Local 100, Sonny Hall. (*Id.* ¶ 33) Weiser gave the money to Meehan, who served as a campaign assistant to Hall while he was Director of the Retirees Association. (*Id.* ¶¶ 33-34) Plaintiffs allege that Weiser made more such payments and other gifts from 1991 through 2002, during which agents and representatives of Hall controlled the Retirees Association. (*Id.* ¶ 33) At no time during this period were members of the Retirees Association informed of these alleged "kickbacks." (*Id.*) Plaintiffs claim that Meehan took gifts and benefits from Weiser and Interboro "both to divert to internal union political campaigns and to utilize for himself and to reward himself for continuing the payment of premiums to Weiser and Interboro." (*Id.* ¶ 34)

Plaintiffs allege that Fitzpatrick, who succeeded Meehan as Director of the Retirees Association and served also as a campaign assistant to Hall, took gifts and benefits from Weiser and Interboro as well. (*Id.* ¶ 35) Plaintiffs add that in October 2002, Fitzpatrick became aware that he would be replaced as Director of the Retirees Association and in turn reported a "break-in" at the offices of the Retirees Association. (*Id.* ¶ 36) Plaintiffs believe that this "break-in" was staged to allow defendants to "cleanse the Retirees Association files of evidence relating to kick-backs and gifts" provided to Hall and his political allies. (*Id.*)

Plaintiffs allege that because of defendants' misconduct, (i) Local 100 has had to subsidize the operation of the Retirees Association from its general revenues in order to replace the dues diverted from the Retirees Association by the excessive premiums charged by Weiser and Interboro (*Id.* ¶ 38); (ii) the Retirees Association has had to pay the bulk of its revenue from members' dues to Weiser and Interboro, and as a result, has been unable to spend its revenue on better insurance and other programs for its members (*Id.* ¶ 39); and (iii) the Individual Plaintiffs have paid grossly excessive premiums for the Policy and have been deprived of additional benefits and dividends they should have received as Policy holders. (*Id.* ¶ 40).

Plaintiffs commenced the instant action on April 5, 2004. Their complaint contains a series of federal ERISA and state law claims, stemming largely from purported breaches of fiduciary duty by defendants.

II.

This court has subject matter jurisdiction pursuant to ERISA and can exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Dismissal of a claim is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Facts alleged in the complaint must be taken as true and all reasonable inferences therefrom must be drawn in the nonmoving party's favor. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994).

**\*4** Defendants offer various grounds for dismissing plaintiffs' complaint. Those pertaining to plaintiffs' breach of fiduciary duty claims under ERISA are an apt starting point.

III.

Plaintiffs frame defendants' alleged breach of fiduciary duty in four claims, three pursuant to ERISA and the fourth under New York state law. Among the ERISA claims, the first two allege ERISA breaches of fiduciary duty

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

by all defendants and the third appears to apply only to the Former Directors.

*A. Subject Matter Jurisdiction*

First, defendants argue for dismissal on the ground that the Plan is exempt from ERISA and that plaintiffs lack standing to sue under ERISA.[FN2] Insofar as Meehan and Fitzpatrick challenge ERISA coverage and certain plaintiffs' standing to sue, their motion arises under Fed.R.Civ.P. 12(b)(1), because the questions of standing and ERISA coverage implicate the court's subject matter jurisdiction. *See Arnold v. Lucks,* 392 F.3d 512, 518 (2d Cir.2004); *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999); *Bona v. Barasch,* No. 01-2289, 2003 WL 1395932, at *8 (S.D.N.Y. Mar. 20, 2003). Because dismissal of a complaint for lack of subject matter jurisdiction renders other defenses moot, I must determine whether ERISA governs the Plan and whether plaintiffs have standing to bring their claims.

> FN2. It does not appear that the Broker Defendants incorporated these two grounds argued only by the Former Directors in their briefs. However, because challenges to subject matter jurisdiction cannot be waived, the Former Directors' challenges to this court's subject matter jurisdiction are applied to the Insurance Broker defendants as well. *See Knic Knac Agencies v. Sunkyong Am., Inc.,* No. 04-735, 1997 WL 177888, at *3 (S.D.N.Y. Apr. 14, 1997) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982)).

The Former Directors contend that because plaintiffs are former employees of the MTA, the Plan is a "governmental plan" exempt from ERISA's regulatory reach. 29 U.S.C. § 1003(b). A "governmental plan" is "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). Although the Second Circuit has held that the MTA is a "political subdivision" within the meaning of 29 U.S.C. § 1002(32), *see Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 915 (2d Cir.1987), nothing in the complaint or defendants' motion suggests that the MTA "established" or "maintains" the Plan. The Complaint alleges that the Transport Workers Union, not the MTA, obtained the Plan and Policy from Weiser and Interboro. (Compl.¶ 19) Nor has there been any allegation that the Plan resulted from the collective bargaining agreement between Local 100 and the MTA. According to the Complaint, the Retirees Association and Local 100 sponsor and maintain the Plan. (*Id.* ¶ 1) The MTA is not mentioned in this regard. Hence, from the face of the statute and the facts alleged in the Complaint, the Plan is not a "governmental" plan exempt from ERISA.

The Former Directors argue also that the Individual Plaintiffs do not have standing to bring ERISA claims because they are not "participants" in an ERISA plan. Under ERISA, the term "participant" means

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

**\*5** 29 U.S.C. § 1002(7). An "employee welfare benefit plan" is
> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or maintained for the purpose of providing for its participants or their beneficiaries, ... (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment,....

> 29 U.S.C. § 1002(1). Reading these two definitions together with what constitutes an "employee organization": [A]ny labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

29 U.S.C. § 1002(4), the plain language of the statute defeats the Former Directors' argument. Local 100, an "employee organization," established the Plan, while the Retirees Association, another "employee organization," maintains it. For purposes of the Plan,[FN3] Individual Plaintiffs fall into two of the four categories of "participants" defined by Section 1002(7). They are former members of an "employee organization" (Local 100) and current members of another "employee organization" (the Retirees' Association), both organizations composed of those who are or may become eligible "to receive a benefit of any type from an employee benefit plan which covers ... members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C § 1002(7).

> FN3. Individual Plaintiffs are also "former employees of an employer"-*i.e.,* the MTA. However, according the Complaint, the "employee benefit plan" at issue was neither established nor maintained by the MTA.

Finally, the Former Directors contend that Toussaint and Watt, who are suing in their capacities as officers of Local 100, are not proper plaintiffs under ERISA Section 1132(a), the civil enforcement provision of ERISA. Section 1132(a) sets out what kinds of actions may be brought by the Secretary of Labor, "participants," "beneficiaries," "fiduciaries," and various combinations of the four. Persons not designated in Section 1132(a) have no standing to sue under ERISA. *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27 (1983) (ERISA "does not provide anyone other than participants, beneficiaries, or fiduciaries of an ERISA-covered plan with an express cause of action....").

Neither Toussaint nor Watt is alleged to fit any of the above categories; in fact, plaintiffs offer no response to defendants' contention. First, Toussaint and Watt sue as officers of Local 100, and not as participants in the Plan. Nothing in the Complaint suggests that they are participants in the Plan. Second, plaintiffs do not allege any facts indicating that Toussaint and Watt are "fiduciaries" within the meaning of the statute:

**\*6** [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of the plan.

29 U.S.C. § 1002(21)(A). Third, there has been no claim that Toussaint and Watt have been designated by any participant as "beneficiaries" of the Plan, as defined in 29 U.S.C. § 1002(8) ("a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder").

Plaintiffs seem to suggest that because Toussaint and Watt are suing in their official capacities as officers of Local 100, the union itself should be treated as a plaintiff. (Pls.' Opp'n to Former Directors at n. 4) However, Local 100 is not a participant as defined by ERISA, because it is not an employee, former employee, member, or former member of an employee organization with eligibility to receive benefits. It is conceivable that, under certain circumstances, a union could be a beneficiary or fiduciary because ERISA further clarifies that the term "person" as used therein encompasses an employee organization, 29 U.S.C. § 1002(9), which specifically includes "any labor union" within its definition. 29 U.S.C. § 1002(4). However, there has been no claim that Local 100 is designated by any participant as a beneficiary nor any suggestion that it qualifies as an ERISA fiduciary. Therefore, Local 100 itself does not have standing to sue under ERISA. *See, e .g., District 65, UAW v. Harper & Row Publishers Inc.,* 576 F.Supp. 1468, 1476 (S.D.N.Y.1983) ("[U]nion has no standing under the clear language of ERISA ... to assert claims [because union] is not a participant, beneficiary or fiduciary."); *McCabe v. Trombley,* 867 F.Supp. 120, 125 (N.D.N.Y.1994) ( "Standing for employee organizations is not mentioned in the statute, and this court cannot substitute its will for that of Congress."); *N.J. State AFL-CIO v. State of New Jersey,* 747 F.2d 891, 893 (3d Cir.1984) ("It

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

is clear from the statute that labor unions are neither participants nor beneficiaries"). Plaintiffs make no effort to fit Toussaint, Watt, or the "employee organization" that they represent into any of the categories listed under Section 1132. Hence, Toussaint and Watt do not have standing to bring the ERISA claims.

*B. "Fiduciary" under ERISA*

The Broker Defendants contend that they are not "fiduciaries" within the meaning of 29 U.S.C. § 1002(21)(A). If they are not ERISA fiduciaries, plaintiffs' ERISA claims must be dismissed.

"ERISA makes the existence of discretion a sine qua non of fiduciary duty." *Pohl v. Nat'l Benefits Consultants, Inc.,* 956 F.2d 126, 129 (7th Cir.1992). Department of Labor regulations provide that "persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures" and thus perform "purely ministerial functions" are not fiduciaries. 29 C.F .R. § 2509.75-8. "Ministerial functions" include the application of rules determining eligibility for participation or benefits, the maintenance of service and employment records, the calculation of benefits, and the processing of claims. *Id.; see also Geller v. County Life Auto Sales, Inc.,* 86 F.3d 18, 21 (2d Cir.1996).

**\*7** "Whether or not an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman,* 812 F.2d 810, 812 (2d Cir.1987). A party "need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary ." *Id.* Instead, fiduciary status exists "with respect to any activity enumerated in the statute over which the [party] exercises discretion or control." *Id.; see also Amato v. Western Union Int'l, Inc.,* 773 F.2d 1402, 1416-17 (2d Cir.1985).

Reciting 29 U.S.C. § 1002(21)(A), plaintiffs allege that the Broker Defendants "(i) exercised discretionary authority respecting management of the Plan and exercised authority and control respecting the management and disposition of Plan assets and (ii) exercised discretionary authority and responsibility in the administration of the Plan." (Compl.¶ 32) In addition, these defendants "controlled the Plan regarding the Policy's premiums, enrollment, claim determinations, solicitation of membership and dividends." (*Id.*) Plaintiffs allege also that an "undated Letter of Engagement between Weiser, Interboro, and the Retirees Association" sent to Mahoney in 2003 "reflect[s] an agreement" among the three parties that "Weiser agrees to provide the billing and mailing services as well as a billing service, claim service and related software support." (*Id.* ¶ 29) Through the "claim service," according to plaintiffs, the Broker Defendants possess discretion over interpretation of the Plan and determination of who receives benefits under the Plan. (Pls.' Mem. of Law in Opp. to Mot. to Dismiss by Weiser, Cohen, and Gluck ("Pls.' Opp'n to Broker Defs .") at 4)

Broker Defendants respond that their tasks as described in the Complaint amount to nothing more than the abovementioned "ministerial functions." They argue that plaintiffs' mere recitation of the statute is conclusory and provides nothing in the way of fact allegations.

At this stage, the content of the "claim service" and "billing service" provided by the Broker Defendants to plaintiffs is unclear. Courts have held or suggested in some circumstances that insurance brokers and other plan administrators are ERISA fiduciaries. *See, e.g., Patelco Credit Union v. Sahni,* 262 F.3d 897, 909 (9th Cir.2001) (insurance broker was fiduciary when he determined the amounts paid to plan members, which were deposited into an account under his sole control; transferred some of these funds to a different account from which he wrote checks to pay claims; and was entitled to keep, as his administrative fee, a portion of the insurance company's payments); *Blue Cross & Blue Shield of Ala. v. Sanders,* 138 F.3d 1347, 1353 (11th Cir.1998) (third-party administrators are fiduciaries if they "have the authority to make ultimate decisions regarding benefits eligibility"); *Reich v. Lancaster,* 55 F.3d 1034, 1046 (5th Cir.1995) (a party is a fiduciary to a fund where he "in effect, exercised discretionary authority and control over assets of the Fund" because the trustees accepted every recommendation he made); *Olson v. E.F. Hutton & Co.,* 957 F.2d 622, 626-67 (8th Cir.1992) (insurance broker had discretionary authority over pension plan because broker and plan trustees had "an understanding that [the broker's] investment advice would serve as the primary basis for investment decisions"); *Brink v. DaLesio,* 496 F.Supp. 1350, 1374-75 (D.Md.1980), *rev'd in part*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

*on other grounds,* 667 F.2d 420 (4th Cir.1981) (insurance broker was fiduciary when plan trustees relied heavily on his advice for which insurance to purchase and other matters regarding the plan's investments); *but see, e.g., Fink v. Union Cent. Life Ins. Co.,* 94 F.3d 489, 493 (8th Cir.1996) (insurance broker was not fiduciary to plan holder merely because he recommended insurance plan and helped one member apply for death benefits); *Kerns v. Benefit Trust Life Ins. Co.,* 992 F.2d 214, 217-218 (8th Cir.1993) (insurance broker did not become plan fiduciary merely because it handled claims under the plan).

**\*8** At a conference held by this court on January 7, 2004, plaintiffs attempted to clarify their argument by asserting that the Broker Defendants "did the claims adjudications." (Tr. of Conference, dated January 7, 2004 ("Conference Tr.") at 4) To what extent these adjudications invoked discretion over management of the Plan or disposition of the Plan's assets-and hence whether the Broker Defendants are ERISA fiduciaries-cannot be determined dispositively at this time. *See Liss v. Smith,* 991 F.Supp. 278, 304 (S.D.N.Y.1998) ("the issue of ERISA fiduciary status is a mixed question of fact and law"; factual component of inquiry relates to "whether a person exercised authority or control in managing plan assets" (quoting *Reich v. Lancaster,* 55 F.3d 1034, 1044 (5th Cir.1995)). Regardless, construing the allegations in the Complaint and inferences therefrom in the light most favorable to plaintiffs, the Broker Defendants are deemed at this stage to be fiduciaries under ERISA.

*C. Pleading Requirements*

Defendants move to dismiss the ERISA claims on the alternative ground that plaintiffs have not pleaded with sufficient particularity what they deem are allegations of fraud. They contend that the ERISA claims must satisfy the pleading requirement for fraud under Fed.R.Civ.P. 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity." This requirement is designed "(1) to provide a defendant with fair notice of the plaintiff's claim, (2) to protect a defendant from harm to his or her reputation or goodwill, and (3) to reduce the number of strike suits." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (quoting *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988)).

Under Rule 9(b), allegations of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). "In instances where the alleged fraud is premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 293 (S.D.N.Y.2000). Where, as here, there are multiple defendants, the complaint must specify the nature of each defendant's participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Nat'l Prop. Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989).

Rule 9(b) "extends to all averments of fraud or mistake, whatever may be the theory of legal duty-statutory, common law, tort, contractual or fiduciary." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00-8688, 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002) (quoting *Frota v. Prudential-Bache Sec., Inc.,* 639 F.Supp. 1186, 1193 (S.D.N.Y.1986)). By the same logic, the rule "does not extend to allegations of breach of duty, whether or not characterized as fiduciary, by conduct not amounting to fraud or mistake." *Id.* (quoting *Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 236 (D.Mass.1979)).

**\*9** Plaintiffs do not dispute that their ERISA claims should be subject to Rule 9(b) pleading requirements. Regardless, upon a liberal reading of the Complaint, defendants may be found to have breached their fiduciary duty to plaintiffs under ERISA by conduct not amounting to fraud, but by failing to fulfill duties of care, disclosure, and loyalty. In particular, plaintiffs allege in their First Cause of Action that defendants breached their fiduciary obligations to act in the best interests of the Plan and its participants and beneficiaries, in violation of ERISA Section 1104, and not that they attempted to induce action or inaction on the part of investors by fraudulent means. *See McCoy v. Goldberg,* 810 F.Supp. 539, 548 (S.D.N.Y.1993) ("[t]he principle ... that a fiduciary may be held liable without proof of deceitful intent ... has long remained the uniform law of New York"). This claim encapsulates in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

the language of ERISA Section 1104 plaintiffs' allegations that defendants breached their fiduciary duty by charging grossly excessive premiums and failing to disclose to plaintiffs the amounts of benefits paid out and expenses incurred by defendants in administering the Policy. Because plaintiff's first claim of breach of fiduciary duty under ERISA does not sound in fraud but instead implicates defendants' duties of care, loyalty, and disclosure, Rule 9(b)'s particularity requirements do not apply.

In what they term their Second Cause of Action for breach of fiduciary duty, plaintiffs allege that defendants knowingly concealed acts and omissions committed by each other, in violation of ERISA Section 1105. Plaintiffs bring their third ERISA claim only against the Former Directors for "failing to safeguard assets of the Plan, entering into long-term imprudent insurance contracts with Weiser and Interboro, accepting gifts and benefits from Weiser and Interboro and by using plan assets to further the political careers of certain Local 100 union officers," in violation of ERISA Section 1106. (Compl.¶ 44).

To the extent that plaintiffs rely on a theory of fraud or fraudulent concealment in these claims, their allegations are spare and non-specific. These deficiencies exist partly because of plaintiffs' withdrawal of Interboro as a defendant and their subsequent unwillingness to amend the complaint to account for that development, despite this court's invitation to do so. In what appeared to be an effort to supplement and clarify their Complaint, plaintiffs offered the following allegations at the January 7, 2004 conference "for concluding that there was fraud here": (i) the gross disparity between benefits and premiums; (ii) "the omission fairly to advise individuals running the plan" of this disparity; (iii) the October 2002 "break-in"; and (iv) the $1,000 payment by the Broker Defendants to Sonny Hall's election fund. (Conference Tr. at 3-5)

Plaintiffs' allegations of fraud do not satisfy Rule 9(b). In particular, they fail to plead "events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Conn. Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) (internal quotation marks and citation omitted); *see also Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 276 (2d Cir.1992) (noting that fiduciary breach alone does not equate with fraud and that to prove the latter, plaintiff must show: (i) a material false representation or the omission of a material fact; (ii) made with knowledge of its falsity and an intent to defraud; and (3) leading to reasonable reliance on the part of the plaintiff and actual damages as a result of such reliance).

**\*10** First, the disparity between benefits and premiums does not signal an intent to defraud. Nor do the alleged omissions. Neither allegation gives rise to inferences that any of the defendants knew that the premium-to-expense ratio was excessive and even if they had such knowledge, that their silence was due to an intent to defraud plaintiffs. Plaintiffs fail also to specify the nature of each defendant's participation in the alleged fraud, especially with regard to the Weiser Officers and Former Directors. *DiVittorio,* 822 F.2d at 1247 (2d Cir.1987).

To the extent plaintiffs accuse defendants of having made affirmative fraudulent misrepresentations of claims and expense figures-such as false invoices-such allegations are made without specificity. (Compl.¶ 28) The Complaint sets forth neither the content of such misrepresentations nor when and where they were made. Particular individuals are not identified as making the fraudulent representations or concealing others' breaches of fiduciary duty. *Oechsner v. Connell Ltd. P'ship,* 283 F.Supp.2d 926, 933 (S.D.N.Y.2003) ("Generically pleading unspecified false statements" made by unspecified individuals at unspecified times does satisfy "requirements necessary for allegations of fraudulent concealment pursuant to Rule 9(b).") (citing *Losguadro v. FGH Realty Credit Corp.,* 959 F.Supp. 152, 157 (E.D.N.Y.1997)).

Without specific facts to support the allegation that particular defendants "knowingly and intentionally" made the alleged omissions or misrepresentations, the mere incantation of these words is insufficient to establish that any of the defendants acted fraudulently. It is one thing to accuse defendants of having breached their fiduciary duties; it is another to accuse them of having done so with the intent to defraud. *See Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986) (affirming the dismissal of fraud claims that were "entirely conclusory and unsupported by assertions of facts"); *Inst. of Applied Human Dynamics v. Mut. of Am.,* No. 02-2331, 2003 WL 22126691, at \*3 (S.D.N.Y. Sept.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

12, 2003).

Plaintiffs' allegation of kickbacks paid by the Broker Defendants to Local 100 officers and the Former Directors are made "on information and belief." Allegations of fraud can be based "on information and belief" with regard to "matters peculiarly within the opposing party's knowledge." *First Capital Asset Mgmt. v. Satinwood, Inc.,* 385 F.3d 159, 179 (2d Cir.2004). However, to satisfy Rule 9(b) in such instances, the allegations must be accompanied by a statement of facts upon which the belief is founded. *See id.; DiVittorio,* 822 F.2d at 1247. Plaintiffs do not provide facts explaining why they believe the Broker Defendants contributed $1,000 to Hall's re-election campaign or why they believe these payments continued from 1991 through 2002, let alone how the payments were fraudulent or otherwise improper.

Likewise, plaintiffs' allegation "on information and belief" of the October 2002 staged "break-in" at the offices of the Retirees' Association suffers from the same deficiencies. A conclusory statement that the "break-in" was engineered to "cleanse" evidence of kickbacks is insufficient. *See Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974); *Int'l Telecom, Inc. v. Generadora Electrica del Oriente S.A.,* No. 00-8695, 2002 WL 465291, at *7 (S.D.N.Y. Mar. 27, 2002) (plaintiff "bases the misrepresentation on information and belief, yet provides no sources for its conclusory allegations"); *accord Conn. Nat'l Bank,* 808 F.2d at 962 ("[t]he absence of a requirement that scienter be alleged with 'great specificity' ... does not mean ... that plaintiffs are relieved of their burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter"). To base a general allegation of fraud on allegations that themselves rest "on information and belief" without any factual support or source does not satisfy Rule 9(b).

**\*11** Hence, plaintiffs' ERISA claims fail to the extent that they are based on allegations of fraud and fraudulent concealment. At the January 7, 2004 conference, plaintiffs declined the invitation to amend their complaint to meet Rule 9(b) requirements, and hence will not be given a second opportunity. However, they may proceed with their ERISA claims under a theory that defendants breached fiduciary duties of loyalty, care, and disclosure.

*D. Statute of Limitations*

Finally, the Former Directors move to dismiss plaintiffs' ERISA claims as time-barred. Dismissal for failure to state a claim based on a statute of limitations is appropriate only if a complaint shows clearly that a claim is not timely. *See Harris v. City of New York,* 186 F.3d 243, 251 (2d Cir.1999). ERISA Section 1113 sets forth the limitations period applicable to claims alleging breach of fiduciary duty under ERISA:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of:

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Plaintiffs cannot take advantage of the six-year statute of limitations for acts of fraud or concealment because to the extent its claims are premised on allegations of fraud (or fraudulent concealment), *see Caputo v. Pfizer, Inc.,* 267 F.3d 181, 190 (2d Cir.2001) ("concealment" in 29 U.S.C. § 1113 "incorporates 'fraudulent concealment' doctrine"), the Complaint does not satisfy the standard of particularity in pleading fraud under Fed.R.Civ.P. 9(b), *see supra.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

The Former Directors contend that because the Individual Plaintiffs "knew or should have known shortly after they got the policy whether they were getting any benefit out of it" (Former Directors' Reply Mem. of Law in Supp. of Mot. to Dismiss ("Former Directors' Reply") at 5) more than three years before the Complaint was filed, the ER-ISA claims should be time-barred.

To trigger the three-year statute of limitations, a plaintiff must have "actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Bona,* 2003 WL 1395932, at *14 (citing *Reich v. Lancaster,* 55 F.3d 1034, 1057 (5th Cir.1995)). "It is not enough that a plaintiff suspects something is awry; rather, the plaintiff must have specific knowledge of the actual breach on which he sues." *Id.* (citing *Martin v. Consultants & Adm'rs., Inc.,* 966 F.2d 1078, 1086 (7th Cir.1992)). In other words, the Former Directors must show that plaintiffs "knew not only of the relevant events that occurred, but also that those events supported a claim for breach of fiduciary duty or violation under ERISA." *McConnell v. Costigan,* No. 00-4598, 2002 WL 313528, at *7 (S.D.N.Y. Feb. 28, 2002) (citing *Int'l Union v. Murata Erie N. Am.,* 980 F.2d 889, 890 (3d Cir.1992) and *Caputo,* 267 F.3d at 193).

**\*12** Plaintiffs allege that defendants failed to disclose claims and expense experiences under the Policy for the years 2001, 2002, 2003. Not until January 8, 2004 did plaintiffs discover the claims and expenses incurred by Weiser and Interboro during the 2001-03 period. They appear to extrapolate from the figures for the 2001-03 period that Interboro and Weiser "realized millions of dollars in unconscionable profits" by "misrepresenting and failing to advise the Plaintiffs of their actual expenses under this Policy." (Compl.¶ 28) However, plaintiffs do not allege explicitly that defendants failed to advise them of claims and expense disparities pre-2001 as defendants failed to do during the 2001-03 period.

Regardless, plaintiffs cannot, based on the pleadings alone, be charged with actual knowledge of the alleged breaches of fiduciary duty. Although plaintiffs allege that defendants began overcharging premiums and concealing actual claims and expense figures as early as 1991, these allegations do not support the inference that plaintiffs had actual knowledge that the premiums were in fact excessive. *Martin,* 966 F.2d at 1086 n. 6 (explaining that Section 1113 was amended to delete a constructive knowledge provision and replace it with a more stringent actual knowledge requirement). Because Mahoney served as Director of the Retirees Association for less than three years before plaintiffs filed their complaint, he cannot be charged with disqualifying knowledge of the alleged breaches of fiduciary duty. Indeed, other than noting that Individual Plaintiffs joined the Plan at different times during a 26-year period, the Former Directors do not offer any theory as to how any of the plaintiffs knew about the potential claims arising from their joining the Plan or whether plaintiffs received claims and expense reports at any time during the period in question. The Former Directors do not address whether any of the plaintiffs had "actual knowledge" of their potential ERISA claim arising from the alleged kickbacks taken by the Former Directors. At this stage, it is impossible to discern with any certainty whether any of the plaintiffs had "actual knowledge" of a kickback scheme more than three years before they filed the Complaint.

IV.

Plaintiffs' Fourth through Thirteenth Causes of Action, all under New York state law, are asserted only against the Broker Defendants and not against the Former Directors. (Pls.' Opp'n to Former Directors at n. 9)

The Broker Defendants argue that plaintiffs' state law claims are preempted by ERISA. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The phrase " '[r]elates to' must be construed in its 'normal sense'-that is, a state law claim is preempted 'if it has a connection with or reference to such a plan." ' *Gilbert v.. Burlington Indus.,* 765 F.2d 320, 326-27 (2d Cir.1985) (quoting *Shaw v. Delta Air Lines,* 463 U.S. 85, 97 (1983)); *see also NYSA-ILA Med. & Clinical Serv. Fund by Bowers v. Axelrod,* 27 F.3d 823, 826 (2d Cir.1994) ("even where a state law has no express link to an employee benefit plan, it can be preempted 'insofar as the law applies to benefit plans in particular cases" ').

**\*13** Further, "the preemption clause is not limited to 'state laws specifically designed to affect employee benefit

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

plans." ' *Pilot Life Ins. Co. v. Dedaux,* 481 U.S. 41, 47-48 (1987) (quoting *Shaw,* 463 U.S. at 98). State common law claims involving claims for benefits or affecting the management and administration of an ERISA-governed plan are preempted as well. *See id.*

Over all, "a state common law action which merely amounts to an alternative theory of recovery for conduct actionable under ERISA is preempted." *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 288 (2d Cir.1992). In *Aetna Life Ins. Co. v. Borges,* the Second Circuit held that

> laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application-often traditional exercises of state power or regulatory authority-whose effect on ERISA plans is incidental.

869 F.2d 142, 146 (2d Cir.1989). Accordingly, "[w]hat triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Id.* at 146-147.

ERISA's civil enforcement mechanism, Section 1132(a), is intended to be the exclusive method of enforcing its substantive provisions. *See Pilot Life,* 481 U.S. at 52. Indeed, "[t]he six [now nine] carefully integrated civil enforcement provisions found in [29 U.S.C. § 1132(a) ] ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146 (1985). As the Supreme Court stated in *Pilot Life:*

> The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive.

481 U.S. at 54. The Court concluded further that "the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.' ' *Id.* at 45-46 (quoting *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523 (1981)).

Plaintiffs "submit that the developing law in [preemption] limits federal preemption to instances in which the invoked state law, be it common or statutory, requires construction of the terms of the plan and affects the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits." (Pls.' Opp'n to Broker Defs. at 14) According to plaintiffs, their state law claims are not preempted by ERISA because none of the claims aim to recover "benefits due under the plan or damages for failing to pay promised benefits." (*Id.*)

**\*14** In support, plaintiffs argue that the Second Circuit in *Gerosa v. Savasta & Co.,* 329 F.3d 317 (2d Cir.2003), "renewed the presumption that Congress does not intend to displace state law, especially in traditional areas of state control." (Pls.' Opp'n to Broker Defs. at 15) The *Gerosa* Court observed that where enforcement of "state remedies are consistent with ERISA's core purposes ... the ERISA text is open to the possibility that alternate state remedies might be available." 329 F.3d at 325.

Plaintiffs' suggestion that their state law claims "are entirely independent" is starkly wrong. First, all of their state law claims, based largely on the same factual allegations of excessive premiums and failure to disclose, address the Plan and the terms of the Plan. The Plan terms control the amount of benefits paid and the amount of premiums charged. Where "interpretation of the terms of [plaintiffs'] benefit plans forms an essential part of their" claims and defendants' "potential liability ... derives entirely from the particular rights and obligations established by the benefit plans," plaintiffs' state law claims "are not entirely independent of the federally regulated contract itself." *Aetna Health Inc. v. Davila,* 124 S.Ct. 2488, 2498 (2004).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

Moreover, that the Broker Defendants are ERISA fiduciaries places plaintiffs' state law claims within ERISA's preemptive reach. As a suit brought by plan participants to recover for breaches of fiduciary duty by parties deemed fiduciaries to the Plan under ERISA, it falls within the scope of 29 U.S.C. § 1132(a)(2), which provides an exclusive claim for the resolution of such disputes:

> A civil action may be brought ... by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.

29 U.S.C. § 1132(a)(2). Section 1109 provides:
Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a). *See also Pedre Co. v. Robins,* 901 F.Supp. 660, 666 (S.D.N.Y.1995) ("If [defendants] are fiduciaries, plaintiffs must plead their injuries under ERISA. If they are not fiduciaries, plaintiffs have no ERISA claim, but may proceed at common law."); *Local 875 I.B.T. Pension Fund v. Pollack,* 992 F.Supp. 545, 571 (E.D.N.Y.1998).

"[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted." *Aetna,* 124 S.Ct. at 2495. Indeed, one of ERISA's "core purposes," *Gerosa,* 329 F.3d at 325, is the prosecution of claims arising from the management of ERISA-governed plans through "a comprehensive civil enforcement scheme." *Pilot Life,* 418 U.S. at 54. The state law claims here run afoul of that "core purpose" because plaintiffs seek on those claims

**\*15** judgment against the Defendants, jointly and severally, in favor of Transport Workers Union, Local 100, the Retirees Association, and the individual Plaintiffs and the class they represent of participants in the Limited Medical Expenses and Accidental Death and Dismemberment Policy, in an amount of money equal to the damages they suffered as a result of the conduct by Defendants from 1991 to the present.

(Compl. at 20, ¶ 4) In other words, these state law claims are preempted because through them, plaintiffs attempt to add (or convert) equitable remedies provided under ERISA to legal ones for money damages to the Individual Plaintiffs. *See Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 379 (2002); *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 484 (1990). The Supreme Court has held these types of claims to be incompatible with ERISA's enforcement scheme; they provide a form of ultimate relief in a judicial forum that adds to the judicial remedies provided by ERISA. *See Pilot Life,* 481 U.S. at 56. "Any such provision patently violates ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential,* 536 U.S. at 379.

Accordingly, plaintiffs' claim breach of fiduciary duty under New York State Insurance Law is preempted by ERISA. That "[c]ourts routinely find that garden-variety state-law malpractice or negligence claims against non-fiduciary plan advisors ... are not preempted" is irrelevant here because the Broker Defendants are ERISA fiduciaries. (Pls.' Opp'n to Broker Defs. at 17) Moreover, plaintiffs allege the same wrongdoing in their state fiduciary breach claim as they do in their ERISA claims. ERISA provides a remedy for the conduct upon which plaintiffs base their state law breach of fiduciary duty claim. *See Ingersoll-Rand Co. v. McClendon,* 498 U.S. at 145 (ERISA preempts claims that "purport[ ] to provide a remedy for the violation of a right expressly granted by [ERISA]."). In

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**

such cases, breach of fiduciary duty with regard to an ERISA-covered employee benefits plan is necessarily an ER-ISA claim. *See Pedre Co.,* 901 F.Supp. at 665; *Mason Tenders Dist. Council v. Messera,* 958 F.Supp. 869, 1880 (S.D.N.Y.1997). Plaintiffs' claim of breach of fiduciary duty under New York state law therefore is dismissed.[FN4]

> FN4. Plaintiffs do not raise whether New York Insurance Law Section 2120 is a law that regulates insurance, and hence falls under the ERISA preemption savings clause, 29 U.S.C. § 1144(b)(2)(A), which provides that "nothing in this subchapter shall be construed to exempt or relieve any person from any of any State which regulates insurance, banking, or securities." Regardless, the Supreme Court has held that even if the state law claim falls within the savings clause, it is preempted if it conflicts with the civil enforcement provisions of ERISA. *See Pilot Life,* 481 U.S. at 52 (even if state law bad faith claim fell under ERISA savings clause, it was preempted because ERISA's civil enforcement provisions are the "exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits"). Accordingly, any state law claim that adds to the remedies available under ERISA conflicts with the express provisions of ERISA and is preempted regardless of the savings clause. *See id* . at 56-57; *see also Aetna Health, Inc. v. Davila,* 124 S.Ct. 2488, 2500 (2004) (ERISA savings clause "must be interpreted in light of the congressional intent to create an exclusive federal remedy in ERISA § [1132(a) ]" and that "even a state law that can arguably be characterized as 'regulating insurance' will be preempted if it provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme"); *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 377 (2002) ("savings clause had to stop short of subverting congressional intent clearly expressed through the structure and legislative history, that the federal remedy displace state causes of action" and hence, state causes of action that provide a "form of ultimate relief in a judicial forum that added to the judicial remedies provided by ERISA" are preempted under *Pilot Life* regardless of the savings clause). As explained above, plaintiffs' claim under New York State Insurance Law constitutes "a separate vehicle" for obtaining relief beyond what is authorized under ERISA's civil enforcement provisions. Hence, that claim is preempted regardless of whether it falls under the ERISA savings clause.

Plaintiffs' claim of deceptive business practices is another attempt to enforce what is exclusively within ERISA's civil enforcement provisions. ERISA preempts causes of action aimed " 'to recover benefits due to [the plaintiff under the terms of the] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ' *Lupo v. Human Affairs, Int'l, Inc.,* 28 F.3d 269, 272 (2d Cir.1994) (citing 29 U.S.C. § 1132(a)(1)(B)). Hence, the deceptive business practices claim is preempted. *See Kolaskinski v. CIGNA Healthplan of Connecticut, Inc.,* 163 F.3d 148, 149 (2d Cir.1998) (state law unfair trade practices and breach of contract claims brought to enforce rights under ERISA plan are preempted by ERISA); *Reichelt v. Emhart Corp.,* 921 F.2d 425, 431-32 (2d Cir.1990).

**\*16** Likewise, plaintiffs plead in their unjust enrichment claim the same supporting facts and allege the same losses as in their ERISA claims. Courts have held uniformly that there is no need to supplement ERISA with a common law claim of unjust enrichment because ERISA already provides adequate relief for an injury such as the losses claimed by plaintiffs here. *See, e.g., Amato v. W. Union Int'l,* 773 F.2d 1402, 1419 (2d Cir.1985), *abrogated on other grounds, Mead Corp. v. Tilley,* 490 U.S. 714 (1989); *Am. Medical Ass'n v. United Healthcare Corp.,* No. 00-2800, 2001 WL 863561, at \*14 (S.D.N.Y. July 31, 2001).

Plaintiffs' breach of contract and breach of implied contract claims are also preempted. In support of these claims, plaintiffs allege that Broker Defendants were bound under the Plan "to fully disclose all relevant information concerning the insurance benefits they supplied to the Plaintiffs" and "to provide insurance benefits reasonably related to the amount of premiums being paid by the Plaintiffs." (Compl.¶ 55) Where the obligations alleged to have been unmet or violated are contained in the ERISA-regulated benefits plan, state law claims based on such violations are preempted by ERISA. *See Aetna,* 124 S.Ct. at 2498 (citing *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 217 (1985) and *Steelworkers v. Rawson,* 495 U.S. 362, 371 (1990)); *Tappe v. Alliance Capital Mgmt.,* 177 F.Supp.2d 176, 187-88 (S.D.N.Y.2001).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883
**(Cite as: 2005 WL 356834 (S.D.N.Y.))**


Plaintiffs' fraud claims fail to satisfy the particularity requirements of Fed.R.Civ.P. 9(b), *see* supra. In addition, the claims are preempted by ERISA because they are based on the same facts alleged in support of plaintiffs' ERISA claims. Their gravamen is that the Broker Defendants misrepresented, concealed, and failed to inform plaintiffs of material facts, which resulted in plaintiffs' continued payment of premiums to defendants. (Compl.¶¶ 38-40, 59-62) *See Allen v. Westpoint-Pepperell, Inc.,* 11 F.Supp.2d 277, 282 (S.D.N.Y.1997). Not only do these fraud claims have "as a 'critical factor in establishing liability' the existence of a plan and duties similar to those imposed by ERISA," *Geller,* 86 F.3d at 22-23 (quoting *Diduck,* 974 F.2d at 288), but they also allege wrongdoing in the operation and management of an ERISA plan. *Id.* at 23. Therefore, plaintiffs' claims of actual and constructive fraud are dismissed. Plaintiffs' claim of negligent misrepresentation, again based on the same facts and alleging the same injuries, is preempted as well.

Plaintiffs' unconscionability claim is no different. Again, plaintiffs attempt to enforce purported rights under the Plan by citing the Broker Defendants' obligations under the Plan as ERISA fiduciaries to disclose information regarding benefits and expenses. Whether the terms of the insurance contract are unconscionable necessarily involves interpretation of the contract itself, *see Franks v. Prudential Health Care Plan, Inc.,* 164 F.Supp.2d 865, 873 (W.D.Tex.2001), and any state law requiring such an exercise falls within the ERISA preemption provision.

**\*17** Sections 1132(a)(2) and 1109(a) provide specifically for "personal liability" against ERISA fiduciaries for breach of their duties. 29 U.S.C. § 1109(a) ("Any person who is a fiduciary ... shall be personally liable to make good to such plan any losses resulting from [his breach]...."). Hence, plaintiffs' claims for personal liability against Cohen and Gluck, which appear to have been brought under state common law, are preempted by ERISA.

For the reasons set forth above, defendants' motions to dismiss are granted as to all claims by plaintiffs Toussaint and Watt, all claims sounding in fraud, and all state law claims. Defendants' motions are otherwise denied.

SO ORDERED:

S.D.N.Y.,2005.
Toussaint v. JJ Weiser & Co.
Not Reported in F.Supp.2d, 2005 WL 356834 (S.D.N.Y.), 34 Employee Benefits Cas. 1883

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.